UNITED STATES of America,
Plaintiff–Appellee,

v.

Vytautas GECAS, Defendant–Appellant.

No. 93–3291.

United States Court of Appeals,
Eleventh Circuit.

Aug. 26, 1997.

---

Ivars Berzins, Babylon, NY, for Defendant–Appellant.

E. Bryan Wilson, Asst. U.S. Atty., U.S. Dept. of Justice, Tallahassee, FL, Robert G. Seasonwein, Joseph C. Wyderko, U.S. Dept. of Justice, Office of Special Investigations, Washington, DC, for Plaintiff–Appellee.

Before HATCHETT, Chief Judge, TJOFLAT, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES and BARKETT, Circuit Judges, and KRAVITCH *, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

Appellant, Vytautas Gecas, is a Lithuanian national who has lived in the United States as a resident alien for thirty-four years. The United States subpoenaed oral and written testimony from Gecas concerning allegations that he participated in the persecution of persons because of their race, religion, or political opinion during World War II. Such conduct would render Gecas deportable. *See* 8 U.S.C. § 1251(a)(4)(D) (1994). Gecas refused to testify and instead invoked the Fifth Amendment's privilege against self-incrimination. *See* U.S. Const. amend. V, cl. 2.

The United States petitioned the district court for an order to enforce its subpoena, and the district court granted the Government's petition. *See United States v. Gecas,* 830 F.Supp. 1403, 1423 (N.D.Fla.1993). Gecas appealed, claiming that his silence is protected by the constitutional privilege against self-incrimination. A divided three-judge panel reversed the district court's order, *see United States v. Gecas,* 50 F.3d 1549, 1567 (11th Cir.1995), and held that Gecas was entitled to the equitable relief provided by the privilege because he had a real and substantial fear of conviction under foreign law.[1] We granted rehearing en banc,[2] and now affirm the district court's order compelling Gecas to testify.

We examine the underlying facts in part I. We determine in part II that the conduct with which Gecas is charged could form the basis of a criminal conviction under foreign law. We also find that Gecas faces a real and substantial risk of actually being convicted under foreign law based on the alleged

conduct. Therefore, in part III we turn to the issue of whether a real and substantial fear of foreign conviction is a valid basis for the invocation of the privilege against self-incrimination.

We start with the language of the Fifth Amendment's Self–Incrimination Clause and find it ambiguous. We then turn to precedent, and discover that the Clause, as currently interpreted, does not apply to Gecas. Because Gecas argues that the original intent of the Self–Incrimination Clause authorizes his invocation of the privilege, we discuss in part IV the history of the privilege against self-incrimination. We conclude in part V that the privilege against self-incrimination was not intended to apply here.

## I.

According to Gecas' immigration file, he was born on September 25, 1922, in Naumiestis, a town in the Taurage district of Lithuania. On August 2, 1962, Gecas applied at the American Consulate in Liverpool, England, for a visa to enter the United States. Gecas stated in his application that from 1938 to 1944 he lived in Naumiestis as a "pupil," and that from 1944 to 1947, he lived in Lubeck, Germany, in a camp for "displaced persons"—a refugee camp. The application also stated that he moved to England in 1947, where he obtained employment first as a farm worker and then as a miner.

Gecas obtained a four-month visa from the Consulate on August 2, 1962. On October 23, 1962, at the age of thirty-nine, Gecas arrived in New York City on the *Queen Elizabeth* and was admitted to the United States. Upon entry, Gecas apparently went to Chicago, Illinois, to live with his cousin, a naturalized American citizen. In 1964, Gecas moved to a separate residence in Chicago, where he lived until October 1989. Gecas

---

* Senior Judge Phyllis A. Kravitch who was a member of the en banc court which heard oral argument in this case, took senior status on January 1, 1997, and has elected to participate in this decision pursuant to 28 U.S.C. § 46(c)(1994).

1. The district court and the panel referred to the alleged harm as a foreign *prosecution* on the basis of compelled, testimonial self-incrimination. For reasons we discuss in Part III.B.1,

*infra,* we instead refer to the alleged harm as a foreign *conviction* based on compelled, testimonial self-incrimination.

2. *See United States v. Gecas,* 81 F.3d 1032, 1032 (11th Cir.1996). Granting rehearing en banc vacated the panel opinion by operation of law. 11th Cir. R. 35–11.

then moved to Sunny Hills, Florida, where he has since resided.

On July 25, 1991, the Office of Special Investigations (the "OSI")[3] of the United States Department of Justice issued to Gecas an administrative subpoena.[4] *See generally* 8 U.S.C. § 1225(a) (1994) (authorizing the Attorney General to subpoena the testimony of witnesses and the production of documents "relating to the privilege of any person to ... reside in ... the United States"). The subpoena directed Gecas to testify "relating to [his] residence and activities in Europe (including but not limited to the years 1940–1945)" and to produce documents and photographs "which concern [his] date and place of birth, [his] whereabouts and activities in Europe (including but not limited to 1940–1945), [and his] immigration to and residence in the United States." The OSI claimed to have evidence that Gecas served in the 12th Lithuanian *Schutzmannschaft* Battalion between 1940 and 1945. According to the OSI, this armed police unit participated in the persecution of persons because of their race, religion, national origin, or political opinion under the direction of the Nazi forces then occupying Lithuania. If Gecas engaged in this prohibited conduct, he would become deportable under 8 U.S.C. § 1251(a)(4)(D).

A United States Marshal served the OSI's subpoena on Gecas on July 30, 1991. On September 12, 1991, OSI investigators interviewed Gecas in the presence of his attorney. Gecas was placed under oath, and provided his name, his current address in Florida, and his previous address in Illinois. The OSI then asked Gecas some 162 other questions. These questions generally concerned Gecas' biographical data, such as alleged alternate spellings of his name, and Gecas' activities during World War II, such as his alleged participation in wartime atrocities against Jewish persons. To each question, Gecas responded as follows: "I decline to answer on the ground that the answer might tend to incriminate me." Gecas produced no documents or photographs other than his alien registration card.

On February 19, 1992, the United States petitioned the district court for an order to enforce the OSI's administrative subpoena. On August 11, 1993, the district court granted the Government's petition. *See Gecas,* 830 F.Supp. at 1423. The district court found that Gecas faced a real and substantial fear of criminal conviction in Lithuania, Germany, or Israel. *See id.* at 1411. Each of these states, the court noted, had enacted a law under which Gecas could be convicted. The court found that the OSI had previously provided information to foreign prosecutors of deported war criminals. Therefore, the court concluded that Gecas faced a real and substantial fear of foreign conviction.

Despite the legitimacy of Gecas' fear, however, the district court granted the Government's petition. The district court held that the privilege against self-incrimination contained in the Fifth Amendment to the United States Constitution does not apply to foreign prosecutions. *See id.* at 1423. The district court examined at length Supreme Court precedent and concluded that the privilege is not a "personal 'right' conferred upon persons within the protection of American law." *Id.* at 1421. Rather, according to the district court, the privilege was designed to protect the individual from prosecutorial overreaching and inhumane treatment at the hands of government. *See id.* at 1421–22. The court reasoned that neither purpose would be served by allowing the invocation of the privilege here because "[t]he privilege is a limitation only upon the power of the United States and its component states," not upon foreign governments. *Id.* at 1422. The court also noted that extending the privilege to foreign prosecutions would severely weaken domestic law enforcement. Therefore, the district court granted the Government's petition to enforce the OSI's administrative subpoena.

---

**3.** The Attorney General created the OSI pursuant to Order No. 851–79, 28 C.F.R. § 0.55(f) (1995). The order assigned to the OSI responsibility for "detecting, investigating, and, where appropriate, taking legal action to deport ... any individual who was admitted as an alien into ... the United States and who had assisted the Nazis by persecuting any person because of race, religion, national origin, or political opinion." *Id.*

**4.** Gecas does not challenge the validity of the OSI's subpoena.

Gecas appeals, arguing that the privilege against self-incrimination is a fundamental right of the individual rather than a mere limitation on the activities of government. The United States cross-appeals the district court's holding that Gecas' fear of foreign prosecution was substantial enough to invoke the equitable relief provided by the privilege.

## II.

The Self–Incrimination Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V, cl. 2. To assert this privilege against self-incrimination, as an initial matter, a witness' fear of conviction on the basis of his testimony must be reasonable, real, and appreciable. *See Brown v. Walker*, 161 U.S. 591, 599, 16 S.Ct. 644, 648, 40 L.Ed. 819 (1896). The witness must face a "real danger" of conviction to invoke the privilege because the privilege does not protect against "remote and speculative possibilities." *Zicarelli v. New Jersey State Comm'n of Investigation*, 406 U.S. 472, 478, 92 S.Ct. 1670, 1675, 32 L.Ed.2d 234 (1972). If the privilege applies to foreign proceedings, Gecas must demonstrate, first, that the information to be disclosed through his testimony would incriminate him under foreign law and, second, that his fear of foreign conviction is real and substantial rather than merely speculative. *See In re Application of the President's Comm'n on Organized Crime*, 763

F.2d 1191, 1198 (11th Cir.1985) [hereinafter *In re President's Comm'n* ].

### A.

The district court held that the information sought from Gecas would incriminate him under the laws of Israel, Germany, and Lithuania. *See Gecas*, 830 F.Supp. at 1408. The district court's interpretation of Israeli, German, and Lithuanian law is a question of law subject to review *de novo*. *See* Fed.R.Civ.P. 44.1. Israel punishes Nazi war criminals under the Nazis and Nazi Collaborators (Punishment) Law, 1950, S.H. 57.[5] This act purports to apply extraterritorially, *see* Nazis and Nazi Collaborators (Punishment) Law, 1950, S.H. 57(2), and, in fact, it has been imposed for war crimes committed outside Israel. *See generally* Yoram Kessel, *Israel Split on Extradition of Ex–Nazis from U.S.*, Wall Street Journal, June 2, 1983, at 34 (describing the imposition of this law on Adolph Eichmann "for his major part in implementing the Nazis' 'final solution' against European Jewry"). The questions posed by the OSI could lead to answers that would incriminate Gecas under the Israeli law. For example, the OSI asked Gecas, "[w]ere you involved in any operations [in a Minsk concentration camp] where pits or ditches were excavated?" and "[w]ere you involved in any executions [at the camp]?" Affirmative responses to these questions could certainly lead to Gecas' prosecution and conviction un-

---

**5.** The Israeli law punishes with the death penalty any "crime against the Jewish people," any "crime against humanity," and any "war crime." Nazis and Nazi Collaborators (Punishment) Law, 1950, S.H. 57(1)(a). The term "crime against the Jewish people" includes the following acts:
   (1) killing Jews;
   (2) causing serious bodily or mental harm to Jews;
   (3) placing Jews in living conditions calculated to bring about their physical destruction;
   (4) imposing measures intended to prevent births among Jews;
   (5) forcibly transferring Jewish children to another national or religious group;
   (6) destroying or desecrating Jewish religious or cultural assets or values; [or]
   (7) inciting to [sic] hatred of Jews.
Nazis and Nazi Collaborators (Punishment) Law, 1950, S.H. 57(1)(b).

The term "crime against humanity" includes the following acts: "murder, extermination, enslavement, starvation or deportation and other inhumane acts committed against any civilian population, and persecution on national, racial, religious, or political grounds." *Id.*

The term "war crime" means any of the following acts:
   murder, ill-treatment or deportation to forced labour or for any other purpose, of civilian population [sic] of or in occupied territory; murder or ill treatment of prisoners of war or persons on the seas; killing of hostages; plunder of public or private property; wanton destruction of cities, towns or villages; and devastation not justified by military security.
*Id.*

der the Nazis and Nazi Collaborators (Punishment) Law.

Germany does not specifically punish crimes against Jewish persons, crimes against humanity, or war crimes. Germany instead prosecutes Nazi war criminals under its murder statute, § 211, Nr. 1 StGB.[6] Unlike the Israeli statute, section 211 on its face does not apply extraterritorially, but Germany has apparently used the law to prosecute former German citizens who committed war crimes outside the territorial boundaries of Germany. *See, e.g.,* Douglas Martin, *Canada Orders Extradition of Accused Nazi,* N.Y. Times, Nov. 5, 1982, at A3 (describing the extradition of a former Gestapo officer to Germany to stand trial for the murder of 11,584 Jews in Lithuania). Gecas, however, is not a former German citizen, and German law appears unsettled as to whether section 211 applies to non-Germans who commit murder outside Germany. *See generally* Letter from Jürgen Schmude, Minister of Justice, Federal Republic of Germany, to William F. Smith, United States Attorney General 1 (Feb. 12, 1982) ("Just as in American law 'jurisdiction' basically exists only for criminal acts perpetrated in one's own territory, so there is also no German jurisdiction applicable to those punishable acts, under consideration here [war crimes], committed by foreign nationals in occupied territory *without the addition of further exceptional circumstances.*" (emphasis added)). The issue is close, but we find that the information sought from Gecas could potentially incriminate him under section 211.

According to Gecas, Lithuania punishes Nazi war crimes under the Law Concerning Responsibility for Genocide of the People of Lithuania, Art. 1 (1992) [hereinafter Lithuanian Genocide Law].[7] This law applies to "[t]he murder or torture of people in Lithuania [or] the deportation of her people ... during the period of occupation by Nazi Germany." Lithuanian Genocide Law, Art. 2 (1992). We hold that affirmative responses to the OSI's questions would incriminate Gecas under the Lithuanian Genocide Law. We therefore affirm the district court's holdings that the information sought by the OSI through their questions would incriminate Gecas under the laws of Israel, Germany, and Lithuania.

### B.

■ The district court also found that Gecas faced a real and substantial likelihood of prosecution and conviction in Israel, Germany, and Lithuania. *See Gecas,* 830 F.Supp. at 1411. The district court's determination of the likelihood of conviction is a question of fact subject to review for clear error. *See* Fed.R.Civ.P. 52(a). We have identified several factors which inform our inquiry into the probability of foreign conviction: whether there is a likelihood that his testimony would be disclosed to a foreign government, whether there is an existing or potential foreign prosecution of the claimant, and whether any of the charges would entitle the foreign jurisdiction to have him extradited. *See In re President's Comm'n,* 763 F.2d at 1198. The circuit courts that have addressed this issue, including this court, have narrowly construed

6. This law provides that "[a] murderer shall be punished by imprisonment for life." § 211, Nr. 1 StGB. A murderer is defined as "a person who kills another person from thirst for blood, satisfaction of his sexual desires, avarice or other base motives in a malicious or brutal manner or one dangerous to public safety or in order to permit the commission or concealment of another criminal act." § 211, Nr. 2 StGB.

7. Gecas provided the district court with a translation of the Lithuanian law, which the United States did not challenge. *See Gecas,* 830 F.Supp. at 1409. The copy of the Lithuanian law submitted by Gecas reads as follows:

Actions which strive, completely or in part, to physically destroy people who belong to any particular national, ethnic, racial or religious groups, and which manifest themselves through the murder of members of these groups, brutal torture, physical maiming, mental retardation; the deliberate creation of such living conditions through which it is strived to *completely or in part destroy persons from* these groups; the forcible transfer of children from these groups to others or the use of means which seek to forcibly limit the birth rate (genocide) ... are punishable by incarceration for five to fifteen years along with the confiscation of belongings and property or by the death penalty along with the confiscation of belongings and property.
Lithuanian Genocide Law, Art. 1 (1992).

these factors and have rarely found that a witness faces a real and substantial danger of foreign conviction. *See, e.g., id.* at 1199; *Environmental Tectonics v. W.S. Kirkpatrick, Inc.,* 847 F.2d 1052, 1064–65 (3rd Cir. 1988), *aff'd on other grounds,* 493 U.S. 400, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990); *In re Gilboe,* 699 F.2d 71, 76 (2nd Cir.1983); *In re Baird,* 668 F.2d 432, 433 (8th Cir.), *cert. denied,* 456 U.S. 982, 102 S.Ct. 2255, 72 L.Ed.2d 860 (1982); *In re Tierney,* 465 F.2d 806, 811 (5th Cir.1972), *cert. denied,* 410 U.S. 914, 93 S.Ct. 959, 35 L.Ed.2d 276 (1973).[8] Because these courts found that the witness faced no meaningful danger of foreign conviction, they did not reach the constitutional question we decide today.

Nevertheless, few witnesses who invoke the privilege based on a fear of foreign conviction face imminent expulsion of the sort anticipated by Gecas. The OSI exists to expel war criminals from the United States, *see* 28 C.F.R. § 0.55(f) (1995), and the OSI has been successful in its mission, *see, e.g., Kalejs v. INS,* 10 F.3d 441, 448 (7th Cir.1993) (affirming the deportation order sought by the OSI against a Latvian war criminal), *cert. denied,* 510 U.S. 1196, 114 S.Ct. 1305, 127

L.Ed.2d 656 (1994). As part of its mandate, the OSI is required to "[m]aintain liaison[s] with foreign prosecution, investigation and intelligence offices." *Id.* The OSI maintains liaisons with foreign prosecutors to cooperate in the indictment of expelled war criminals. *See generally U.S. Gives Nazi Data to Israelis,* Wash. Post, May 16, 1984, at A10 (describing the ceremonial transfer of information on the "investigation, interrogation and completed or pending prosecution of war criminals found living in the United States"). Gecas faces a real danger that the information obtained through his interrogation would be transferred to any country interested in obtaining his conviction.[9]

Once that information is transferred, Gecas faces potential conviction in Israel, Germany, and quite possibly Lithuania.[10] As discussed above, both Israel and Germany have prosecuted alleged war criminals like Gecas. Gecas' ability to select his destination upon deportation offers little protection. Under 8 U.S.C. § 1253(a), the Attorney General may nullify Gecas' selection if transporting Gecas to that country "would be prejudicial to the interests of the United States." 8 U.S.C. § 1253(a) (1994). Accordingly, there

8. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent the decisions of the former Fifth Circuit issued before October 1, 1981.

9. The United States argued below that an order sealing Gecas' testimony (and its fruits) would suffice to supplant any asserted privilege against self-incrimination. According to the United States, the district court could prevent a foreign court from convicting Gecas on the basis of his testimony by enjoining the OSI from disclosing that testimony to any foreign government.

The United States' argument might have some merit if Gecas faced extradition only. If, for example, Gecas alleged that the OSI sought his testimony in order to turn it over to the Israeli government, which would then extradite him and convict him on the basis of his testimony, then an order barring the OSI from disclosing his testimony to foreign governments would arguably supplant his privilege against self-incrimination. In such cases, as we stated in *In re President's Comm'n,* "the [sealing] order given by the court is sufficient to eliminate the danger of ... disclosure." *In re President's Comm'n,* 763 F.2d at 1199.

Gecas, however, faces deportation, not extradition. Even if the district court could enjoin the OSI from disclosing the contents of Gecas' depo-

sition to foreign governments, we question whether the district court could prevent the immigration tribunals reviewing Gecas' potential deportation order, as well as the court of appeals, from discussing his testimony in their public adjudication of his case. At the very least, the district court could not assume that these tribunals would deport Gecas without a full explanation of their reasons for doing so—to wit, that he "participated in the persecution of [persons] because of race, religion, national origin, or political opinion." 8 U.S.C. § 1182(a)(3)(E)(ii) (1994). We therefore agree with the district court that, in the present context, a sealing order would not reduce Gecas's risk of foreign conviction.

10. The United States argues that the newly-enacted Constitution of Lithuania prevents Gecas from being prosecuted there on the basis of his answers to the OSI's questions. *See* Lith. Const., art. 31. However, the United States has not shown how the Lithuanian courts have interpreted this provision. If, for example, the Lithuanian courts refuse to apply article 31 to the Genocide Law, Gecas' testimony would remain unprotected. We are unprepared to rely on a foreign constitutional provision without some indication of how it will be applied in that nation's courts.

is no guarantee that Gecas would be deported to the country of his choice.

Even if Gecas could avoid deportation, he could be extradited under the treaties the United States maintains with Israel, *see* Convention on Extradition, Dec. 10, 1962, U.S.-Isr., art. 1, 14 U.S.T. 1707, 1707, Germany, *see* Treaty Concerning Extradition, June 20, 1978, U.S.-F.R.G., art. 1(2)(a), 32 U.S.T. 1485, 1485, and Lithuania, *see* Treaty on the Extradition of Fugitives from Justice, Apr. 9, 1924, U.S.-Lith., art. 1, 43 Stat. 1835, 1835. Foreign governments have pursued the extradition of those who murdered civilians at the direction of the Germans during World War II. *See, e.g., Demjanjuk v. Petrovsky,* 10 F.3d 338, 340 (6th Cir.1993) (noting that Israel sought and obtained the extradition of an alleged Nazi prison guard), *cert. denied,* 513 U.S. 914, 115 S.Ct. 295, 130 L.Ed.2d 205 (1994). If Gecas' compelled testimony substantiates the OSI's allegations, it is distinctly possible that Gecas would face extradition for prosecution to Israel, Germany, or Lithuania. Therefore, we hold that the district court did not err when it concluded Gecas faces a real, substantial, reasonable, and appreciable fear of foreign conviction.

### III.

We now consider whether a real and substantial fear of foreign conviction is a valid basis for the invocation of the privilege against self-incrimination. The Fourth and Tenth Circuits have refused to extend the privilege to prevent this alleged harm. *See United States v. (Under Seal),* 794 F.2d 920, 926 (4th Cir.), *cert. denied sub nom. Araneta v. United States,* 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986) [hereinafter *Araneta* ]; *In Re Parker,* 411 F.2d 1067, 1070 (10th Cir.1969), *vacated as moot sub nom. Parker v. United States,* 397 U.S. 96, 90 S.Ct. 819, 25 L.Ed.2d 81 (1970). The North Dakota Supreme Court has similarly refused to expand the privilege's scope. *See Phoenix Assurance Co. of Canada v. Runck,* 317 N.W.2d 402, 413 (N.D.), *cert. denied,* 459 U.S. 862, 103 S.Ct. 137, 74 L.Ed.2d 117 (1982).

However, several district courts, including one district court in this circuit, have held

that the privilege may apply in this situation. *See Yves Farms, Inc. v. Rickett,* 659 F.Supp. 932, 940 (M.D.Ga.1987); *United States v. Lileikis,* 899 F.Supp. 802, 809 (D.Mass.1995); *Moses v. Allard,* 779 F.Supp. 857, 882 (E.D.Mich.1991); *Mishima v. United States,* 507 F.Supp. 131, 135 (D.Alaska 1981); *United States v. Trucis,* 89 F.R.D. 671, 673 (E.D.Pa.1981); *In re Cardassi,* 351 F.Supp. 1080, 1086 (D.Conn.1972). In addition, the Second Circuit recently held that "the Fifth Amendment privilege against self-incrimination may be invoked by a witness who possesses a real and substantial fear of foreign prosecution." *United States v. Balsys,* 119 F.3d 122 (2nd Cir.1997). Because neither the Supreme Court nor the Eleventh Circuit has decided the issue, however, we treat it as a matter of first impression.

### A.

■ The plain language of the Self–Incrimination Clause provides no conclusive answer. The Clause protects a "person" from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V, cl. 2. There is no question that resident aliens such as Gecas are "persons" within the meaning of the Fifth Amendment. *See Kwong Hai Chew v. Colding,* 344 U.S. 590, 596, 73 S.Ct. 472, 477, 97 L.Ed. 576 (1953). The parties do not dispute that the Government seeks to "compel" testimony from Gecas that will make him a "witness against himself." The question is, therefore, whether the current proceeding is a "criminal case." This term has been interpreted ambiguously.

■ A deportation hearing itself is a civil proceeding, not a criminal proceeding. *See I.N.S. v. Lopez–Mendoza,* 468 U.S. 1032, 1038–39, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984); *Harisiades v. Shaughnessy,* 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952); *Fong Yue Ting v. United States,* 149 U.S. 698, 730, 13 S.Ct. 1016, 1028–29, 37 L.Ed. 905 (1893). For this reason, the Government need not give to deportees all of the constitutional protections guaranteed to criminal defendants. *See Lopez–Mendoza,* 468 U.S. at 1038–39, 104 S.Ct. at 3483; *see,*

*e.g., United States ex rel. Bilokumsky v. Tod,* 263 U.S. 149, 154–55, 44 S.Ct. 54, 56, 68 L.Ed. 221 (1923) (holding that a deportee's silence can be held against him where he refuses to testify concerning an issue that would not incriminate him under American law). Under a literal reading of the Self–Incrimination Clause, then, Gecas could be compelled to testify against himself because the deportation proceeding is not a "criminal case." In fact, the Supreme Court has never extended the Self–Incrimination Clause to deportation proceedings.

The Supreme Court, however, has held that a witness facing a legitimate possibility of conviction (in either the current or a subsequent proceeding) may invoke the privilege against self-incrimination "in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory." *Kastigar v. United States,* 406 U.S. 441, 444, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972). Thus, for example, the Court has held that a bankruptcy proceeding becomes a "criminal case," for purposes of the Self–Incrimination Clause, as long as the testimony sought from the witness "might tend to subject to criminal responsibility him who gives it." *McCarthy v. Arndstein,* 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924). This language suggests that, regardless of the noncriminal character of a deportation proceeding, it might become a "criminal case" under certain circumstances. We therefore turn to precedent to determine whether the current deportation proceeding involving Gecas is a "criminal case" within the meaning of the Fifth Amendment's Self–Incrimination Clause.

### B.

### 1.

▮▮▮ The Self–Incrimination Clause protects a witness against the infliction of criminal penalties on the basis of compelled, testimonial self-incrimination. *See Kastigar,* 406

U.S. at 453, 92 S.Ct. at 1661.[11] The Clause does not protect a witness against the disclosure of facts which might "disgrace him or bring him into disrepute." *Brown v. Walker,* 161 U.S. 591, 598, 16 S.Ct. 644, 647, 40 L.Ed. 819 (1896). The Clause does not shield a witness from the "loss of [his] job, expulsion from labor unions ... [or] general public opprobrium" stemming from his incriminating testimony. *Ullmann v. United States,* 350 U.S. 422, 430, 76 S.Ct. 497, 502, 100 L.Ed. 511 (1956). The Clause does not even prevent the *prosecution* of a witness based on coerced admissions. *See Kastigar,* 406 U.S. at 453, 92 S.Ct. at 1661. The Clause only protects against the actual "infliction of criminal penalties on the witness"—a criminal conviction—based on self-incriminating testimony. *Id.* For this reason, the Supreme Court has stated that a violation of the Self–Incrimination Clause does not necessarily occur at the time the self-incriminating testimony is compelled. The actual violation, if any, occurs only at *a witness's own criminal trial. See United States v. Verdugo–Urquidez,* 494 U.S. 259, 264, 110 S.Ct. 1056, 1060, 108 L.Ed.2d 222 (1990).

▮▮▮ Courts can prevent the occurrence of this harm in one of two ways. First and most basically, courts presiding over a criminal trial must exclude from evidence compelled, testimonial self-incrimination and its fruits. *See Murphy v. Waterfront Comm'n of New York Harbor,* 378 U.S. 52, 79, 84 S.Ct. 1594, 1609, 12 L.Ed.2d 678 (1964). For example, if overzealous law-enforcement officers unfairly coerce a damaging admission from the defendant, the court must exclude from evidence that admission and its fruits. *See Bram v. United States,* 168 U.S. 532, 542, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897). Similarly, if another court compelled the defendant's testimony[12] at a prior proceeding—pursuant to a grant of immunity from prosecution, for example—a court presiding over the defendant's subsequent trial must also

---

**11.** The Self–Incrimination Clause only applies to *compelled, testimonial* self-incrimination. *See Fisher v. United States,* 425 U.S. 391, 399, 96 S.Ct. 1569, 1575, 48 L.Ed.2d 39 (1976). Therefore, references to "self-incrimination" hereinafter mean compelled, testimonial self-incrimination.

**12.** There is no question that a court's contempt power is a coercive instrument. *See New Jersey v. Portash,* 440 U.S. 450, 460, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501 (1979).

exclude from evidence that testimony and its fruits. *See Murphy,* 378 U.S. at 79 n. 18, 84 S.Ct. at 1610 n. 18. In either situation, a trial court must force the Government to "launder" its case and purge the taint of compulsion from its evidence. Forcing the Government to launder its case at a special hearing complies with the Self–Incrimination Clause by ensuring that the compelled testimony can in no way lead to the infliction of criminal penalties. *See Kastigar,* 406 U.S. at 461, 92 S.Ct. at 1665.

■ Second, courts can prevent the infliction of criminal penalties based on compelled, testimonial self-incrimination by refusing to force witnesses to testify against their own penal interest. *See, e.g., United States v. Saline Bank of Virginia,* 26 U.S. (1 Pet.) 100, 104, 7 L.Ed. 69 (1828) (affirming the denial of the Government's discovery motion because "a party is not bound to make any discovery which would expose him to penalties"). This prophylactic rule [13] prevents the infliction of criminal penalties on the basis of self-incrimination by keeping the testimony hidden from the opposing party. What the movant does not know it cannot later use.

■ When a court considers a motion to compel testimony, it acts as a court of equity, balancing the risk of a violation of the Self–

Incrimination Clause against the Government's right to the evidence of every citizen. *See Mason v. United States,* 244 U.S. 362, 364, 37 S.Ct. 621, 622, 61 L.Ed. 1198 (1917). If the court concludes, based on the circumstances of the case, that disclosure of the testimony would not lead to a conviction that violates the Self–Incrimination Clause, then the court may force the witness to speak. *See, e.g., Murphy,* 378 U.S. at 79, 84 S.Ct. at 1609—10 (holding that the defendants could be compelled to answer the Government's questions because a grant of state-law immunity shielded them from the use of their testimony and its fruits in federal court).

If, on the other hand, the court finds that compelling the testimony will likely lead to a conviction that violates the Self–Incrimination Clause, then the court must refuse to compel the witness to testify. *See Pillsbury Co. v. Conboy,* 459 U.S. 248, 256–57, 103 S.Ct. 608, 614, 74 L.Ed.2d 430 (1983). Thus, courts use two basic mechanisms for enforcing the Clause: excluding coerced testimony at a criminal trial and denying a motion to compel disclosure. Both mechanisms are designed to prevent *conviction* of an offense revealed through compelled testimony—the only harm against which the Self–Incrimination Clause protects.[14]

---

**13.** We refer to the second method of preventing a conviction based on self-incrimination as a prophylactic rule because the Supreme Court has required its use even when the exclusionary rule would preclude a violation of the Clause. *See generally Lefkowitz v. Turley,* 414 U.S. 70, 78, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973) (holding (1) that a witness may refuse to answer unless he is protected against the use of his testimony and its fruits at a subsequent trial and (2) that the witness's testimony and its fruits can never be used in a subsequent trial).

If, for example, the Government tries to prosecute someone who was compelled to incriminate himself under a grant of immunity, the requirement that the prosecution launder its case would satisfy the Self–Incrimination Clause. *See Kastigar,* 406 U.S. at 461, 92 S.Ct. at 1665. Nevertheless, a court faced with a Government motion to compel incriminating testimony from a witness cannot order the witness to testify in reliance on a subsequent court's exclusion of the testimony. *See Pillsbury Co. v. Conboy,* 459 U.S. 248, 262, 103 S.Ct. 608, 616, 74 L.Ed.2d 430 (1983). This "belt-and-suspenders" approach both conserves judicial resources and leaves to the Executive Branch the decision whether to grant immunity.

*See id.* at 262, 103 S.Ct. at 616. The rule barring the initial compulsion, however, is prophylactic. The Self–Incrimination Clause protects against conviction based on self-incrimination; it does not protect against the mere compulsion of testimony by a court. *See Brown,* 161 U.S. at 600, 16 S.Ct. at 648.

**14.** In *Counselman v. Hitchcock,* 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892), the Supreme Court said that "[i]f Counselman had been guilty of the matters inquired of in the questions which he refused to answer, he himself was liable to criminal *prosecution* under the act. *The case before the grand jury was therefore a criminal case.*" *Id.* at 562, 12 S.Ct. at 198 (emphasis added). In similar terms, Gecas contends that his deportation hearing is a criminal case simply because he would be liable to criminal prosecution under foreign law if the OSI's allegations are true.

Putting aside the question whether a foreign government's actions can give rise to a violation of the Fifth Amendment, which we address forthwith, we find that the threat of prosecution does not transform a proceeding into a criminal case. In *Kastigar v. United States,* the Supreme Court

2.

■ The Fifth Amendment does not apply to foreign court proceedings involving foreign citizens. *See Verdugo–Urquidez,* 494 U.S. at 269, 110 S.Ct. at 1063. The Supreme Court has extended at least some of the protections of the United States Constitution to foreign citizens residing in the United States. *See, e.g., Yick Wo v. Hopkins,* 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886) (applying the Due Process Clause of the Fourteenth Amendment to resident aliens). The Court has also applied the Bill of Rights to the criminal prosecution of American citizens conducted by the United States in foreign lands. *See, e.g., Reid v. Covert,* 354 U.S. 1, 5–6, 77 S.Ct. 1222, 1225, 1 L.Ed.2d 1148 (1957) (holding that the United States Government must abide by the Constitution when it prosecutes civilian dependents accompanying members of the armed forces overseas).

The Court, however, has refused to apply the procedural protections of the Constitution to our government's treatment of foreign citizens in foreign countries. *See, e.g., Johnson v. Eisentrager,* 339 U.S. 763, 771, 70 S.Ct. 936, 940, 94 L.Ed. 1255 (1950) ("[I]n extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act."); *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 318, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936) ("Neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens."). The Court has also refused to apply our notions of due process to foreign court proceedings against American citizens who have committed foreign crimes outside the United States. *See, e.g., Neely v. Henkel,* 180 U.S. 109, 123, 21 S.Ct. 302, 307, 45 L.Ed. 448 (1901) ("When an American citizen commits a crime in a foreign country, he cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people.").

■ By necessary implication, the United States Constitution places no restraints at all on a *foreign* government's treatment of its *own* citizens who have allegedly committed foreign crimes abroad. *See Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897); *see, e.g., United States ex rel. Steinvorth v. Watkins,* 159 F.2d 50, 51 (2nd Cir.1947) (holding that a United States court will not review the Costa Rican government's cancellation of appellant's Costa Rican citizenship). As Justice Kennedy wrote in *United States v. Verdugo–Urquidez,* "[t]he Constitution does not create ... any juridical relation between our country and some undefined, limitless class of noncitizens who are beyond our territory." *Verdugo–Urquidez,* 494 U.S. at 275, 110 S.Ct. at 1066 (Kennedy, J., concurring). Therefore, a foreign court cannot violate the Fifth Amendment to the United States Constitution when it inflicts criminal penalties on a foreign national based on compelled, testimonial self-incrimination.

C.

■ Applying these principles to the current appeal, we conclude that a proceeding becomes a "criminal case" only when a witness faces conviction on the basis of his testimony in a jurisdiction subject to the Fifth Amendment of the United States Constitution. Gecas faces no possibility of a criminal conviction in the United States. He only faces trial and conviction in Israel, Germany, or Lithuania. The United States Constitution does not prohibit foreign countries such as these from trying and convicting

reconsidered the *Counselman* decision. The *Kastigar* Court held that, notwithstanding *Counselman,* a person who invokes the privilege in one proceeding can still be prosecuted in a subsequent criminal trial. *See Kastigar* 406 U.S. at 453, 92 S.Ct. at 1661.

The Court reasoned that the Fifth Amendment protects against the infliction of criminal penalties based on self-incrimination, not against mere prosecution. *See id.; see also Murphy,* 378 U.S. at 106, 84 S.Ct. at 1618 (White, J., concurring) ("In my view it is possible for a federal prosecution to be based on untainted evidence even after a grant of federal immunity in exchange for testimony in a federal investigation."). In light of *Kastigar,* the threat of prosecution alone does not make Gecas' deportation proceeding a "criminal case."

their own citizens on the basis of self-incrimination. Therefore, Gecas does not face the kind of conviction proscribed by the Self-Incrimination Clause, and his deportation proceeding is not a "criminal case." The district court did not err by granting the Government's motion to compel Gecas to respond to the OSI's questions.

1.

Gecas cites *Murphy v. Waterfront Comm'n of New York Harbor,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), for the proposition that he should not be forced to testify regardless of which sovereign intends to use his testimony to obtain a conviction. In *Murphy,* the Waterfront Commission of New York Harbor subpoenaed the defendants to testify concerning a work stoppage at several New Jersey piers. *See id.* at 53, 84 S.Ct. at 1596. The defendants asserted the privilege against self-incrimination and refused to testify. The defendants were granted immunity from prosecution under the laws of New York and New Jersey, but they persisted in their refusal to testify and were cited for contempt. Their appeal reached the United States Supreme Court.

The defendants in *Murphy* argued that they could refuse to testify because the grant of state-law immunity did not prevent their prosecution under federal law. They contended that federal prosecutors could use their testimony to initiate a federal prosecution. The Supreme Court held that the defendants could be forced to testify before the Waterfront Commission because the Self-Incrimination Clause barred the federal government from using their state testimony or its fruits to obtain their conviction in federal court. *See Murphy,* 378 U.S. at 79, 84 S.Ct. at 1609–10.

Gecas contends that his silence is protected because *Murphy* applied the Self-Incrimination Clause to the jurisdiction compelling the testimony—the state tribunal—as well as to the jurisdiction using the testimony—the federal tribunal. According to Gecas, "[t]he law of the sovereign that ultimately [makes] use of the compelled testimony [is] not ... controlling. The controlling fact [is] whether the witness is compelled to testify by a gov-

ernment whose law grants to him the right not to incriminate himself." Brief for Appellant at 14. Hence, Gecas claims that the Clause prohibits an American court from compelling his testimony even when it will be used, if at all, only in a foreign proceeding. We disagree.

To understand the holding of *Murphy,* we must place it in context. In *Twining v. New Jersey,* 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908), the Supreme Court held that the Fifth Amendment's privilege against self-incrimination was not one of the rights made applicable to the states by the Fourteenth Amendment. *Id.* at 110, 29 S.Ct. at 24. State-court defendants therefore had to rely on state-law provisions securing the privilege against self-incrimination. The decision in *Twining* in part gave rise to a series of decisions limiting the scope of the privilege to the jurisdiction in which it was invoked. *See, e.g., Feldman v. United States,* 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408 (1944), *overruled by Murphy v. Waterfront Comm'n of New York Harbor,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964); *see also id.* at 490, 64 S.Ct. at 1083 ("[O]ne of the settled principles of our Constitution has been that these Amendments[, including the Fifth Amendment's Self-Incrimination Clause,] protect only against invasion of civil liberties by the Government whose conduct they alone limit.").

On June 15, 1964, the same day on which *Murphy* was decided, the Court overruled *Twining* in *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). The Court held that the Fifth Amendment's Self-Incrimination Clause applies to the states through the Due Process Clause of the Fourteenth Amendment. *Id.* at 3, 84 S.Ct. at 1491. The application of the Fifth Amendment to both the federal and state governments raised the issue of whether the Fifth Amendment also applied *between* those governments. *See Murphy,* 378 U.S. at 53, 84 S.Ct. at 1595–96.

The Court chose *Murphy* as a vehicle for unifying the meaning of the privilege against self-incrimination within the United States. The *Malloy* Court cited *Murphy* and noted that "[i]t would be incongruous to have dif-

ferent standards determine the validity of a claim of privilege based on the same feared prosecution, depending on whether the claim was asserted in state or federal court." *Malloy*, 378 U.S. at 11, 84 S.Ct. at 1495. Likewise, the *Murphy* Court cited *Malloy* and reasoned that the policies behind the Self-Incrimination Clause would be defeated if a witness "could be whipsawed into incriminating himself under both state and federal law even though the constitutional privilege against self-incrimination is applicable to each." *Murphy*, 378 U.S. at 55, 84 S.Ct. at 1597 (quoting *Knapp v. Schweitzer*, 357 U.S. 371, 385, 78 S.Ct. 1302, 1310, 2 L.Ed.2d 1393 (1958) (Black, J., dissenting) (internal quotation marks omitted)). Thus, the *Murphy* Court's application of the Self-Incrimination Clause to both the compelling jurisdiction and the using jurisdiction was *inextricably tied* to a simultaneous decision applying the Self-Incrimination Clause to both jurisdictions. *See (Under Seal)*, 794 F.2d at 926.

The *Murphy* Court noted this interrelationship:

In every "whipsaw" case, either the "compelling" government or the "using" government is a State; and, until today, the States were not deemed fully bound by the privilege against self-incrimination. *Now that both governments are fully bound by the privilege,* the conceptual difficulty of pinpointing the alleged violation of the privilege on "compulsion" or "use" need no longer concern us.

*Id.* at 57 n. 6, 84 S.Ct. at 1598 n. 6 (emphasis added). In this case, by contrast, there has been no recent decision applying the Clause to each of the governments involved. To the contrary, Supreme Court precedent indicates that Israel, Germany, and Lithuania are not bound by the privilege at all. They are not "States." We must therefore reach the question that the *Murphy* Court avoided: whether a violation of the privilege occurs upon compulsion of the testimony or upon its use.

Fortunately, in the years since *Murphy*, the Supreme Court has answered this question for us. The harm is the use of the testimony, not its compulsion. *See Verdugo–Urquidez*, 494 U.S. at 264, 110 S.Ct. at 1060 (citing *Kastigar*, 406 U.S. at 453, 92 S.Ct. at

1661). Gecas' testimony will be used, if at all, in a jurisdiction to which the Self–Incrimination Clause does not apply. Accordingly, we hold that Gecas cannot invoke the privilege before the compelling sovereign. We view this holding as consistent with the framework established in *Murphy*.

Gecas also claims support for his position from the *Murphy* Court's discussion of three old English cases: *United States v. McRae*, 3 L.R. 79 (Ch.App.1867); *Brownsword v. Edwards*, 28 Eng. Rep. 157 (Ex. 1750); and *East India Co. v. Campbell*, 27 Eng. Rep. 1010 (Ex. 1749). In analyzing the earliest of these cases, *Campbell*, the *Murphy* Court stated that "the privilege against self-incrimination protected a witness in an English court from being compelled to give testimony which could be used to convict him in the courts of *another jurisdiction*." *Murphy*, 378 U.S. at 58, 84 S.Ct. at 1598 (emphasis added). The *Murphy* Court wrote later in its opinion that "we now accept as correct the construction given the privilege by the English courts." *Id.* at 77, 84 S.Ct. at 1608. Gecas reads such language as an endorsement of his position. A conviction in Israel, Germany, or Lithuania would be a conviction in "another jurisdiction," so Gecas argues that *Murphy* proscribes court compulsion of his testimony in the United States.

Upon closer examination, however, *Campbell*, *Brownsword*, and *McRae* lend little support to Gecas' invocation of the privilege. In *Campbell*, the Court of the Exchequer considered a motion to compel the defendant to disclose how he obtained possession of the plaintiff's goods. *See Campbell*, 27 Eng. Rep. at 1010. The defendant answered that disclosure of this information would subject him to criminal penalties in India, which at that time was a colony of Britain. *See id.* The court denied the motion on the ground that "a jurisdiction is erected in Calcutta for criminal facts, where [the defendant] may be sent to government and tried." *Id.* at 1011. Thus, *Campbell* dealt with "disclosures which would have been incriminating under a separate system of laws operating within the same legislative sovereignty." *Murphy*, 378 U.S. at 82 n. 1, 84 S.Ct. at 1619 n. 1 (Harlan, J., concurring in the judgment).

Similarly, *Brownsword* concerned a discovery motion where the response would have subjected the defendant to prosecution for incest in an English ecclesiastical court. *See Brownsword,* 28 Eng. Rep. at 157. The court declared that "no one is bound to answer so as to subject himself to punishment, whether [sic] that punishment arises by the ecclesiastical law of the land." *Id.* at 158. Hence, *Campbell* and *Brownsword* stand for the proposition that different court systems operating under the same sovereign power must abide by the same procedural constraints.

So construed, *Campbell* and *Brownsword* directly support the holding of *Murphy,* which applied the privilege between jurisdictions within the United States. *Campbell* and *Brownsword,* however, did not consider the applicability of the privilege between separate, sovereign nations. Hence, they do not support Gecas' invocation of the privilege here.

The third case, *McRae,* did deal with separate nations. In that case, the United States itself sued McRae in England to recover funds McRae collected in England as an agent for the Confederacy during the Civil War. *See McRae,* 3 L.R. at 79. The United States moved to discover from McRae how much money he accepted on behalf of the Confederacy. McRae claimed that the United States had passed a law confiscating all of the property of the Confederacy. He argued that telling the United States how much he collected on behalf of the Confederacy would enable the United States to forfeit an equivalent amount of McRae's American property—even if McRae prevailed in the English court. Given this unusual scenario, the court denied the motion: "The United States coming into our Courts must be subject to every rule of evidence which prevails in them, and, amongst others, to that which protects a witness from exposing himself to penalties by his answer." *Id.* at 87.

Apart from the obvious factual distinctions between *McRae* and the present case, Parliament overruled *McRae* four years after *Murphy* was decided. In 1968, Parliament reviewed the English case law, including *McRae,* and limited the privilege against self-

incrimination to potential criminal liability under the laws of the United Kingdom. *See* Civil Evidence Act, 1968, ch. 64, § 14(1) (Eng.); *see also* Law Reform Committee, Sixteenth Report, 1967, Cmnd. 3472, No. 113, at 7 (discussing the English cases). We decline to rely on a foreign case that has been overruled.

Even assuming that the *Murphy* Court's discussion of eighteenth- and nineteenth-century English case law supports Gecas' invocation of the privilege, we view this discussion as dicta. *See Murphy,* 378 U.S. at 81–82 & n. 1, 84 S.Ct. at 1619 & n. 1 (Harlan, J., concurring in the judgment); *In Re Parker,* 411 F.2d 1067, 1070 (10th Cir.1969), *vacated as moot sub nom. Parker v. United States,* 397 U.S. 96, 90 S.Ct. 819, 25 L.Ed.2d 81 (1970). As noted above, the defendants in *Murphy* did not face potential conviction under the laws of another sovereign nation. They faced potential conviction in a different court within our unified federal system. Therefore, any discussion in *Murphy* suggesting that the possibility of a foreign conviction permitted the invocation of the privilege could not have been necessary to the Court's decision. *Murphy* does not foreclose our own consideration of whether a fear of foreign conviction can justify invocation of the Self–Incrimination Clause.

2.

■ Gecas argues in the alternative that the United States itself is both the compelling and the using sovereign. He claims that the OSI seeks to circumvent the Clause by orchestrating a foreign prosecution based on the testimony the OSI seeks here. Gecas contends that cooperation in this case among the OSI and the governments of Israel, Germany, and Lithuania transforms these governments into agents of the United States. As agents, these foreign governments are, according to Gecas, subject to the constraints of the Self–Incrimination Clause. *See generally United States v. Heller,* 625 F.2d 594, 599 (5th Cir.1980) (suggesting that the failure of foreign police to give *Miranda* warnings could violate the Fifth Amendment if the foreign police were acting as agents of the United States). He argues that the Clause

therefore should prevent the compulsion of his testimony here. Again, we disagree.

The record suggests that the OSI may turn over its file on Gecas to whatever foreign government requests it. This type of intergovernmental cooperation, while it increases the chance Gecas will be convicted abroad, does not render the requesting government an agent of the United States. *See, e.g., United States v. Behety,* 32 F.3d 503, 511 (11th Cir.1994) (holding that Guatemalan officials did not become agents of the United States when they stopped and searched the defendants' boat on a tip from a DEA agent and then allowed other DEA agents to videotape them searching the defendants' boat), *cert. denied,* 515 U.S. 1137, 115 S.Ct. 2568, 132 L.Ed.2d 820 (1995); *Birdsell v. United States,* 346 F.2d 775, 782 (5th Cir.) (holding that Mexican police were not acting as agents of the United States when "American police officers gave information leading to the arrest and search" of the defendants in Mexico), *cert. denied,* 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366 (1965).

Extradition, another example of international cooperation, ordinarily does not subject the requesting sovereign's legal regime to constitutional scrutiny in American courts. *See Glucksman v. Henkel,* 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1911); *Garcia–Guillern v. United States,* 450 F.2d 1189, 1192 (5th Cir.1971). Mere delivery of Gecas's file to a foreign government should produce no different result. Israel, Germany, and Lithuania are independent nations. They will decide for themselves whether or not to prosecute crimes falling within their jurisdictions. We will not assume that the Executive Branch is colluding with foreign powers to circumvent the United States Constitution whenever it shares information on the conduct of foreign nationals—particularly where the conduct in question is not a crime under American law. In short, Gecas has failed to show that the United States is effectively prosecuting him in a foreign country.

3.

We do not base our decision on the negative repercussions of the rule urged by Gecas, but we recognize that those repercussions would be substantial. Extension of the Self–Incrimination Clause to reach foreign convictions would bind the conduct of American officials to the legislative acts of foreign nations. Assume, for example, that the sale and distribution of cocaine is illegal in the nation of Ames. A citizen of Ames visits the United States on a temporary visa. She is arrested in Miami International Airport after police find five kilograms of cocaine in her luggage. The prosecution offers her immunity in exchange for testimony about three leaders of a drug ring operating in Southern Florida. Under the rule proposed by Gecas, she can still refuse to testify because Ames may prosecute her for the same conduct. We agree with the Fourth Circuit that "our own national sovereignty would be compromised if our system of criminal justice were made to depend on the actions of foreign government[s] beyond our control." *(Under Seal),* 794 F.2d at 926.

Conversely, the rule urged by Gecas would constrain the law enforcement activities of foreign countries where the privilege against self-incrimination does not exist. Fugitives who flee to the United States would become entitled to a procedural right they lack in their own countries. "Comity among nations dictates that the United States not intrude into the law enforcement activities of other countries conducted abroad." *Id.* Stated differently, we leave to the Executive Branch, with the advice and consent of the Senate, the decision to negotiate the application of the privilege to both domestic and foreign court proceedings.[15]

---

15. Judge Birch suggests in dissent that the federal government "has the ability to render insubstantial the suspect's fear of foreign prosecution by agreeing not to deport or extradite her." *Post* at 1480. This curious suggestion raises the possibility that the United States could become a haven for suspected war criminals. In most cases, these individuals cannot be deported without their testimony; the dissent would generously allow the government to take their testimony so long as the government agreed not to deport them. Judge Birch's opinion would thereby afford foreign nationals greater constitutional protections than United States Citizens themselves receive, but he passes this problem off as merely another "high cost" that the federal government

*See Phoenix Assurance Co. of Canada v. Runck,* 317 N.W.2d 402, 413 (N.D.), *cert. denied,* 459 U.S. 862, 103 S.Ct. 137, 74 L.Ed.2d 117 (1982). In conclusion, we find that our precedent sensibly limits the application of the Fifth Amendment's Self–Incrimination Clause to domestic convictions.

## IV.

We now turn to the broadest contention made by Gecas: he contends that, precedent notwithstanding, the Framers intended the privilege against self-incrimination to extend to the possibility of incrimination under the law of a foreign jurisdiction. According to Gecas, the history of the privilege against self-incrimination indicates that its "main purpose" is the protection of individual privacy and dignity. *See* Brief for Appellant at 5. He claims that the privilege creates in the individual a freedom to remain silent whenever his testimony may be adverse to his penal interests, regardless of where the infliction of criminal penalties will occur. Gecas contends that the Framers intended the Self–Incrimination Clause to bestow upon him this personal, individual right. We must therefore examine the history of the privilege against self-incrimination to determine whether the policies behind the Clause justify its application to Gecas.

Unfortunately, the cases do not provide us with a detailed exposition of the history of the privilege against self-incrimination. The Fifth Amendment's Self–Incrimination Clause itself has virtually no legislative history. Beyond the few ambiguous English cases cited by the *Murphy* Court, no court has examined the history of the privilege with regard to self-incrimination under foreign law. Therefore, we must pull together, largely from academic scholarship, an understanding of the history of the privilege as it developed in continental Europe, in England, and in America. This undertaking will fill a few more pages of the federal reporter than we might otherwise wish, but we consider a full understanding of the privilege essential to the resolution of the important issue presented in this case. The following is a summary of our discussion:

We begin in subpart A.1 with medieval ecclesiastical procedure. Ecclesiastical courts in continental Europe barred compelled, testimonial self-incrimination until an accuser stepped forward. Once accused, however, defendants were forced to prove their innocence through the performance of a ritualistic test. Because all convictions were based on the defendant's behavior in performing the test, all convictions were based on self-incrimination. Whether an individual would be forced to undergo a test depended on the legal sufficiency of the accusation.

We turn in subpart A.2 to medieval English courts, both ecclesiastical and secular. At Rome's direction, medieval English ecclesiastical courts relaxed the requirements for a legally sufficient accusation. In particular, judges themselves were allowed to accuse and force an incriminatory test. English common-law courts, by contrast, did not follow ecclesiastical law on this point. They required a personal accusation or the accusation of an inquest, the precursor to our modern grand jury.

In subpart B.1, we discuss the effect of the advent of the jury trial. The jury trial gradually replaced the ancient tests as the method of proof used in the common-law courts. Access to a neutral trier of fact meant that not every conviction would be a conviction based on self-incrimination. In subpart B.2, we explain why the jury trial did not cause the common-law courts to recognize a privilege against self-incrimination: when the jury began to hear evidence, defendants were disqualified from testifying under oath. They could not be called as witnesses for the prosecution, so there was no need for a privilege.

In subpart C, we address how the common-law courts came to recognize an implicit privilege against self-incrimination. By the mid–1500s, common-law judges themselves were taking testimony at preliminary hearings. Relying on their interpretation of medieval ecclesiastical law, they refused to interrogate suspects under oath at the preliminary hearing, although they did compel sworn testimony from nonparty witnesses.

must bear in the exercise of its duties. *See post* at 1480–81.

Abstention from sworn interrogation of defendants created an implied privilege against self-incrimination at common law.

In subpart D, we consider how that implied privilege eventually became explicit. During the 1600s, the British monarchy enlarged the jurisdiction of its prerogative tribunals,[16] the Star Chamber and the Commission for Causes Ecclesiastical (the "Commission"),[17] in an effort to suppress religious and political heterodoxy. Subpart D.1 shows how the common-law courts fought against the Crown's expansion of its prerogative jurisdiction. Subpart D.2 describes the procedures of the Star Chamber and the Commission. Subpart D.3 discusses how religious dissenters, particularly the Puritans, fought against the prosecutorial techniques of these two tribunals.

Subpart E deals with the actual recognition of the privilege against self-incrimination, first in ecclesiastical courts and then at common law. Together, the common-law courts and the religious dissenters of the seventeenth century achieved the abolition of the royal prerogative courts and caused the enactment of a privilege against self-incrimination in ecclesiastical courts. When the common-law courts finally gave substance to their own implied privilege against self-incrimination in the late–1600s, they viewed it as a limitation on the power of centralized government to punish crimes of conscience by diluting the procedural protections of the common law.

In subpart F we turn to the American colonies. Subpart F.1 discusses colonial criminal procedure and the recognition of the privilege in America. The colonists gradually came to view the repressive measures of the British authorities as a repeat of the actions of the prerogative courts of the seventeenth century—the institutions which had driven many of their ancestors out of England. We explain in subpart F.2 the various attempts to codify the privilege after the

American Revolution. Eight of the thirteen newly-independent states enacted an explicit privilege against self-incrimination. Almost all early discussion of the privilege limited its application to criminal prosecutions. We conclude that the Framers adopted a privilege against self-incrimination, applicable in "any criminal case," as a limitation on the power of centralized government to prosecute crimes of conscience by weakening the procedural protections of the common law.

## A.

### 1.

Early in the history of the Roman Catholic Church, confession of sin became an obligation of faith. The Church decided during the third century A.D. that parishioners would be more likely to confess privately to a priest than publicly before the congregation. *See* Albert W. Alschuler, *A Peculiar Privilege in Historical Perspective: The Right to Remain Silent*, 94 Mich. L.Rev. 2625, 2639–40 (1996). Parishioners naturally would have expected that a public confession of crime would result in punishment by ecclesiastical or secular authorities, and confidentiality helped to overcome their reluctance to expurgate their sins. Christians were free from the moral duty spontaneously to confess their sins in public. In the eyes of the Church, they had a right to remain silent about their own transgressions.

This privilege against public confessions, however, ceased to apply once an accuser stepped forward and informed the ecclesiastical authority that an individual had committed an offense. A formal accusation placed the burden of proof on the accused to exonerate himself. The accused discharged the burden of proof through the successful performance of a ritualistic test, the nature of which was decided by the ecclesiastical court based on the accusation. The primary methods of proof were ordeal,[18] battle, and precise

---

**16.** By "prerogative" tribunals, we mean the hybrid law-and-equity courts established by the Crown during the fifteenth and sixteenth centuries to execute the orders of the monarch.

**17.** When Henry VIII established the Commission in 1535, it had no formal name. Under Eliza-

beth I, it came to be known as Her Majesty's Commission for Causes Ecclesiastical. It is also routinely referred to as "the High Commission."

**18.** The two primary methods of proof by ordeal were "trial by water" and "trial by fire." *See* 2 Frederick Pollack & Frederic W. Maitland, The

oaths accompanied by the supporting oaths of relatives. *See generally* 2 Frederick Pollock & Frederic W. Maitland, The History of English Law 598–602 (Legal Classics Library 1982) (1899) (explaining the different methods of proof sanctioned by the Ecclesiastical tribunals). The purpose of these rituals was to allow God through divine intervention to reveal which party was telling the truth.

Each of the methods of proof relied entirely on the behavior of the defendant, under the threat of a penalty, to determine guilt. In this sense, every conviction under the ancient methods of proof was a conviction based on self-incrimination.[19] For example, if a party came forward with an accusation that adhered to the proper formulas, the court might force the defendant to pay a fine or, alternatively, to swear, along with twelve family members, to the falsity of the charge. If the defendant and these co-swearers precisely recited the appropriate set of oaths, the defendant would be acquitted. If not, the defendant would be convicted. All convictions under the ancient methods of proof resulted from the defendant's failure to perform the required test.

In early medieval ecclesiastical procedure, then, the accusation ended a defendant's right to remain silent. If properly accused, a defendant could be summoned and forced to prove his innocence: *"Licet nemo tenetur seipsum prodere, tamen proditus per famam tenetur seipsum ostendere utrum possit suam innocentiam ostendere et seipsum purgare"* ("Although no one is bound to produce himself, he who is singled out by rumor is bound to show whether he can prove his innocence and to purge himself."). *See* M.R.T. MacNair, *The Early Development of the Privilege Against Self-Incrimination,* 10 Oxford J. Legal Stud., Spring 1990, at 66, 70. This *"nemo tenetur* principle" marked the boundary between protected silence and compelled self-incrimination. There was no privilege against self-incrimination after an accusation was made.

Moreover, beginning in the ninth century, the Church relaxed the requirements for a legally sufficient accusation, which increased the use of self-incriminatory tests. Ecclesiastical courts began to prosecute individuals not just on the basis of a private accusation, but also on the basis of public rumors of wrongdoing. *See* Adhémar Esmein, A History of Continental Criminal Procedure with Special Reference to France 79 (1913). Church leaders sought this expansion of ecclesiastical jurisdiction because private accusers often refused to come forward and face the severe penalties for false accusation.

The Church borrowed one method of discovering rumors of wrongdoing from the roy-

History of English Law 598–99 (Legal Classics Library 1982) (1899). During the trial by water, a priest blessed a pool of water, into which the accused was then thrown. If the accused sank, the accused was "accepted" by the holy water and deemed innocent. Those who floated, however, were convicted by virtue of the water's "rejection."

During the trial by fire, the accused had to walk holding a white-hot iron for a certain distance (the more notorious the crime or the criminal, the longer the distance). Afterwards, a priest blessed the wound. If the wound healed within a predetermined number of days, the accused was exonerated. If the wound festered, however, the accused was adjudicated guilty.

19. The ancient methods of proof clearly produced convictions based on compelled self-incrimination. One could argue, however, that such self-incrimination was not "testimonial," because the court did not force the accused to speak about the facts surrounding the alleged crime—which is how we think of testimonial self-incrimination today. *See generally Doe v. United States,* 487 U.S. 201, 210, 108 S.Ct. 2341, 2347, 101 L.Ed.2d 184 (1988) ("[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information.").

Nevertheless, the ancient methods of proof were testimonial in a very basic sense: the accused indicated through word and deed whether or not the accused had, in fact, committed the alleged offense. During the early middle ages, the ancient methods of proof were considered valid mechanisms for uncovering the facts. Modern society has since rejected the concept that God intervenes during an ordeal, battle, or oath to reveal the facts through the body of the accused. Since the introduction of the jury trial in the late 1100s, our legal system has come to view facts as neutral and unsusceptible to divine determination. However, from an eleventh-century perspective, the performance of an ordeal, battle, or oath was testimony. Therefore, convictions under the ancient methods of proof involved a primitive type of compelled, testimonial self-incrimination.

al courts of Charlemagne—a procedure later known as the "inquest." *See generally* Leonard W. Levy, Origins of the Fifth Amendment 22 (1st ed.1968) (explaining the ecclesiastical inquest). A bishop would visit a monastery and convene an inquest of several monks. The bishop would "deputize" this group to reveal those who were rumored to be guilty of certain crimes. *See id.* The bishop would then call the accused to exculpate themselves.

Defendants incriminated by popular report of an inquest could still obtain an acquittal through the successful performance of an ordeal or an oath, but, as discussed above, these methods of proof effectively compelled defendants to be witnesses against themselves by placing on them the burden of proving their innocence. On the other hand, those who refused the opportunity to exonerate themselves were condemned as if they had confessed. Thus, the implementation of the ecclesiastical inquest increased the use of compelled self-incrimination. Until 1198, however, an ecclesiastical court could not proceed against an individual without, at very least, a private accusation or a strong rumor of criminal activity, as indicated, for example, through an inquest.[20]

In 1198, Pope Innocent III began to issue a series of decretals authorizing a procedure that became infamous under the auspices of the Holy Inquisition, the *processus per inquisitionem* (the "inquisitional procedure"). *See generally* Esmein, *supra,* at 80. The inquisitional procedure was novel in two main respects. First, a priest was permitted to proceed, on the authority of his office, against individuals who had not been accused of any wrongdoing. A priest could initiate secret proceedings against any individual by gathering witnesses and interrogating them separately. If the witnesses examined by the priest incriminated the target of the investigation, the priest could summon the target.

Second, Innocent III authorized the administration of a different kind of oath, the oath *de veritate dicenda* (the "inquisitional oath") to witnesses. The inquisitional oath required witnesses, including defendants, to answer truthfully all the questions to be asked by the judge—often before they knew the nature of the questions to be asked.[21] For defendants, silence in the face of an accusation was taken as a confession of guilt. Once again, the ecclesiastical courts had expanded the use of compelled self-incrimination.

The first defendants who were tried under the inquisitional procedure objected to the absence of any public accusation of wrongdoing against them. The church hierarchy responded by pointing to numerous biblical examples of God's intervention in the affairs of men. Just as God interceded to punish and reform sinners, so too could God's Church through its ministers. *See* Esmein, *supra,* at 81.

The first defendants also objected to the Church's refusal to allow them to exculpate themselves with a purgatory oath, a simple, blanket denial of wrongdoing. The church leaders responded that the inquisitional oath was actually more lenient than the purgatory oath. To use a purgatory oath, the defendant had to obtain supporting oaths from relatives and friends. Under the inquisitional oath, by contrast, the accused's promise to tell the truth sufficed without more.

Finally, these defendants argued that the longstanding privilege against public confessions, originally adopted to encourage confidential confessions, barred the administration of the inquisitional oath. The Church leaders rejected this argument too. The privilege against public confessions merely spared the faithful from the requirement of

---

**20.** An ecclesiastical court could also proceed against an individual caught in the commission of a proscribed act. *See* Esmein, *supra,* at 124–25. Capture in the act was thought to excuse the requirement of a formal accusation because the circumstances themselves served as an accusation. Such cases, however, were presumably rare.

**21.** This new oath differed from the purgatory oath, a method of proof discussed in the text above. The purgatory oath allowed defendants to obtain an acquittal by swearing to their own innocence. The new inquisitional oath required defendants to respond to fact-based questions posed by the prosecution.

spontaneously producing evidence of their own guilt in public. That privilege did not entirely excuse the wayward from their duty to confess; once formally accused of a crime, they were required to confess their error or purge themselves. The Fourth Lateran Council upheld the inquisitional procedure in 1215 and effectively decided that the sanctity of the confessional provided no defense against the imposition of the inquisitional oath.

Thus, the ecclesiastical courts of the early medieval period recognized no privilege against self-incrimination. The only limitation on prosecutorial discretion was the requirement of an accusation, as represented by the *nemo tenetur* principle. The first real debate about compelled self-incrimination centered on *who* could accuse—not whether the defendant should be exempt from all sworn interrogation. The inquisitional procedure simply allowed the judge to decide that a common report of criminal wrongdoing was sufficient to overcome the privilege against public confessions.

2.

Before the Norman Conquest in 1066, the English common-law courts heard both secular and religious cases according to the ancient accusatorial system of ordeals, battles, and oaths. Religious and secular jurisdictions were unified. During this period of shared jurisdiction, the common-law courts effectively adopted the *nemo tenetur* principle: an individual could only be forced to face the ordeal, fight, or swear if properly accused. The *nemo tenetur* maxim was enshrined in chapter 28 of the Magna Carta, the first English bill of rights: "No Bailiff can put any one to his Law upon his single accusation, without sufficient witnesses." Magna Carta ch. 28 (1215).

In accordance with continental custom, however, William the Conqueror severed secular from ecclesiastical jurisdiction sometime in the latter 1160s. *See* 1 Pollack & Mait-

land, *supra*, at 97–98. In 1236, a papal emissary announced the Pope's promulgation of the inquisitional procedure at the Pan–Anglican Council in London. *See* John H. Wigmore, *The Privilege Against Self–Incrimination; Its History*, 15 Harv. L.Rev. 610, 610 (1902). Thereafter, administration of the inquisitional oath became routine in English ecclesiastical courts.

The English secular courts, by contrast, never adopted the inquisitional procedure. They had split off from the ecclesiastical courts some seventy years earlier. The most common form of secular criminal trial in twelfth-century England involved an accusation of wrongdoing by private citizens.[22] Before the defendant was required to answer, the accuser would be required to make an offer of proof by obtaining the supporting oaths of so-called "suitors," who were usually the accuser's relatives or allies in the community.

Unlike the ecclesiastical courts, English common-law courts dispensed with this formal, private accusation of crime in only two situations. First, if someone was caught in the act of committing a crime or in flight from a crime, courts would usually impose a punishment without any further inquiry. Second, individuals could be tried without a private accusation if an inquest offered up their names as reputed felons.

From the time of Charlemagne, the Norman kings authorized their itinerant justices of the peace ("JPs") to summon groups of prominent local inhabitants—or "jurors"—to answer under oath about the affairs of the locale. *See generally* 2 Pollock & Maitland, *supra*, at 520–21. During the twelfth century, JPs began to use the inquest of jurors to inquire about reputed criminals. *See generally* 1 Pollock & Maitland, *supra*, at 140–141. If the inquest swore that a particular individual was rumored to be a thief, for example, that individual would be arrested and jailed.[23] The court held no preliminary inquiry re-

---

**22.** Any private citizen could accuse any other private citizen of a crime. The accuser need not have been personally interested in the outcome. *See* Esmein, *supra*, at 336. Of course, false accusations carried heavy penalties.

**23.** In addition to JPs, coroners could call an inquest in cases of homicide. The inquest would determine the cause of death and search for the guilty parties. *See generally* Esmein, *supra*, at 335–36.

garding the truth of the allegation. *See* 2 Pollock & Maitland, *supra*, at 582. At trial, the accused would be required to make an offer proof, just as if a private plaintiff had made the accusation.

In sum, like defendants in the ecclesiastical courts of the twelfth century, defendants at common law could only be summoned to answer for a crime if properly accused. *See* Esmein, *supra*, at 337. Once accused, defendants at common law, like defendants in church proceedings, were required to offer proof of their innocence in the form of an ordeal, battle, or oath. They too had no privilege against self-incrimination. Ecclesiastical and secular proceedings differed primarily in that, from the early thirteenth century, church leaders themselves were permitted to accuse on the authority of their office, while JPs had to wait for a private accusation or an indictment by inquest.

## B.

### 1.

Beginning in the thirteenth century, trial by jury began to replace the ancient methods of proof in English common-law courts. This development removed from the defendant's shoulders the burden of proof associated with ordeals, battles, and oaths. By allowing defendants recourse to an ostensibly neutral determination of guilt or innocence, the jury trial ended the automatic self-incrimination inherent in the ancient methods of proof.

Ordeals, battles, and oaths fell into disfavor. In 1215, the Fourth Lateran Council forbade the clergy from participating in trial by ordeal, depriving these rituals of their religious sanction. Trial by battle was rarely available because of several exceptions, such as the exception for aged and infirm litigants, and the widespread use of hired champions undermined the perceived validity of battle. *See* 2 Pollock & Maitland, *supra*, at 633. Courts were reluctant to allow trial by oath in metropolitan jurisdictions, where professional swearers could earn easy acquittals for their clients. Defendants in rural common-law courts often found it difficult to gather sufficient relatives and neighbors willing to swear the required supporting oaths. More-

over, courts often refused to allow repeat offenders to take the purgatory oath. With these older forms of proof in decay, the common-law courts of the thirteenth century began to turn to a different method of proof—the ubiquitous inquest.

Trial by jury arose from the combination of two procedural reforms: the fact-finding inquest and the exception. As noted above, the Norman kings used inquests in the eleventh century to indict suspected criminals. Beginning in 1164, King Henry II also authorized private litigants to summon an inquest to resolve certain types of civil disputes. *See* 1 Pollock & Maitland, *supra*, at 145–46. Around the same time, the royal courts were beginning to recognize the defendant's ability to "take exception" to the plaintiff's allegations. *See* 2 Pollock & Maitland, *supra*, at 587—88. Instead of denying the allegations outright, the defendant could, for example, attack the plaintiff's pleadings on the ground that the complaint was motivated by "hatred and spite." During the mid-thirteenth century, defendants began to obtain writs of inquest to determine the validity of the exception. By taking exception and summoning an inquest, a civil litigant in the king's courts could choose to be "put upon his country"— to rely on a verdict of his neighborhood— instead of vindicating himself through ordeal, battle, or oath. The combination of inquest and fact-based exception created the jury trial.

Jury trials spread to criminal cases in the latter half of the 1200s. *See id.* at 618. At first, the inquest that was called to inform the king of suspected lawbreakers also decided the guilt of the accused at trial. In 1352, however, King Edward III established that the defendant could exclude from the trial jury any person who was on the inquest that accused him, a reform which effectively separated the grand jury from the petit jury. Although trial by battle was not abolished until 1819, and trial by oath was not abolished until 1833, the jury trial soon came to dominate the landscape of English criminal procedure. *See* Esmein, *supra*, at 334.

The jury trial was a necessary step towards the recognition of the privilege against self-incrimination. The arrival of the jury

trial allowed defendants to discharge their burden of proof without themselves becoming involved in the adjudication. Instead of performing a religious ritual, engaging in battle, or taking an oath, defendants could rely on an impartial determination of the underlying facts. Unlike a conviction under the ancient methods of proof, conviction by a jury did not necessarily entail self-incrimination by the defendant. The rise of the jury trial effectively ended the use of the self-incriminatory methods of proof.

### 2.

The advent of the jury trial, however, did not cause the common-law courts to recognize a privilege against self-incrimination. There was no immediate need for a privilege against compelled, testimonial self-incrimination because in early-fourteenth-century England, the jury heard no courtroom testimony at all—much less compelled, self-incriminatory testimony. *See id.* at 328. Jurors decided a defendant's guilt based on their own personal observations, their judgments about the defendant's character, and even hearsay and gossip within the community. Conscientious jurors investigated the crime on their own initiative by interviewing witnesses and visiting the crime scene. *See id.* at 327. Juries still rendered verdicts on the basis of their own private sleuthing well into the eighteenth century. *See id.* at 329.

Live witness testimony became a regular fixture in jury trials only in the sixteenth century. *See* 9 William Holdsworth, A History of English Law 178 (3rd ed. 2nd prtg. 1976) (1926). Even then, the question of testimonial self-incrimination did not immediately arise, for two reasons.

First, defendants were barred from testifying under oath at trial. Defendants were initially disqualified because allowing them to give sworn testimony was thought to combine unfairly two methods of proof—trial by oath and trial by jury. *See* Wigmore, *The Privilege Against Self-Incrimination, supra,* at 628. The common-law courts allowed defendants only one method of proof—one "bite of the apple." As the law of evidence evolved, courts began to exclude the defendant's sworn testimony based on its assumed

unreliability. Defendants were considered presumptively biased. Although the absence of defense counsel forced defendants to *argue* on their own behalf at trial, common-law courts ruled in the latter half of the sixteenth century that the jury was not to assign any evidentiary value to the defendant's *factual* assertions. *See* 9 Holdsworth, *supra,* at 195. In fact, criminal defendants could not testify under oath at all until 1872, and they could not testify under oath in all criminal cases until 1898. *See* Frederic W. Maitland & Francis C. Montague, A Sketch of English Legal History 176 & n. 3 (1915). Accordingly, until 1872, the state could not have compelled the defendant to testify under oath at trial.

Second, until the mid-sixteenth century, all nonparty witness testimony in common-law criminal trials was voluntary. The Chancery Court invented the subpoena in the fourteenth century to compel the attendance of nonparty witnesses in equity cases. *See* 9 Holdsworth, *supra,* at 184. Common-law courts, however, did not obtain this power until 1562. Before then, nonparty witnesses testified, if at all, only reluctantly, mainly because they assumed potential liability for false imprisonment if the opposing party prevailed at trial. *See* 9 Holdsworth, *supra,* at 130—31. Because all nonparty witness testimony was voluntary until the mid-sixteenth century, nonparty witnesses could not be compelled to incriminate themselves.

Therefore, introduction of the jury trial did not immediately give rise to a need for the privilege against self-incrimination. Jury trial, however, did set the stage for an implicit recognition of a privilege against self-incrimination in the sixteenth century. As the jury began to hear evidence, courts began to consider what types of evidence should be excluded. New investigative techniques, including the preliminary examination of the accused and compulsory process for witnesses, produced incriminatory testimony. The common-law courts reacted to these procedural innovations by restricting the permissible scope of the defendant's interrogation.

## C.

The procedural innovations began in 1383. In that year, Parliament passed the first statutes authorizing JPs to examine suspects and witnesses before trial in minor criminal matters. These preliminary examination statutes covered a wide array of subject matters, from heresy to poaching, and established a variety of procedures to be applied, depending on the nature of the case. Most of the early statutes concerned misdemeanors and simply authorized JPs to take testimony and decide guilt themselves, dispensing with the trial altogether. The majority of these statutes did not mention whether or not the examination was to be under oath. Other statutes were more specific and actually required the JPs to take sworn testimony from the witnesses and the suspect.

For example, a 1414 statute authorized the JPs to interrogate laborers under oath to discover if they had committed any crimes. *See* John H. Langbein, Prosecuting Crime in the Renaissance: England, Germany, France 68 (1974). In the sixteenth century, Parliament authorized common-law courts to interrogate under oath accused bankrupts, abusers of warrants, and other specific types of criminals. *See* 8 John H. Wigmore, Evidence in Trials at Common Law § 2250, at 285—86 (McNaughton rev. ed. 1961). At first, most common-law courts accepted the practice of examining both suspects and witnesses under oath. *See* John H. Wigmore, *Nemo Tenetur seipsum Prodere,* 5 Harv.L.Rev. 71, 76–78 (1891).

In 1554, however, a discourse began among judges about the propriety of sworn interrogation. In that year, Parliament enacted the Bail Statute. *See* An Act appointing an Order to Justices of Peace for the Bailement of Prisoners, 1 & 2 Phil. & M., ch. 13, § 1 (1554) (Eng.) [hereinafter Bail Statute]. In the following year Parliament enacted the Committal Statute. *See* An Acte to take the Examination of Prysoners suspected of Manslaughter or Felonye, 2 & 3 Phil. & M., ch. 10, § 1 (1555) (Eng.) [hereinafter Committal Statute]. These statutes systematically applied the apparatus of the preliminary examination to felonies. The purpose of the Bail Statute and the Committal Statute was to augment the system of private accusa-

tions in cases of serious crime where no accuser stepped forward. *See* Langbein, *supra,* at 39.

The system established by the Bail Statute and the Committal Statute functioned as follows: if the suspects or witnesses were not already before the court, the court could compel their attendance by issuing a warrant to the sheriff to apprehend them and bring them into court. *See* Michael Dalton, The Countrey Justice 400–01 (Legal Classics ed.1996) (1655). Once the parties were present, the court examined them and recorded only the information that could be used to prove the guilt of the accused. *See* Committal Statute, *supra,* at § 1; *see also* Bail Statute, *supra,* at § 1 (providing similar language). JPs had no authority to discharge accused felons. Until the nineteenth century, in fact, they were required to either jail or bail the accused—the preliminary hearing was not a probable cause hearing. *See* J.M. Beattie, Crime and the Courts in England 1660—1880, at 271 (1986).

The language of the statutes did not tell JPs whether or not to interrogate suspects and witnesses under oath. In practice, JPs consistently threatened, cajoled, and badgered suspected felons into confessing at the preliminary hearing. JPs recorded any incriminating statements and presented them to the jury at trial. Reading the record of the examination was the first step in most criminal trials during the sixteenth and seventeenth centuries. *See* 8 Wigmore Evidence, *supra,* § 2250, at 286. The suspect's statements during the examination were apparently treated as admissions. Magistrates were not required to warn suspected felons of the potentially dire consequences of their pretrial statements, however, until 1848. *See* Sir John Jervis' Act (Administration of Criminal Justice), 11 & 12 Vict., ch. 42, § 18 (1848) (Eng.).

Nevertheless, JPs disagreed for several decades about whether suspected felons should be administered an oath before the interrogation. For the first two decades after the enactment of the statutes, some courts apparently took sworn testimony while others did not. In the 1580s, however, a consensus began to emerge that common-

law courts should not interrogate suspected felons under oath during the preliminary examination. *See* Levy, *supra,* at 107. In support of this new rule, the common-law judges of the seventeenth century reiterated the arguments of the ecclesiastical lawyers of the 1200s, particularly the *nemo tenetur* principle.

Under the ancient accusatorial system, a suspected felon could only be brought to trial on the basis of a private accusation or an indictment by an inquest of jurors. Chapter 28 of the Magna Carta established the requirement of an accusation early in the history of the common law. Some common-law judges opined that allowing the court to interrogate suspected felons under oath during the preliminary examination would undermine the requirement of an accusation. They reasoned that, in effect, sworn interrogation forced the suspect to take an oath before a private citizen or an inquest had accused him:

> The offender himself shall not be examined upon oath, for by the Common Law, *Nullus tenetur seipsum prodere:* Neither was a mans fault to be wrung out of himself (no not by examination only) but to be proved by others, untill the Stat. of 2 & 3. Ph. & M. cap. 10. gave authority to the Justices of peace to examine the Felon himself.

Dalton, *supra,* at 369. Thus, the common-law courts rejected the path taken by the ecclesiastical courts in establishing the inquisitional procedure.

Against the background of the jury trial and testimonial disqualification, this application of the *nemo tenetur* principle by the common-law courts effectively conferred on defendants an implied privilege against self-incrimination. As originally conceived, the *nemo tenetur* principle allowed a court to force properly accused defendants to swear to their innocence at trial. The ecclesiastical courts essentially had followed this model: once a private accuser, an inquest of clerics, or the bishop summoned a defendant, the trial court formally interrogated the defen-

dant and other witnesses under oath and based its verdict on their testimony.

Common-law courts, by contrast, gave defendants the option of exoneration through jury trial rather than through oath or battle. Moreover, the disqualification of defendants from testifying under oath at trial prevented the state from calling them as witnesses. Under the common-law rule, then, the *nemo tenetur* principle barred the court from interrogating defendants under oath at the pretrial hearing, and proof by jury plus witness-disqualification allowed defendants to avoid giving incriminatory testimony at trial. In combination, these policies prevented the state from compelling defendants to testify against themselves.

The implied privilege against self-incrimination for defendants contrasted with the treatment of nonparty witnesses. As noted above, JPs had the power to compel the attendance of witnesses at the examination by issuing a warrant to the sheriff to bring them before the court. *See id.* at 401. The Bail Statute and the Committal Statute further authorized magistrates to bind over prosecution witnesses who were before them to give testimony at trial against the defendant. *See* Committal Statute, *supra,* at § 2; *see also* Bail Statute, *supra,* at § 1 (providing similar language). In other words, after recording the testimony of prosecution witnesses, the examining magistrate could require those witnesses to post a bond to secure their attendance at trial.[24] If a witness refused to post a bond, then the magistrate could incarcerate the witness to ensure attendance. *See* Dalton, *supra,* at 397.

If a witness before the court agreed to be bound over but failed to appear, JPs apparently had several options. First, they could order the forfeiture of the witness's bond. Second, they could jail the witness for contempt. *See id.* at 401. Third, they could substitute the transcript of the witness' prior sworn testimony for the expected trial testimony, provided that the JP who presided over the preliminary examination was pres-

---

24. If the identity of witnesses became known after the examination had already taken place, JPs after 1562 could subpoena their testimony under penalty of a large fine. *See* An Act for the Punyshement of suche persones as shall procure or comit any wyllfull Perjurye, 5 Eliz., ch. 9, § 6 (1562) (Eng.).

ent to attest to the accuracy of the transcript. *See* Langbein, Prosecuting Crime, *supra,* at 30 (citing 2 Thomas Smith, *De Republica Anglorum* 79–80 (L. Alston ed., 1906) (1565)). Fourth, JPs could order a continuance until the prosecution could persuade the witness to testify. Fifth and finally, JPs could order the release of the defendant, but they rarely chose this option. *See id.* Thus, the Bail and Committal Statutes expanded the courts' power to compel the testimony of prosecution witnesses in criminal cases.[25]

Despite the potential for compelled self-incrimination, the common-law courts did not recognize a privilege for nonparty witnesses until the second half of the seventeenth century. *See* 9 Holdsworth, *supra,* at 199, 229. For example, in the 1580 trial of Thomas Tresham for harboring a heretic, the Lord Chief Justice opined that nonparty witnesses could be compelled to testify under oath at trial, regardless of the nature of their testimony, because they were not themselves in criminal jeopardy. *See* Levy, *supra,* at 105. While JP manuals of the time cited the *nemo tenetur* maxim for the proposition that judges should not question suspects under oath at the preliminary examination, those same manuals instructed JPs to interrogate witnesses under oath. *See, e.g.,* Dalton, *supra,* at 369.

Therefore, with regard to defendants, an implied privilege against self-incrimination originated in the application of the *nemo* *tenetur* principle to preliminary examinations under the Committal and Bail Statutes. While the common-law courts generally applied the *nemo tenetur* maxim to interrogation of the defendant at the preliminary investigation, they simultaneously required sworn testimony from nonparty witnesses, apparently without regard to the potential for self-incrimination. This contrasting treatment indicates the presence of a limited privilege against self-incrimination for defendants. Nevertheless, the common-law courts did not recognize an explicit privilege against self-incrimination, for defendants or nonparty witnesses, until the late seventeenth century.

### D.

Discussion of an explicit privilege against self-incrimination began in the early seventeenth century and arose in two contexts. First, the English common-law courts began to attack the jurisdiction of the prerogative tribunals established by the monarchy for the enforcement of religious and political orthodoxy. The common-law courts did not challenge these rival courts in defense of an individual right to remain silent in the face of self-incriminating questions. Rather, the common-law courts sought to block the Crown from undermining common-law jurisdiction by creating special courts that could operate free from the constraints of common-law procedure.

---

**25.** At common law, criminal defendants were not permitted to call witnesses on their behalf until 1589, when Parliament allowed defense witnesses to give unsworn testimony in cases involving the theft of army supplies. *See* An Acte againste ymbeaziling of Armor Habylimente of Warre and Victuall, 31 Eliz., ch. 4, § 2 (1589) (Eng.). In 1606, Parliament expanded this right by allowing English citizens accused of crime in Scotland to call sworn witnesses on their behalf. *See* An Act for the utter abolicion of all memory of Hostilitie and the Dependances thereof beweene England and Scotland, and for the repressinge of occasions of Discord and Disorders in tyme to come, 4 Jam., ch.1, § 6 (1606) (Eng.). These particular defendants were also entitled to process (presumably subpoenas) for the production of their witnesses. *See id.* at § 7. In the vast majority of cases during the seventeenth century, however, defendants could not call witnesses on their behalf, much less obtain process to compel their attendance.

In 1695, Parliament authorized defendants charged with treason to compel the attendance of defense witnesses. *See* An Act for regulateing of Tryals in Cases of Treason and Misprision of Treason, 7 & 8 Will. 3, ch. 3, § 7 (1695) (Eng.). These defense witnesses could also give sworn testimony. *See id.* at § 1; *see generally* 4 William Blackstone, Commentaries on the Laws of England 359–60 (William D. Lewis ed., 1902) (1765) (explaining the development of the rule allowing defendants to call sworn witnesses). In 1702, Parliament expanded these rights to include all defendants accused of a felony. *See* An Act for punishing of Accessories to Feloneys and Receivers of stolen Goods to prevent the wilful burning and destroying of Ships, 1 Anne, ch. 9, § 3 (1701) (Eng.). Thus, in England, the prosecution could compel the attendance of sworn witnesses from the mid-sixteenth century, but ordinary defendants had to wait until the beginning of the eighteenth century for the same right.

Second, the religious nonconformists of the early seventeenth century asserted the privilege as a method for obstructing the prosecution of crimes of conscience. Opponents of the Church of England cited the *nemo tenetur* maxim as an argument against the royal prerogative courts—the Star Chamber and the Commission—that were enforcing establishmentarian dogma. For both the common-law courts and the religious dissenters of the period, the implied privilege against self-incrimination in common-law criminal cases came to represent a limitation on the power of centralized government to take action against private citizens.

### 1.

The scope of the Church's jurisdiction over the laity did not become settled until the seventeenth century. During the thirteenth century, the Church assumed broad jurisdiction over several types of disputes, including the correction of sinners. Ecclesiastical jurisdiction included prosecution of fornication, adultery, incest, defamation, usury, simony, perjury, heresy, and sorcery. *See id.* at 129–30. With ecclesiastical jurisdiction sometimes came the severe inquisitional procedure. *See generally,* Levy, *supra,* at 47–48.

Protests against the severity of the inquisitional procedure may have led Parliament to pass the *Prohibitio Formata de Statuto Articuli Cleri* in the early 1300s. *See* Levy, *supra,* at 48–49. This statute purported to restrict the use of the inquisitional oath and thereby limit the jurisdiction of ecclesiastical tribunals. The statute provided that JPs should not allow "that laypersons in their bailiwick be called somewhere to give testimony on their oath, *except in causes matrimonial and testamentary.*" *See* Wigmore, *The Privilege Against Self-Incrimination, supra,* at 611–612 (emphasis added).

The statute, however, did not specify how JPs were to prevent such interrogations, and, in practice, ecclesiastical courts continued to prosecute sin among the laity, particularly after 1382. *See generally* Levy, *supra,* at 49. In fact, by statute, ecclesiastical courts formally received jurisdiction over the crime of heresy in 1401. *See* Wigmore, *The Privilege Against Self-Incrimination, supra,* at 618.

They frequently employed the inquisitional procedure against suspected heretics during the fifteenth and early sixteenth centuries. *See generally* Levy, *supra,* at 60.

During the mid-sixteenth century, the monarchy and Parliament continually revised the Church's jurisdiction over heresy. Finally, in 1558, Parliament under Elizabeth I effectively repealed the 1401 statute and once again confined the jurisdiction of ordinary ecclesiastical courts to matrimonial and testamentary suits. *See* Wigmore, *The Privilege Against Self-Incrimination, supra,* at 619. The sixteenth-century common-law courts then made a sincere effort to restrict the ordinary ecclesiastical courts to this limited purview.

Beginning around 1590, common-law courts began to issue a steady stream of writs of prohibition against ecclesiastical proceedings thought to infringe common-law jurisdiction. *See* Levy, *supra,* at 221. A writ of prohibition temporarily halted all pending proceedings until a common-law court could determine whether common-law jurisdiction was involved. *See Id.* at 220. The reviewing court might then permanently enjoin the ecclesiastical judge from proceeding or, alternatively, issue a "writ of consultation" which canceled the writ of prohibition and allowed the ecclesiastical court to continue. *See id.*

In seeking a writ of prohibition against pending church proceedings, petitioners naturally pointed to the harm that they would suffer if the common-law court refused to issue the writ. Some petitioners argued that the use of the inquisitional procedure outside matrimonial or testamentary cases undermined the *nemo tenetur* principle as interpreted by the common-law courts. At common law, petitioners argued, a judge could not force an individual to swear unless independently accused, but the inquisitional procedure allowed the bishop himself to accuse and force an oath. According to these petitioners, therefore, allowing a bishop to prosecute matters outside his jurisdiction would prejudice their common-law rights. In the early seventeenth century, the royal courts began to issue large numbers of writs on the

ground that the ecclesiastical courts had exceeded their jurisdiction.

The issuance of writs on jurisdictional grounds, however, did not represent the recognition of an explicit privilege against self-incrimination by the common-law courts. For instance, during the early seventeenth century, the common-law courts refused to enjoin the use of the inquisitional procedure against clergymen or against laypersons who were involved in matrimonial or testamentary disputes. The common-law courts of the early seventeenth century sought to limit the potential abuses of compelled, inquisitional self-incrimination, not to eliminate it altogether. See MacNair, supra, at 73. They perceived the expanding jurisdiction of the prerogative courts of the king as a threat to their continued survival, particularly in light of the efficiency with which the inquisitional procedure produced convictions.

2.

a.

Since early in the history of England, the king dispensed prerogative justice through his appointed officials. See William Hudson, A Treatise of the Court of Star Chamber 9–10 (Legal Classics ed.1986) (1792). Beginning around 1290, a group of these officials began regularly to advise the king on the resolution of legal disputes which were of interest to the Crown. The Privy Council, as the group came to be called, also performed several other executive functions.[26] By the mid-fourteenth century, when the Privy Council acted as a court, it sat in a room at Westminster ornamented with the king's star-shaped seal. The Council-as-tribunal came to be known as the Court of Star Chamber.

The Star Chamber was a prerogative court of the monarchy. The Star Chamber could punish all offenses except treason and enumerated felonies. See Levy, supra, at 100. In general, it heard cases involving misuse of judicial power, official corruption, rioting, disobedience to royal writs, perjury, contempt, forgery, counterfeiting, and fraud, but the court's jurisdiction was not limited to these crimes. See id. The Star Chamber could "not only ... take causes from other courts and punish them [itself], but also ... punish offences secondarily, when other courts have [already] punished them." Hudson, supra, at 115–16. The Star Chamber could impose sentences of torture, imprisonment, fines, or mutilation, but it could not order the execution or dismemberment of the defendant, as these penalties were reserved to the common-law courts. See Levy, supra, at 100.

The Star Chamber had the power to change its own procedures, a power which it exercised with some frequency. See 5 William Holdsworth, A History of English Law 187 (3rd ed. 2nd prtg.1973) (1924). In general, however, defendants could only be summoned through a formal accusation by either a private individual or the Crown's counsel. See Levy, supra, at 182–83. Once accused, a defendant was compelled to appear and to respond to the accusation. After the accuser reviewed the defendant's answer, the accuser submitted interrogatories which the court asked the defendant to answer.[27] The court recorded the defendant's testimony, and af-

---

**26.** Special committees of the Privy Council later became the House of Lords, the Court of Common Pleas and the King's Bench. See Levy, supra, at 49.

**27.** When the procedures of the Star Chamber began to take shape during the mid-sixteenth century, accusers generally submitted only five to seven interrogatories, each consisting of one question. See Hudson, supra, at 168–9. During the latter half of the sixteenth century, however,

examination was used like a Spanish Inquisition, to rack men's consciences, nay to perplex them by intricate questions, thereby to make contrarieties, which may easily happen to simple men; and men were examined upon one

hundred interrogatories, nay, and examined of the whole course of their lives; but that was grounded especially upon the weakness of the defendant, who is sworn to answer no other interrogatories but such as concern the cause. Id. at 169. The court responded by limiting to four the number of days the accuser had to prepare the interrogatories. This policy apparently failed, and, consequently, the Star Chamber limited the number of interrogatories to fifteen with two questions apiece. Violations of this rule were punished by a fine of fifteen shillings per extraneous interrogatory. Nevertheless, during the seventeenth century "busy clerks or ignorant counsellors" continued to submit lists of up to fifty interrogatories with twenty or thirty questions in each one. Id. at 170.

terwards the defendant reviewed and, if necessary, amended the recorded testimony. The defendant was then required to swear—after the fact—to the veracity of the testimony. *See* Hudson, *supra,* at 171.

At the court's discretion, the parties could compel the attendance of witnesses, provided that the summoning party paid the travel expenses of each witness. *See id.* at 207. The court or its commissioners examined the witnesses under oath, once again using interrogatories submitted by the parties. *See id.* at 199. Based on the pleadings and on the depositions of the defendant and the witnesses, the Star Chamber then rendered its decision. *See id.* at 223.

The Star Chamber recognized no privilege against self-incrimination for defendants. *See* 5 Holdsworth, *supra,* at 187. When defendants refused to answer material interrogatories, the court fined them twenty shillings and repeated their questions. *See* Hudson, *supra,* at 171. If the defendants again refused to answer, the court would double the fine and imprison them until they relented. *See id.* Some obstinate defendants remained in prison for life because of their refusal to testify. *See id.*

Nonparty witnesses in the Star Chamber, by contrast, had a *limited* privilege against self-incrimination. As a matter of policy, the parties were barred from defaming witnesses through "scandalous and impertinent" questions about unrelated crimes. *Id.* at 209. The parties might have used such questions to impeach the credibility of witnesses. Nevertheless, the oath administered to witnesses before the Star Chamber required only that they "make true answer to such interrogatories as shall be ministered unto you as a witness *concerning this cause,* without partiality or affection to either of the parties." *Id.* (emphasis added). If the question did not concern the present crime, the witness could refuse to answer. *See id.*

By implication, however, nonparty witnesses had to answer incriminating questions that *did* concern the present crime. This was particularly true if prosecution of the

alleged crime was very important to the Crown. In a "Case of State," the Star Chamber allowed the prosecution to compel sworn testimony that might place a witness in criminal jeopardy. *See id.* Thus, the defendant had no privilege against self-incrimination before the Star Chamber, but witnesses had a limited privilege, depending on the relevance of the questions and the importance of the case.

Although folklore concerning the Star Chamber continues to inspire antipathy,[28] the Star Chamber itself did not directly orchestrate the persecution of religious nonconformists. Instead, a body that came to be known as "the Commission" prosecuted religious heterodoxy during the late–1500s and early 1600s using the inquisitional procedure. The Star Chamber became associated with the Commission, and therefore incited popular resentment, largely because the Star Chamber upheld on appeal the judgments and practices of the Commission.

### b.

In 1534, Henry VIII split the Church of England from the Roman Catholic Church. The Act of Supremacy unified matters of church and state under the direction of the monarchy and gave the king absolute power to repress heresy. Those who advocated the disestablishment of the Church of England could be considered heretics or traitors, depending on how the monarchy wished to proceed against them. Over time, the prerogative courts of the king, particularly the Star Chamber and Commission, began to adopt ecclesiastical procedures in pursuit of political and religious dissidents.

In 1535, Henry VIII granted to his Chancellor of the Exchequer, Thomas Cromwell, the authority to investigate all matters of ecclesiastical concern and to deal with them as Cromwell saw fit. *See* Roland G. Usher, The Rise and Fall of the High Commission 20 (2nd ed.1968) (1913). This 1535 order was the first in a series of "Letters Patents," or royal decrees, which authorized royal officers

---

**28.** *See, e.g.,* The Star Chamber (Panavision 1983) (depicting a fictional court of private vigilantism established by frustrated judges).

to investigate and punish heresy. Henry's successors also obtained from Parliament their own letters patents, each of which granted broad authority to royal officers to investigate religious nonconformity on behalf of the monarchy. *See, e.g.,* The Act of Supremacy, 1 Eliz., ch. 1, § 8 (1558) (Eng.) (vesting all ecclesiastical jurisdiction in the monarchy and granting the Queen broad power to "correct" heresy, "any matter or cause to the contrary in any wise notwithstanding"). These groups of investigating officers came to be known as "the Commission."

Perhaps because of the broad scope of the letters patents, the early Commission adopted few formal procedures. *See* Usher, *supra,* at 44. From 1535 to around 1570, the Commission basically performed whatever task the Privy Council assigned to it, such as the imprisonment without trial of some particular heretic, the censorship of a pernicious book, or even the consecration of the remains of a martyr whose grave had been defiled in a religious riot. *See id.* at 49–54. During this early period, the commissioners did not convene in one location; they met in private homes, taverns, gardens, or whatever locale served their purpose. To summon an accused, the Commission simply sent a letter stating its demand. *See id.* at 73–74.

What "trials" the commissioners conducted usually began with unsworn interrogation of the suspect by the commissioners. These interrogations often devolved into rambling debates among the accused and the judges, with all parties trading insults. The commissioners borrowed what minimal procedures they required from the canon law, including the inquisitional oath, but until around 1575, the commissioners rarely forced detainees to take the oath. *See id.* at 44. Of course, a conscientious refusal to swear might easily have been taken as an admission of guilt.

The procedures of the Commission took shape with greater clarity during the late sixteenth century, when the Privy Council began to delegate a large number of ordinary ecclesiastical disputes to the Commission. *See id.* at 70. Beginning around 1580, the Commission began to apply the procedures of continental ecclesiastical courts. *See id.* at

76–77. For criminal cases, the Commission used the inquisitional procedure and the inquisitional oath whenever necessary. *See id.* at 107. For example, in heresy trials, the commissioners themselves often accused suspects and administered the oath to them without informing them of the nature of the accusation or the nature of the questions to be asked. Any resulting testimony was used to the detriment of the accused.

### 3.

At first, few defendants protested against the inquisitional procedures of the Star Chamber and the Commission. During the sixteenth century, the Commission focused its attention on uncovering Roman Catholic conspiracies against the monarchy and the Church of England. For some reason, the vast majority of Catholic defendants simply submitted to sworn interrogation without protest. In 1580, for example, the Commission rounded up 170 suspected Catholics in York and interrogated them under oath. Only one suspect refused to take the oath, and he was imprisoned for his refusal. *See* Levy, *supra,* at 99.

Unlike the Catholic dissenters, the Puritan nonconformists of the early seventeenth century vehemently protested against the use of inquisitional tactics by the Crown. For example, a Puritan pamphlet of 1605 condemned the oath as "most damnable and tyrannous, against the very Law of Nature, devised by Antichrist, through the inspiration of the devil." *Id.* at 215 (quoting 2 Benjamin Brook, The Lives of the Puritans 232 (1813) (internal quotation marks omitted)). Puritan defendants made similar arguments in court. For instance, when the Commission attempted to interrogate Nicholas Fuller, a Puritan attorney, concerning his alleged slanders against the Church of England, Fuller attacked the oath as "against the old laws of England, the law of nature, justice, and equity." *Id.* at 236 (quoting The Argument of Master Nicholas Fuller 2–3 (1607) (internal quotation marks omitted)).

The precedent cited by Fuller and others like him provided scant support for a broad privilege against self-incrimination. For instance, Puritan defendants often quoted

chapter 28 of the Magna Carta for the proposition that no one should be forced to testify under oath to their detriment. As noted above, however, Chapter 28 simply encapsulated the *nemo tenetur* principle, which sanctioned compelled self-incrimination if there was sufficient accusation of criminal activity. Puritan defendants, however, refused to testify under oath no matter how clear the evidence against them. *See id.* at 235–36. Accordingly, the Commission and the Star Chamber generally rejected this argument.

The Puritans argued for a general privilege against self-incrimination not because they were entitled to one under precedent, but because they sought to interpose as many procedural objections as possible to their prosecution. In addition to their arguments concerning compelled self-incrimination, Puritan defendants sought writs of prohibition in the common-law courts on two jurisdictional grounds.

First, Puritan defendants argued that the Commission lacked jurisdiction over heresy because heresy was not "matrimonial or testamentary." As discussed above, common-law courts issued many writs on this basis alone.

Second, Puritan defendants argued that the Commission, as an ecclesiastical tribunal, could not impose *secular punishments* in non-matrimonial, non-testamentary suits. *See id.* at 216. Chief Justice Coke particularly favored this argument, which was based on a strained reading of chapter 29 of the Magna Carta. According to chapter 29, "[n]o Free-man's body shall be taken, nor imprisoned, nor disseised, nor outlawed, nor banished, nor in any ways be damaged, nor shall the King send him to prison by force, excepting by the judgment of his Peers and by the Law of the land." Magna Carta ch. 29 (1215). Coke debated with the king and his attorney general that only common-law courts could impose secular punishments because only common-law courts imposed sentence "by the judgment of [one's] Peers and by the Law of the land." *See* Levy, *supra,* at 246.

This language, however, could not have made the common-law jury trial a prerequisite for fines or imprisonment, as suggested by Coke, because in 1215 the jury trial was only one of several methods of proof, any of which could result in fines or imprisonment. Moreover, as Attorney General Hobart replied to Coke, whatever the meaning of chapter 29, the Letters Patent of 1605 (which Coke himself had helped to draft) arguably authorized the Commission to impose whatever punishments it chose. *See id.* at 246–47. Nevertheless, around 1608, with the support of Coke, the common-law courts began to issue scores of writs against the operation of the Commission on the ground that the Commission had overreached its authority. *See generally* Usher, *supra,* at 199–201.

Therefore, Puritan defendants did not specifically oppose the inquisitional oath so much as they generally opposed the Commission itself as an overextension of government power. The Puritans argued for the recognition of a privilege against self-incrimination to thwart the prosecution of their religious beliefs. *See* William J. Stuntz, *The Substantive Origins of Criminal Procedure,* 105 Yale L.J. 393, 411–12 (1995). The Puritans left England for Plymouth Colony in 1620 partly because of the repressive techniques of the Commission and the Star Chamber.

### E.

#### 1.

While the Puritans were leaving England for the colonies, discussion of the Commission and the Star Chamber became part of a national debate on the role of the British monarchy. By 1641, Puritans in Parliament were willing to take a stand against the use of inquisitional procedures in ecclesiastical courts. On the eve of the Revolution of 1642, Parliament passed a statutory privilege against self-incrimination for ecclesiastical proceedings.

In 1637, John Lilburne, a tailor's apprentice, was arrested and charged with importing seditious books. The Star Chamber tried Lilburne and instructed him to testify under oath. Lilburne refused, citing the *nemo tenetur* maxim, even though he had been accused through the affidavits of two of his confederates. After several months of attempted persuasion, the Star Chamber con-

victed him of contempt for his refusal to take the inquisitional oath. Lilburne was beaten severely and returned to prison. From prison, Lilburne managed to write approximately nine tracts condemning the imposition of the oath specifically and the arbitrary exercise of royal power generally.

The pamphlets were widely read by sympathetic members of Parliament. As a result, in 1640, when Charles I called Parliament to raise funds after an eleven-year hiatus, Parliament insisted that the king redress their grievances before they would make any appropriations. Parliament passed two bills, one of which abolished the Star Chamber and the other of which abolished the Commission and the inquisitional oath in ecclesiastical courts. On July 5, 1641, the king assented to both bills. *See* Levy, *supra,* at 281. By statute, defendants in *church* proceedings finally became entitled to a privilege against self-incrimination. The statute did not, however, apply to common-law proceedings, where the privilege remained tacit.

Unlike the implied common-law privilege, the statutory privilege of 1641 was the product of an open campaign against the use of the inquisitional procedure in the ecclesiastical courts. The Puritans, working alongside the common-law courts, made the privilege against self-incrimination a defining feature of the common-law criminal trial. They used the privilege against self-incrimination as a limitation on the authority of the Crown to prosecute crimes of conscience.

### 2.

Ironically, the 1641 enactment of the statutory privilege for church proceedings did not cause the common-law courts to recognize an explicit common-law privilege against self-incrimination in their own courts. Apart from a few high-profile trials during which the judges went out of their way to demonstrate their fairness to the defendant, common-law courts did not create a distinct common-law privilege, motivated by public policy, until the end of the seventeenth century. *See* MacNair, *supra,* at 82. Instead, the common-law courts continued to adhere to procedures that prevented the use of compelled, testimonial self-incrimination at trial—in particular, the *nemo tenetur* principle, the trial by jury, and the witness-disqualification of defendants.

Even in the few cases where a privilege would have been useful to defendants, the common-law courts of the mid-seventeenth century did not allow it. For example, they used inquisitorial procedures to adjudicate cases of criminal contempt. They also required that parties cited for abuse of process answer sworn interrogatories about the alleged crime. *See id.* at 81–82. This practice continued until around 1700. *See id.* at 83.

Furthermore, common-law courts were lenient in their enforcement of the ecclesiastical privilege. *See Id.* at 81. The 1641 act imposed a penalty of 100 pounds and authorized a treble damages action against any official who required a suspected criminal to give sworn testimony. A 1661 act of Parliament repealed these punitive measures. Thereafter, defendants in ecclesiastical proceedings could only invoke the privilege against self-incrimination by obtaining a writ of prohibition from a common-law court.

Resulting decisions by the common-law courts permitted ecclesiastical tribunals to interrogate suspects in criminal proceedings, provided that they did not do so under oath, and allowed ecclesiastical courts to use sworn interrogation in civil proceedings. *See id.* at 80. Some common-law courts prohibited the oath only where the suspect faced secular punishment, thus allowing ecclesiastical courts to inflict spiritual punishment (such as excommunication) on the basis of self-incrimination. *See id.* at 81. Hence, the statutory privilege for ecclesiastical courts did not cause common-law courts to immediately adopt their own explicit privilege against self-incrimination.

Beginning in the 1690s, however, common-law courts began to describe the pre-existing, implied privilege against self-incrimination as a reflection of natural law. *See* MacNair, *supra,* at 84 (quoting Geoffrey Gilbert, The Law of Evidence 99 (Garland ed., 1979) (1754)). Courts also began to interpret the privilege as a limitation on the power of

centralized government. Jeremy Bentham wrote:

> Of the Court of Star-chamber and the High Commission Court taken together ... the characteristic feature is, that, by taking upon them to execute the will of the king alone, ... they went to supersede the use of parliaments, substituting an absolute monarchy to a limited one. In the case of the High Commission Court, the mischief was aggravated by the use made of this arbitrary power in forcing men's consciences on the subject of religion. In the common-law courts, these enormities could not be committed, because ..., convictions having never, in the practice of these courts, been made to take place without the intervention of a jury, and the bulk of the people being understood to be adverse to these innovations, the attempt to get the official judges to carry prosecutions of the description in question into effect presented itself as hopeless.... In those days, the supreme power of the State was "de facto" in the hands of the king alone: ... being employed and directed against property, liberty, conscience, every blessing on which human nature sets a value,—every chance of safety depended upon the enfeeblement of it.

8 Wigmore, Evidence, *supra*, § 2250, at 292 (McNaughton rev. ed. 1961) (quoting 7 The Works of Jeremy Bentham 456, 462 (Bowring ed. 1843)).

During the early-eighteenth century, the common-law courts gave substance to the implied common-law privilege. They applied the privilege first to defendants, then to witnesses. *See id.* at 290. For example, when nonparty witnesses were questioned on matters that might tend to incriminate them, the old policy forbidding scandalous and defamatory questions gave way to the new policy forbidding questions that might lead to penal sanctions. By the mid-eighteenth century in England, common-law courts could hold that "[i]t is clearly settled now, that no person is obliged to make a discovery, which will subject himself to a disability." *Harrison v. Southcote*, 1 Atk. 530, 533 (1751). This "clearly settled" principle was a rule of evidence limiting the government's power to establish inquisitional tribunals.

### F.

True to its English antecedents, the privilege against self-incrimination in the American colonies was viewed as a limitation on the power of national government to prosecute religious and political heterodoxy. The colonies adopted the common law of England[29] and with it the unsworn preliminary examination, the jury trial, and the testimonial incapacity of defendants—which in combination gave rise to an implied privilege against self-incrimination for defendants. Because American common-law courts followed English procedure for criminal trials, the need for an explicit privilege did not become apparent to the colonists until the eve of the Revolution. In the mid–1700s, repressive moves by the national government in London rekindled old hatreds for prerogative justice. The result was an American re-enactment of the struggle against the Commission and the Star Chamber.

### 1.

The procedures used by the courts in the trial of criminal cases in early colonial America are not altogether clear. Cases were not generally reported during the seventeenth and eighteenth centuries, and procedures were not authoritatively codified. However, the wide circulation of English JP manuals during this period, such as Dalton's *The Countrey Justice*, seems to indicate that American courts followed contemporaneous English criminal jurisprudence. *See* Levy, *supra*, at 371. The existing data corroborate this hypothesis. *See* Eben Moglen, *Taking the Fifth: Reconsidering the Origins of the*

---

**29.** The Virginia Charter of 1606 applied the "Liberties, Franchises, and Immunities" of England to the English inhabitants of Virginia. *See* First Charter of Virginia (1606), *reprinted in* 1 The Roots of the Bill of Rights 54, 59–60 (Bernard Schwartz ed., 1980) [hereinafter Roots]. "The same guaranty was repeated in the Charter of New England, 1620; the Charter of Massachusetts Bay, 1629; the Charter of Maryland, 1632; the Charter of Connecticut, 1662; the Charter of Rhode Island, 1663; the Charter of Carolina, 1663; and the Charter of Georgia, 1732." *Id.* at 53.

*Constitutional Privilege Against Self–Incrimination*, 92 Mich. L.Rev. 1086, 1092 (1994).

In New York and Virginia, where antique court records are most complete, criminal cases in the seventeenth and early eighteenth centuries typically began with a preliminary examination of the accused and the witnesses. *See* Julius L. Goebel, Jr. & T. Raymond Naughton, Law Enforcement in Colonial New York: A Study in Criminal Procedure (1664–1776) 339–40 (1944); Arthur P. Scott, Criminal Law in Colonial Virginia 55–56 (1930). Just as in England, colonial courts could use warrants to compel the attendance of suspects and witnesses for examination.[30] *See* Hugh F. Rankin, Criminal Trial Proceedings in the General Court of Colonial Virginia 99 (1965).

Statements by the accused could be read into evidence at trial (although the court did not inform the accused of this risk). *See* Goebel & Naughton, *supra*, at 340. Because the accused was barred from hiring defense counsel in felony prosecutions and could rarely afford defense counsel in most misdemeanor prosecutions, the accused was effec-

tively forced to argue at trial.[31] Questioning from the bench (and from the jury box) during trial often led to damaging admissions. *See id.* at 652–53. However, as in England, the court could not force the accused to testify under oath. *See* Scott, *supra*, at 55–56. Thus, if New York and Virginia served as models of colonial justice, common-law defendants in colonial America had an implied privilege against self-incrimination, just as they had in England. *Cf.* Colonial Justice in Western Massachusetts 146 (Joseph H. Smith ed., 1961) (noting that, in colonial Massachusetts, defendants were not examined under oath even though they never claimed a privilege against self-incrimination).[32]

This implied privilege, however, became explicit in the colonies later than it did in England. As late as 1640, the inquisitional oath was administered in heresy prosecutions by the civil authorities in Virginia, *see* R. Carter Pittman, *The Colonial and Constitutional History of the Privilege Against Self–Incrimination in America*, 21 Va. L.Rev. 763, 780 (1935), and in Massachusetts as late as 1647, *see* Levy, *supra*, at 351. During the seventeenth century, the implied privilege

---

**30.** In New York, for example, courts could order the sheriff to bring witnesses to the preliminary examination. *See* Goebel & Naughton, *supra*, at 479. At the examination, courts could bind witnesses on recognizance to testify at trial. *See id.* Courts could also generally subpoena witnesses to testify under penalty of a large fine. *See id.* at 476–77. At least in New York, noncompliance with an order to appear and testify before 1750 usually resulted in a dismissal or a continuance until the witness agreed to come forward. *See id.* at 482–83. After 1750, however, the New York courts began to punish the failure to appear as criminal contempt. *See id.* at 483.

The colonial courts expanded the availability of process for witnesses during the eighteenth century. The defendant's right to compulsory process was established before the end of the Revolution. *See United States v. Burr*, 25 Cas. 30, 32 (C.C.D.Va.1807) (No. 14692D). As of 1750, Pennsylvania, Maryland, Massachusetts, and Virginia guaranteed compulsory process for defense witnesses by statute. *See* Peter Westen, *The Compulsory Process Clause*, 73 Mich. L.Rev. 71, 93 (1974). By 1783, nine of the thirteen colonies had included a right to compulsory process in their state constitutions. *See* Delaware Declaration of Rights § 14 (1776), *reprinted in* 2 Roots, *supra*, at 276, 278; Maryland Declaration of Rights art. XIX (1776), *reprinted in* 2 Roots, *supra*, at 280, 282; Massachusetts Declaration of

Rights art. XII (1780), *reprinted in* 2 Roots, *supra*, at 339, 342; New Hampshire Bill of Rights art. XV (1783), *reprinted in* 2 Roots, *supra*, at 375, 377; New Jersey Constitution art. XVI (1776), *reprinted in* 2 Roots, *supra*, at 256, 260; North Carolina Declaration of Rights art. VII (1776), *reprinted in* 2 Roots, *supra*, at 286, 287; Pennsylvania Declaration of Rights art. IX (1776), *reprinted in* 2 Roots, *supra*, at 264, 265; Vermont Declaration of Rights art. X (1777), *reprinted in* 2 Roots, *supra*, at 319, 323; Virginia Declaration of Rights art. VIII (1776), *reprinted in* 2 Roots, *supra*, at 234, 235.

**31.** Most indigent criminal defendants in state courts were forced to speak in their own defense until 1963. *See Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S.Ct. 792, 797, 9 L.Ed.2d 799 (1963).

**32.** Colonial courts during the late-seventeenth and early eighteenth centuries appear to have forced nonparty witnesses to testify against their own penal interests. *See* Goebel & Naughton, *supra*, at 659. They certainly had the power to compel the attendance of witnesses. *See supra* note 32. Confronted with court compulsion, nonparty witnesses began to assert, with mixed success, an explicit privilege against self-incrimination during the mid-eighteenth century.

against self-incrimination was also subject to exceptions. For example, according to Charles Chauncy, one of the Plymouth elders, magistrates in 1641 could use torture (and presumably oaths) to extract a confession in cases of great public importance. *See* Levy, *supra*, at 346 (quoting William Bradford, Bradford's History "Of Plimoth Plantation" 472–73 (1898) (internal quotation marks omitted)).

There appears to have been a consensus during the seventeenth century that sworn interrogation could be used when "strong presumptions" pointed to the guilt of the accused. *See id.* While some state courts eschewed sworn interrogation, others had no such rule. In Maryland, for example, the common-law courts recognized an explicit privilege against self-incrimination during the seventeenth century. *See id.* at 356. In colonies such as South Carolina, however, no discussion of the privilege appears at all during this period. *See id.* at 367. During the seventeenth century, then, colonial courts did not uniformly adopt an explicit privilege against self-incrimination.

In scattered instances during the later half of the seventeenth century, however, the colonists began to recognize the privilege as a common-law right. This recognition invariably coincided with movement by the British administrators to repress political dissidence. For example, in 1677, the legislature of Virginia reaffirmed the ban on sworn interrogation after Governor Berkeley summarily executed a number of alleged participants in Bacon's Rebellion on the basis of confessions compelled through torture. The Virginia bill stated, "The law has provided that a witness summoned against another ought to answer upon oath, but noe law can compell a man to sweare against himself in any matter wherein he is lyable to corporal punishment." Pittman, *supra*, at 781–82 (quoting 2 Statutes at Large Being a Collection of All Laws of Virginia (1619–1792) 442 (William W. Hening ed., 1809) (internal quotation marks omitted)).

Similarly, in 1689 the colonists revolted and overthrew Edmund Andros, Governor of New England, partly because Andros sought "too frequent[ly] upon more particular dis-pleasure to fetch up persons from very remote counties before the Governor and Council at Boston ... not to receive their tryal but only to be examined there, and so remitted to an Inferior Court to be farther proceeded against." *Id.* at 784 (quoting *The Proceedings of Andros* (pamphlet 1691) (internal quotation marks omitted)). Sophisticated defendants began to argue against the use of inquisitional techniques by the colonial authorities. For instance, in 1689, William Bradford successfully refused to incriminate himself for publishing an unlicensed political work in a prosecution initiated by the Governor of Pennsylvania. *See* Levy, *supra*, at 360–61.

The perceived value of the privilege against self-incrimination steadily increased during the eighteenth century as the colonists became aware of a pattern of repressive investigations and prosecutions by the British authorities. For example, the politically motivated trials in New York of Henry Beekman, Nicholas Bayard and John Hutchins, and the inquisitional treatment of Samuel Hemphill, a Presbyterian minister accused by the religious elders of Pennsylvania of heretical sermons, began to convince the colonists of the need for guarantees of uniformity in criminal procedure. *See id.* at 380, 383. The censure of Hemphill in 1735 prompted Benjamin Franklin to declare that the colonial authorities "have no Pattern for their Proceedings, but that hellish Tribunal the *Inquisition,* who rake up all the vile Evidences, and extort all the Confessions they can from the wretched Object of their Rage ... and proceed to Judgment." *Id.* at 383 (quoting Benjamin Franklin, *Some Observations on the Proceedings against The Rev. Mr. Hemphill* (pamphlet 1735) (internal quotation marks omitted)). The refusal of defendants to testify in highly visible trials, such as the 1770 prosecution of Alexander McDougall for authoring seditious literature, gave legitimacy to the privilege as a mantra of independence. *See id.* at 401.

Opponents of the colonial administration also invoked the privilege in opposition to general search warrants, the infamous "writs of assistance." *See id.* at 390. Customs officers used writs of assistance to search

ships for contraband, which they then used as the basis for prosecutions in the Court of Vice Admiralty. These courts apparently adhered to a system of procedure similar to that of the Star Chamber. Once formally accused, for example, on the basis of the evidence seized, the defendant was required to answer written interrogatories under oath, and the court decided guilt without recourse to a jury. *See id.* at 395. Satirists derided the abuses of admiralty jurisdiction, such as the intrusive investigation of John Hancock in 1768. *See id.* at 397–98.

As Parliament cracked down on dissent in the colonies, the colonists rallied around the jury trial as a bulwark of liberty. The colonists protested against the provision for nonjury trials in the Stamp Act and the Townsend Acts. *See* Pittman, *supra*, at 786–87. The Quebec Act's provision for nonjury trials in part of North America and the threatened application of the Treason Act of Henry VIII convinced the colonists of the need to guarantee the integrity of the essential attributes of the common-law jury trial. *See* Moglen, *supra*, at 1117. Thus, the colonists reacted to political repression as their ancestors reacted to religious repression in England: they limited the power of centralized government to establish tribunals that did not adhere to common-law criminal procedure.

### 2.

During the first few years of independence, eight former colonies wrote a privilege against self-incrimination into their new state constitutions. Almost all formulations of the privilege, however, limited its application to criminal prosecutions. The Virginia Declaration of Rights of 1776 proclaimed "[t]hat in all capital or criminal prosecutions no man ... can ... be compelled to give evidence against himself." Virginia Declaration of Rights art. VIII (1776), *reprinted in* 2 Roots, *supra*, at 234, 235.[33] Pennsylvania

soon followed Virginia, relying heavily on the Virginia enactment: "[I]n all prosecutions for criminal offences, a man ... [cannot] be compelled to give evidence against himself." Pennsylvania Declaration of Rights art. IX (1776), *reprinted in* 2 Roots, *supra*, at 264, 265.[34]

Delaware's Declaration of Rights, by contrast, did not limit the privilege to criminal matters. Instead, Delaware's provision focused on preserving the integrity of common-law procedure in general: "[N]o man in the Court of Common Law ought to be compelled to give evidence against himself." Delaware Declaration of Rights § 15 (1776), *reprinted in* 2 Roots, *supra*, at 276, 278. No other colony followed Delaware's lead.

Maryland's Declaration of Rights did not limit the application of the privilege to common-law courts, but, in contrast to all prior formulations, the Maryland Declaration allowed the state legislature to limit the scope of the privilege: "[N]o man ought to be compelled to give evidence against himself, in a common court of law, or in any other court, but in such cases as have been usually practised in this State, or may hereafter be directed by the Legislature." Maryland Declaration of Rights art. XX (1776), *reprinted in* 2 Roots, *supra*, at 280, 282.

Massachusetts and New Hampshire, which enacted guarantees of rights several years after the Declaration of Independence, modified the language of the Virginia Declaration of Rights. They retained, however, Virginia's limitation of the privilege to criminal matters. The Massachusetts Declaration of Rights of 1780 provided that "[n]o subject shall be held to answer for any crime or offence, until the same is fully and plainly, substantially and formally, described to him; or be compelled to accuse, or furnish evidence against himself." Massachusetts Dec-

---

**33.** North Carolina enacted a virtual copy of this provision several months later: "in all criminal prosecutions, every man ... shall not be compelled to give evidence against himself." North Carolina Declaration of Rights art. VII (1776), *reprinted in* 2 Roots, *supra*, at 286, 287.

**34.** Vermont, although not admitted to statehood until 1791, adopted in 1777 a declaration of

rights. This declaration included a privilege against self-incrimination apparently modeled on the Pennsylvania provision. Article X of the Vermont Declaration of Rights provided that "in all prosecutions for criminal offences, a man ... [cannot] be compelled to give evidence against himself." Vermont Declaration of Rights art. X (1777), *reprinted in* 2 Roots, *supra*, at 319, 323.

laration of Rights art. XII (1780), *reprinted in* 2 Roots, *supra*, at 339, 342. Except for the omission of the final comma, the New Hampshire Bill of Rights of 1783 copied the text of the Massachusetts provision exactly. New Hampshire Bill of Rights art. XV (1783), *reprinted in* 2 Roots, *supra*, at 375, 377. In sum, eight of the thirteen independent states adopted a bill of rights, and all eight included a privilege against self-incrimination. Most states, however, applied this constitutional privilege only to criminal defendants.

A few opponents of the Constitution of 1789 pointed to the absence of an explicit privilege against self-incrimination. Once again, their discussion of the privilege assumed that, if included in the Constitution, it would apply to common-law criminal defendants only. One anti-federalist, writing under the pen name of Brutus, complained that "[f]or the security of life, in criminal prosecutions, the bills of rights of most of the States have declared, that no man ... shall ... be compelled to accuse, or furnish evidence against himself.... Are not provisions of this kind as necessary in the general government, as in that of a particular State?" Letters of Brutus No. 2 (anon.1788), *reprinted in* 3 Roots, *supra*, at 505, 508.

In the Massachusetts ratification debate, Abraham Holmes complained that nothing in the Constitution prevented the erosion of procedural protections enjoyed by criminal defendants at common law:

> [W]hen we fully consider this matter, and fully investigate the powers granted, ... we shall find Congress possessed of powers enabling them to institute judicatories little less inauspicious than a certain tribunal in Spain, which has long been the disgrace of Christendom: I mean that diabolical institution, the Inquisition.... There is nothing [in the Constitution] to prevent Congress from passing laws which shall compel a man, *who is accused or suspected of crime*, to furnish evidence against himself.

2 Debates in the Several State Conventions on the Adoption of the Federal Constitution As Recommended by the General Convention at Philadelphia 111 (Jonathan Elliot ed., 1861) (emphasis added).

George Mason, who drafted the Virginia Declaration of Rights, also thought that the privilege only applied to criminal defendants. When George Nicholas cynically observed that the prohibition on torture contained in the Virginia Declaration of Rights had been repeatedly infringed, Mason responded (or mis-responded) as follows: "[T]he worthy gentleman was mistaken in his assertion that the bill of rights did not prohibit torture; for that one clause expressly provided that no man can give evidence against himself; and ... the worthy gentleman must know that, in those countries where torture is used, evidence was extorted from the criminal himself." Debates and Other Proceedings of the Convention of Virginia 320 (David Robinson ed., 2nd ed. 1805). Thus, pre-ratification debate about the privilege seems to have assumed a narrow privilege, applicable only to the defendant in a common-law criminal prosecution.

Four states proposed that a privilege against self-incrimination be included in the amendments to the Constitution of 1789. Yet again, all four limited the privilege to criminal prosecutions. The General Assembly of Virginia followed the Virginia Declaration of Rights in proposing "[t]hat, in all criminal and capital prosecutions, a man ... [cannot] be compelled to give evidence against himself." *Virginia Proposed Amendments* art. 8 (1788), *reprinted in* 4 Roots, *supra*, at 766, 841. North Carolina and Rhode Island repeated Virginia's proposal almost verbatim. Although New York had no state constitutional provision guaranteeing a privilege against self-incrimination, the New York Convention recommended that the Constitution be amended to include the privilege: "[i]n all Criminal Prosecutions, the Accused ... should not be compelled to give Evidence against himself." *New York Proposed Amendments* (1787), *reprinted in* 4 Roots, *supra*, at 911, 913. In short, virtually all discussion of the privilege leading up to the adoption of the self-incrimination clause of the Fifth Amendment limited the privilege to the prosecution of criminal defendants at common law.

Nevertheless, James Madison's first draft of the Bill of Rights contained no such limitation. On June 8, 1789, he proposed that "[n]o person ... shall be compelled to be a witness against himself." *House of Representatives Debates, May–June, 1789, reprinted in* 5 Roots, *supra,* at 1012, 1027. Madison's original formulation of the privilege was limited neither to criminal prosecutions nor to common-law proceedings. The first draft most closely resembled Delaware's Declaration of Rights, which provided that "no man in the Court of Common Law ought to be compelled to give evidence against himself." Delaware Declaration of Rights § 15. Nonetheless, no explanation of Madison's draft has been found.

When the Committee of the Whole took up some of Madison's amendments on August 17, John Laurence, a New York delegate, suggested that "this clause contained a general declaration, in some degree contrary to laws passed.... He thought it ought to be confined to criminal cases, and moved an amendment for that purpose; which amendment being adopted, the clause as amended was unanimously agreed to by the committee." *House of Representatives Debates, July—August, 1789, reprinted in* 5 Roots, *supra,* at 1057, 1111. This limitation of the privilege to "criminal cases" moved the language of the Self–Incrimination Clause away from the Delaware model and towards the Virginia model.

Thus, the Fifth Amendment's Self–Incrimination Clause itself has little legislative history,[35] but the Amendment's precedents suggest that it was intended to protect the integrity of the common-law criminal trial against the adoption of inquisitional tactics by the federal government. During the seventeenth century, an explicit privilege against self-incrimination arose only in scattered cases as a defense to inquisitorial prosecutions of religious and political beliefs. Abuse of the legal process by local officials and threats of radical reform by an anxious

Parliament led colonial Americans to fear the deprivation of their common-law rights.

During the Revolution, most of the new state governments adopted a privilege against self-incrimination as one of the cluster of rights associated with the common-law jury trial, which was viewed as a defense against the potential overreaching of a tyrannous central government. The Framers wrote the privilege against self-incrimination into the Fifth Amendment to preserve one of the essential attributes of the existing criminal trial against the corrosive influence of inquisitional procedures, which the federal government might introduce to the detriment of political and religious freedom.

### G.

■ In conclusion, the history of the privilege against self-incrimination indicates that the Fifth Amendment's Self–Incrimination Clause was intended as a limitation on the investigative techniques of government, not as an individual right against the world. The privilege developed in opposition to systems of law enforcement that relied on self-incrimination for the prosecution of crime.

Medieval English common-law criminal procedure relied entirely on self-incrimination. Under the ancient methods of proof, all convictions were convictions based on compelled self-incrimination. Even under early medieval criminal procedure, however, courts could not force defendants to incriminate themselves absent a legally sufficient accusation. The requirement of an accusation was encapsulated in the *nemo tenetur* principle.

The jury trial and defendants' witness disqualification allowed common-law defendants to opt out of testimonial self-incrimination at trial. When added together, the jury trial, the witness disqualification, and the requirement of an accusation allowed defendants to avoid most forms of compelled, testimonial self-incrimination at common law. Special treatment of defendants stood in marked contrast to the treatment of nonparty wit-

---

**35.** One scholar has suggested that "laws passed" referred to certain provisions of the Judiciary Act of 1789. *See generally* Levy, *supra,* at 425–26 ("Laurence, with this pending legislation in mind, may have moved the insertion of the words 'in any criminal case' in order to retain the customary equity rule that compelled evidence of civil liability."). However, no independent evidence directly supports this hypothesis.

nesses, who were forced during the same period to testify under oath against their own interests.

Defendants first began to invoke the implied, common-law privilege as a shield against the inquisitional techniques of the prerogative courts of the seventeenth century. The common-law courts used the privilege as a pretext for curtailing the jurisdiction of rival tribunals. Religious and political nonconformists asserted the privilege in an effort to undermine the prosecution of crimes of conscience. Through their combined efforts, the common-law privilege came to represent a defining difference between common-law criminal trials and inquisitional proceedings of the seventeenth century. When the common-law courts made explicit their own implied privilege against self-incrimination, they viewed it through the lens of seventeenth-century events. They concluded that it would violate natural law for the government to prosecute crimes of conscience using inquisitional techniques, techniques which undermined the procedural protections of the common law.

Early American criminal procedure followed the English model of jury trials, including the implied common-law privilege. In the mid-eighteenth century, however, the colonists were confronted with abuses of power by colonial administrators and Parliament's creation of exceptions to the common-law jury trial. The colonists viewed the privilege against self-incrimination as a bulwark against arbitrary and intrusive criminal investigations similar to those experienced by their ancestors under the Star Chamber and the Commission. The Framers therefore included the privilege in the Bill of Rights as a limitation on the power of the federal government to tinker with the distinctive attributes of the common-law criminal trial.

## V.

In the present context, we reject Gecas' contention that "[t]he main purpose of the privilege is to protect the individual's privacy and his dignity and integrity as a person." The Fifth Amendment's Self–Incrimination Clause limits the ability of American courts to convict Gecas on the basis of compelled, testimonial self-incrimination. The Clause does not give Gecas a right against the world not to testify, enforceable through the courts of the United States.[36]

According to our precedent, a proceeding becomes a "criminal case" only when a witness faces conviction on the basis of his testimony in a jurisdiction subject to the Fifth Amendment of the United States Constitution. Gecas only faces trial and conviction in Israel, Germany, or Lithuania—countries which are not subject to the United States Constitution. Therefore, the Fifth Amendment's Self–Incrimination Clause does not extend to Gecas' real and substantial fear of a foreign conviction. Gecas must testify. The district court's order compelling Gecas to testify is therefore

AFFIRMED.

EDMONDSON, Circuit Judge, concurring specially:

For a good, long time in English-speaking countries, this proposition has been the rule: the public has a right to every person's testimony. By "rule," I mean the normal principle of law. This rule recognizes the importance of learning the truth. And under the rule, Mr. Gecas would be obliged to testify.

The rule has exceptions. The exceptions, by their nature, interfere with the search for truth. One of the exceptions—perhaps, the most important—is carved out by the Fifth

---

**36.** Judge Birch argues in dissent that we have "eradicated" one of the policy rationales supporting the privilege against self-incrimination—the preservation of individual privacy and dignity. *See, e.g., post,* at 1460–61 n. 14. We reject this characterization. We have studied the case law and history of the privilege to demonstrate that the Self–Incrimination Clause protects individual dignity *by limiting the prosecutorial discretion of the United States government.* The

"systemic" rationale and the "rights-based" rationale, as Judge Birch terms them, are not only "complementary," they are indistinguishable: the individual dignity of criminal defendants is secured by limiting the nature of the federal government's prosecutorial techniques. It is the dissenting opinion which attempts to create support for its position by splitting this unified policy into separate policies, then finding the one which suits the occasion.

Amendment.[1] This case presents the question of whether or not the American Constitution's Fifth Amendment exception to the rule is so broad as to cover criminal actions in courts that are not American courts, but courts of foreign countries.

For interpreting the Fifth Amendment exception, here is how things stand. Most important, no one has been able to show that the Framers—or Ratifiers—of the Fifth Amendment really contemplated criminal actions in foreign courts. And as Judge Tjoflat has demonstrated, a history-based,[2] reasoned, and reasonable argument can be made that the Fifth Amendment exception would not reach criminal actions in courts that are not American courts. In addition, most appellate courts, when the question was before them, have held that the exception does not reach criminal actions in foreign courts.

This legal setting does not compel federal courts to extend the Fifth Amendment exception to cover foreign criminal actions. We cannot say with a reasonable degree of certainty[3] that the Fifth Amendment was intended to reach foreign criminal actions. The judicial branch has no clear authority to interfere with the acts of the executive branch in the present case. So, I am bound to apply *not* the exception, but the rule: the public, acting through its government's processes, has the right to Mr. Gecas's testimony.

On this basis,[4] I would affirm the judgment of the district court.

BIRCH, Circuit Judge, dissenting, in which ANDERSON, DUBINA and BARKETT, Circuit Judges, join:

The court's majority today allows the United States government to enlist the aid of an Article III court to imprison a citizen or permanent resident until he responds to a prosecutor's questions, and then to transfer that citizen or permanent resident to another prison for his prosecution on the basis of his statements. The court allows such a result because the second prison is a foreign, as opposed to a domestic, one. This result is inconsistent with the language of the Fifth Amendment, its history, and the policies underlying the privilege that the Amendment incorporates into the Constitution.[1] I respectfully dissent.

Part I addresses the central issue in this case: whether a real and substantial fear of

---

1. Many other countries with common-law traditions have more or less similar counterparts.

2. I especially accept this point of legal history: it is, at least, unclear that—when the Fifth Amendment was being ratified—the law of England concerning the scope of the privilege against self-incrimination included (or in North America, was widely understood to include) incrimination under the laws of another sovereign.

   And given the lack of historical evidence to support it, I especially doubt this proposition: that, after years of bloody and costly warfare to gain America's independence, these newly-independent Americans by ratifying the Fifth Amendment intended, in effect, to give foreign governments—depending on how the foreign governments choose to make certain conduct criminal under their laws and on how aggressive these governments appear to be when seeking to capture fugitives—the power to obstruct investigations conducted by Americans on matters of national importance, such as, whether someone has lied to our government to gain entry into this country.

3. Absolute certainty cannot be expected.

4. Because the court has addressed the merits of the core constitutional law issue, I have too. I do not reach the government's waiver argument; but there may be something to it. I am skeptical about the idea that a man who gains entry into this country by making representations of fact to our government has a right to decline later—even years later—to answer questions about whether those "facts" were false. No American compelled Mr. Gecas to seek to come here; he voluntarily undertook that process; and he was not silent about what he did during the war years. I also think the waiver argument is strengthened substantially by the fact that the government has special rights and powers when it comes to protecting America's borders and by the fact that the subject of Mr. Gecas's sworn representations dealt directly with whether he would be allowed to cross those borders.

1. In this dissent, I refer interchangeably to the constitutional right in question as the "right against self-incrimination," the "privilege against self-incrimination," or the "Fifth Amendment right." I also refer to the constitutional provision that embodies this right as, alternatively, the "Self–Incrimination Clause" and the "Fifth Amendment." The Fifth Amendment provides: "No person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V, cl. 2.

foreign prosecution is a valid basis for the invocation of the right against self-incrimination. First, I review the policies underlying the right against self-incrimination and demonstrate that denying that right to a witness who has a reasonable fear of foreign prosecution defeats these policies. Next, I discuss the Supreme Court's immunity cases and conclude that these cases do not support the majority's holding that the Fifth Amendment's prohibition on compelling incriminating testimony is merely a "prophylactic rule" that has no application when the using sovereign[2] is foreign. I also review the Supreme Court's decision in *Murphy v. Waterfront Commission*,[3] so facilely dismissed by the majority, and find that this decision virtually compels the conclusion that a fear of foreign prosecution justifies a witness's invocation of the privilege against self-incrimination. I then challenge both the majority's selective reading of the historical development of the Fifth Amendment as well as its suggestion that possible burdens imposed on domestic law enforcement by allowing the privilege to be invoked in this instance justifies infringing a person's constitutional right.

I address and reject the government's waiver argument in Part II. I conclude in Part III that compelling Gecas to answer OSI's questions would violate his constitutional privilege against self-incrimination. At the end of my discussion, it is my fervent hope that the following conclusion, articulated by former Supreme Court Justice Abe Fortas, will be shared by the reader:

The fundamental value that the privilege reflects is intangible, it is true; but so is liberty, and so is man's immortal soul. A man may be punished, even put to death, by the state; but ... he should not be made to prostrate himself before its majesty. *Mea culpa* belongs to a man and his God. It is a plea that cannot be exacted from free men by human authority. To require it is to insist that the state is the superior of the individuals who compose it, instead of their instrument.[4]

## I. APPLICATION OF THE SELF-INCRIMINATION CLAUSE TO A PERSON WHO FEARS FOREIGN PROSECUTION

I concur in Parts I and II of the majority opinion. It is clear that Gecas faces a real, substantial, reasonable, and appreciable fear of foreign prosecution. The question, therefore, is whether Gecas can validly assert his constitutional right against self-incrimination on the basis of his fear of foreign prosecution. As the majority opinion demonstrates, an internally consistent, logical argument can be constructed to support a negative answer to this question.[5] As the Second Circuit's opinion in *United States v. Balsys*[6] and several district court opinions[7] reflect, and as I shall illustrate below, an equally internally consistent and logical argument can be made to support the opposite conclusion.

We are called upon, as appellate judges, to make the difficult choice between these two competing answers to a question that relates to a fundamental precept of our conception of government, individual rights, and the relationship between the two. I submit that the

---

2. I refer to the government that forces a witness to testify as the "compelling sovereign." The "using sovereign" is the government that then employs the testimony or the evidence derived therefrom to prosecute the witness.

3. 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

4. Abe Fortas, *The Fifth Amendment: Nemo Tenetur Prodere Seipsum*, Cleveland Bar Association, The Journal, XXV, Apr. 1954, at 91, 99–100.

5. Two sister circuit courts agree, although their reasoning is not nearly as well developed as that of the majority's. *See United States v. (Under Seal)*, 794 F.2d 920, 926 (4th Cir.) [hereinafter

Araneta], *cert. denied sub nom. Araneta v. United States*, 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986); *In re Parker*, 411 F.2d 1067, 1070 (10th Cir.1969), *vacated as moot sub nom. Parker v. United States*, 397 U.S. 96, 90 S.Ct. 819, 25 L.Ed.2d 81 (1970).

6. 119 F.3d 122 (2nd Cir.1997).

7. *See United States v. Ragauskas*, 1995 WL 86640, No. 94 C 2325, (N.D.Ill. Feb. 27, 1995); *Moses v. Allard*, 779 F.Supp. 857 (E.D.Mich. 1991); *Yves Farms, Inc. v. Rickett*, 659 F.Supp. 932 (M.D.Ga.1987); *Mishima v. United States*, 507 F.Supp. 131 (D.Alaska 1981); *United States v. Trucis*, 89 F.R.D. 671 (E.D.Pa.1981); *In re Cardassi*, 351 F.Supp. 1080 (D.Conn.1972).

force of logic alone cannot resolve the difficult question before us. The force of history and the policies underlying the constitutional right against self-incrimination, as well as its treatment in the Supreme Court, however, do; as the Supreme Court has said: "The answer to this question must depend, of course, on whether [the resulting] application of the privilege promotes or defeats its policies and purposes." [8] These policies and purposes compel the inescapable conclusion that *our* government cannot force a person to answer questions if that person has a real and substantial fear of prosecution, whether domestic or foreign.

### A. The Right Against Self-Incrimination: Underlying Policies

"The privilege against self-incrimination registers an important advance in the development of our liberty—one of the great landmarks in man's struggle to make himself civilized." [9] Fundamentally, the Fifth Amendment privilege supports two goals: constraining the government from overzealous prosecution of individuals and securing individual liberties. [10]

In *Murphy*, Justice Goldberg identified the first rationale as "our preference for an accusatorial rather than an inquisitorial system of criminal justice; [and] our fear that self-incriminating statements will be elicited by inhumane treatment and abuses." [11] This rationale is systemic in nature because its purpose is to ensure the integrity of our criminal justice system by imposing limits on the power of government as a prosecutor. [12]

With respect to the second rationale, Justice Goldberg observed:

[The privilege] reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; . . . our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load" . . . [and] *our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life"* . . . . [13]

This second rationale can be described as rights-based, as it focuses on the individual's interest in privacy and freedom from cruelty. [14]

---

**8.** *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 54, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964).

**9.** *Id.* at 55, 84 S.Ct. at 1596 (internal quotation marks omitted); *see also Kastigar v. United States*, 406 U.S. 441, 444, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972) ("The privilege reflects a complex of our fundamental values and aspirations, [*see Murphy*], and marks an important advance in the development of our liberty.").

**10.** *See Murphy*, 378 U.S. at 55, 84 S.Ct. at 1596–97; *Balsys*, 119 F.3d at 128, *Moses*, 779 F.Supp. at 873; Bret A. Fausett, Comment, *Extending the Self-Incrimination Clause to Persons in Fear of Foreign Prosecution*, 20 Vand. J. Transnat'l L. 699, 701–08 (1987) (describing the first rationale as a "systemic rationale" and the second rationale as a "rights-based rationale").

**11.** *Murphy*, 378 U.S. at 55, 84 S.Ct. at 1596–97.

**12.** In *Balsys*, the Second Circuit identifies separately the goals of (1) constraining overzealous prosecution and (2) protecting systemic values stemming from " 'our distrust of self-deprecatory statements[ ] and our realization that the privilege, while sometimes a shelter to the guilty, is often a protection to the innocent.' " *Balsys*, 119

F.3d at 129, (quoting *Murphy*, 378 U.S. at 55, 84 S.Ct. at 1597). I group both goals under the systemic rationale of the privilege.

**13.** *Murphy*, 378 U.S. at 55, 84 S.Ct. at 1596–97 (citations omitted) (emphasis added).

**14.** The systemic and rights-based rationales of the Fifth Amendment privilege are not hermetically sealed from each other. The systemic rationale, which essentially ensures that our system of criminal justice is fair, also serves the end of human dignity by protecting the individual from an overbearing government. Conversely, the rights-based rationale also guarantees that the system is fair—or at least perceived to be fair, thereby garnering the trust and confidence of the governed—and thus furthering systemic ends. Therefore, at least in the usual case of an individual who refuses to answer for fear of domestic prosecution, the two rationales reinforce each other and merge to a certain extent. Nonetheless, the distinction between these two rationales is necessary because they lead to two different conceptions of the Fifth Amendment: The first leads to a view of the Fifth Amendment that is "instrumental rather than intrinsic." David Dol-

The Fifth Amendment prohibits the government from either compelling a witness who has a reasonable fear of prosecution to testify against his penal interests,[15] or using a witness's compelled testimony or its fruits in prosecuting that witness.[16] The systemic rationale for the Fifth Amendment is fully served by applying the second prohibition: So long as compelled testimony or its fruits cannot be used by *our* government to convict an accused, *our* system of criminal justice is protected from the corrupting influence of overzealous prosecution. By this view, the prohibition against the act of compelling a witness's testimony in the absence of a grant of immunity (i.e., when the witness has a reasonable fear of prosecution on the basis of that testimony) is merely "prophylactic," as the majority labels it.[17] The prohibition against use alone, however, does not promote, and in fact defeats, the rights-based rationale of the Fifth Amendment. The facts of this case make this point abundantly clear. Compelling Gecas to answer OSI's questions even though he has a reasonable fear of prosecution on the basis of his answers in no way reflects on the integrity of our criminal system of justice because there is no possibility that he will be criminally prosecuted in the United States. Nonetheless, the fact that Gecas's fear is of foreign prosecution, not domestic prosecution, does not relieve the "cruel trilemma of self-accusation, perjury or contempt" or vindicate "our respect for the inviolability of the human personality and of the right of each individual to a private enclave where he may lead a private life." [18] Thus, in light of the policies of the Fifth Amendment, the Court's prohibition on forcing a witness to incriminate himself when that witness has a reasonable fear of prosecution is no more a "prophylactic rule" than the prohibition on using such compelled testimony is merely "remedial." Both prohibitions are essential for the vindication of *all* the policies underlying the privilege.

The majority seeks to support its conclusion that the Fifth Amendment may not be invoked if the witness fears only foreign prosecution by (1) misinterpreting Supreme Court case law on the type of immunity necessary to remove the fear of prosecution; (2) dismissing summarily the import of the Supreme Court's decision in *Murphy;* and (3) appealing to history in order to reach the conclusion that the Fifth Amendment has no rights-based rationale because the sole purpose of its framers was to limit the power of the federal government from overreaching in domestic law enforcement. None of these rationales is convincing.

### B. *The Immunity Cases*

The majority holds that the prohibition on forcing a witness to testify against his penal interests is merely a "prophylactic rule" that has no application when the using sovereign is foreign. In this section, I review the Supreme Court's immunity cases and conclude that these precedents do not stand for the sweeping proposition adopted by the ma-

---

inko, *Is There a Rationale for the Privilege Against Self-Incrimination?*, 33 UCLA L.Rev. 1063, 1090 (1986). The rights-based rationale, by contrast, leads to a view of the Fifth Amendment "as an expression of respect for human rights, dignity, or individuality and thus as intrinsically valuable." *Id.* As one commentator cynically noted, "[w]hile the Court's opinion in *Murphy* certainly may offer guidance, lower courts often manipulate the various purposes of the privilege in order to suit their ends." Fausett, *supra* note 10, at 707–08 (footnote omitted). I candidly admit that both opinions in this case follow that route: the majority stresses the systemic rationale of the privilege, while I stress the rights-based rationale. The difference, however, is that the majority has no choice but to eradicate the rights-based rationale for the privilege in order to reach its conclusion that an accused who has a fear of foreign prosecution cannot invoke the right against self-incrimination; while the result that I reach accommodates both the rights-based rationale *and* the systemic rationale. In other words, the majority defeats one of the purposes of the privilege, contrary to *Murphy*'s teaching.

15. *Pillsbury Co. v. Conboy*, 459 U.S. 248, 262, 103 S.Ct. 608, 616, 74 L.Ed.2d 430 (1983) (holding that a court *cannot* compel self-incriminating testimony in the absence of a grant of immunity to the witness).

16. *Bram v. United States*, 168 U.S. 532, 542, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897) (holding that a court must exclude from evidence a coerced confession).

17. *See* Majority op. at 1429.

18. *Murphy*, 378 U.S. at 55, 84 S.Ct. at 1596–97 (citations and internal quotation marks omitted).

jority. Rather, these cases confirm that whether a government subject to the strictures of the Fifth Amendment may compel a witness's testimony is contingent on the precondition that such testimony cannot be used in *any* criminal prosecution of the witness; they do not support the majority's conclusion that a reasonable fear of prosecution in a foreign court may be ignored by a compelling domestic court. Moreover, a review of the Supreme Court's decisions on *Miranda* [19] warnings, which the Court has recognized as "prophylactic," demonstrates that the majority's use of the "prophylactic rule" concept is inconsistent with that of the Supreme Court in a related Fifth Amendment context.

In *Kastigar v. United States*, [20] the Supreme Court held that "immunity from use and derivative use [of compelled testimony] is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege." [21] The majority in this case interprets *Kastigar* as having held that the Fifth Amendment "only protects against . . . the actual 'infliction of criminal penalties on the witness'—a criminal conviction—based on self-incrimination." [22] The majority claims that, therefore, the prohibition on compelling a witness to testify against his penal interests is merely a "prophylactic rule" that is not required when the using sovereign is a foreign government and thus not subject to the Fifth Amendment. This interpretation of *Kastigar*, however, ignores a crucial analytical step in the Court's reasoning. The *Kastigar* Court actually stated that the "sole concern [of the privilege] is to afford *protection against being forced to give testimony* leading to the infliction of penalties affixed to . . . criminal acts." [23] The difference be-

tween the Court's reasoning in *Kastigar* and the majority's recasting of that reasoning is not mere semantics. The focus of *Kastigar*, as is that of the Fifth Amendment, is on the act of compelling testimony: A domestic court is absolutely prohibited from engaging in such an act *if* the testimony could lead to a criminal conviction; that is, *Kastigar* recasts in the context of an immunity statute the requirement that the fear of prosecution must be reasonable to justify the invocation of the privilege against self-incrimination. The granting of use and derivative use immunity removes the danger of conviction on the basis of the compelled testimony and, thus, removes the necessary pre-condition (i.e., fear of use or derivative use of compelled testimony in a criminal prosecution) to a proper invocation of the privilege; at least it does so in the usual case involving a potential domestic prosecution.

This point is illuminated when we consider the *Kastigar* Court's explication of one aspect of *Murphy*. In *Murphy*, the Court held that a state does not violate a witness's Fifth Amendment right against self-incrimination [24] when it compels the testimony by granting the witness immunity because the Constitution prohibits federal authorities from using such compelled testimony or its fruits in a federal prosecution. [25] The Court explained in *Kastigar*: "The *Murphy* Court was concerned solely with the *danger* of incrimination under federal law, and held that immunity from use and derivative use was sufficient to displace the *danger*." [26] Indeed, the *Murphy* Court explicitly held that the state defendants in that case were justified in refusing to answer the questions even though they were granted immunity from state prosecution because, "[a]t the time they refused

19. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

20. 406 U.S. 441, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

21. *Id.* at 453, 92 S.Ct. at 1661.

22. Majority op. at 1428 (quoting *Kastigar*, 406 U.S. at 453, 92 S.Ct. at 1661).

23. 406 U.S. at 453, 92 S.Ct. at 1661 (internal quotation marks omitted) (omission in original) (emphasis added).

24. The Court held in *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), that the Fifth Amendment right against self-incrimination is applicable to the states through the Due Process Clause of the Fourteenth Amendment.

25. *Murphy*, 378 U.S. at 77–79, 84 S.Ct. at 1608–10.

26. *Kastigar*, 406 U.S. at 459, 92 S.Ct. at 1664 (emphasis added).

to answer, ... petitioners had a reasonable fear ... that the federal authorities might use the answers against them in connection with a federal prosecution." [27] Accordingly, the Court vacated the state court's contempt citations and directed that the defendants be afforded an opportunity to answer the questions once they were guaranteed that federal prosecution could not ensue from them.[28]

This understanding of *Kastigar* is consistent with the Supreme Court's historic approach to immunity statutes. In *Brown v. Walker*,[29] the Court upheld a federal statute which provided that the Interstate Commerce Commission may compel the testimony of a witness over a claim of self-incrimination but afforded the witness transactional immunity for all offenses related to the compelled testimony. The Court began by reviewing the various situations in which testimony may be compelled. It concluded that "[w]hen examined, these cases will all be found to be based upon the idea that, if the testimony sought cannot possibly be used as a basis of, or in aid of, a criminal prosecution against the witness, the [privilege] ceases to apply." [30] Thus, because the statute's grant of immunity removed in *Brown* the possibility of a prosecution on the basis of the compelled testimony, the privilege did not apply.

Nothing in *Brown* suggests, however, that the prosecution in question must be one by the federal government, at that time the only jurisdiction subject to the Fifth Amendment. Indeed, the witness in *Brown* argued that his testimony could not be compelled despite the grant of immunity from federal prosecution because he could be subject, possibly, to state or foreign prosecution on the basis of his testimony. The Court rejected these arguments, but not because state and foreign governments are not subject to the Fifth Amendment, as the majority suggests in this case.[31] Rather, the Court responded that, under the Supremacy Clause, the statute at issue foreclosed state as well as federal prosecution on the basis of immunized testimony and thus obviated the danger of both state and federal prosecution.[32] As to the danger of foreign prosecution, the Court said:

> But, even granting that there were still a bare possibility that, by his disclosure, he might be subjected to the criminal laws of some other sovereignty, that ... is not a real and probable danger, with reference to the ordinary operations of the law in the ordinary courts, but a danger of an imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct. Such dangers it was never the object of the provision to obviate.[33]

In short, *Brown* and *Kastigar* confirm that whether a government subject to the strictures of the Fifth Amendment may compel a witness's testimony is contingent on the precondition that such testimony cannot be used in *any* criminal prosecution of the witness. The two cases stand for the proposition that, when the danger of such use can be effectively removed through the grant of immunity or operation of law, as is usually the case when the only reasonable danger is of domestic

27. *Murphy*, 378 U.S. at 79–80, 84 S.Ct. at 1610.

28. *Id.*

29. 161 U.S. 591, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896).

30. *Id.* at 597, 16 S.Ct. at 647.

31. Remarkably, no member of the *Brown* Court advanced an argument similar to that of the majority in this case. Four justices dissented from the Court's decision upholding the statute at issue in *Brown*. Justice Field did not consider the danger of incrimination under state or foreign law because he would have held that the Fifth Amendment grants the witness a constitu-

tional right to silence. *Brown*, 161 U.S. at 630, 16 S.Ct. at 653 (Field, J., dissenting). Another three dissenters disagreed with the majority's conclusion that the Supremacy Clause gives Congress the authority to grant a witness immunity from *state* as well as federal prosecution. *Id.* at 623, 16 S.Ct. at 661 (Shiras, J., joined by Gray and White, JJ., dissenting). These justices concluded that the immunity statute at issue in *Brown* was unconstitutional *because* it could not remove the danger of a state prosecution on the basis of the compelled testimony. *Id.* at 622–23, 16 S.Ct. at 660–61.

32. *Id.* at 606–08, 16 S.Ct. at 650–51.

33. *Id.* at 608, 16 S.Ct. at 651 (internal quotation marks omitted).

prosecution, the testimony may be compelled; *Brown* and *Kastigar* do not support the majority's conclusion that a reasonable fear of prosecution in a foreign court may be ignored by a compelling domestic court.

According to the majority, the prohibition imposed by the Fifth Amendment on domestic courts to force witnesses to testify against their penal interests is merely a "prophylactic rule," intended only to ensure that domestic courts do not use the testimony to convict the witnesses. The majority's use of this label, however, is inconsistent with the Supreme Court's understanding of the meaning of a "prophylactic rule." Indeed, the Court has explained just what a prophylactic rule is, and it did so in the context of the Fifth Amendment right against self-incrimination. In *Miranda v. Arizona*,[34] the Court established a series of procedural safeguards governing custodial interrogation of suspects in order to insure that coerced testimony is not obtained in violation of the Fifth Amendment. The Court has recognized the *Miranda* warnings as "prophylactic" because they "are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected.'"[35] Indeed, the *Miranda* Court itself had conceded that the safeguards it established were not specifically required by the text of the Constitution.[36] By contrast, the Supreme Court has never suggested that the Constitution would allow a domestic court to compel self-incriminating testimony despite the existence of a reasonable fear of prosecution. *Lefkowitz v. Turley*,[37] which the · majority erroneously cites in support of its "prophylactic" label, in fact confirms that the Constitution absolutely

prohibits a domestic court from compelling the self-incriminating testimony of a witness, absent adequate immunity to remove the danger that the compelled testimony would be used against the witness in a criminal prosecution. The Court stated:

> The object of the Amendment "was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime." *Counselman v. Hitchcock*, 142 U.S. 547, 562, 12 S.Ct. 195, 198, 35 L.Ed. 1110 (1892).... [A] witness protected by the privilege may rightfully refuse to answer *unless and until* he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant.[38]

If that were not so, the Court would not have held unconstitutional the very first immunity statute which it considered in *Counselman v. Hitchcock*.[39] In that case, the statute at issue required a witness to answer questions, regardless of the potential incriminating nature of the answers, after being granted immunity against the actual use of the compelled testimony in a subsequent criminal prosecution of the witness. The Court struck down the statute as unconstitutional because it did not grant the witness derivative use immunity; that is, the statute did not preclude the use of evidence uncovered as a result of the compelled testimony.[40] If the prohibition on compulsion were merely a prophylactic rule not required by the Constitution, and in light of the familiar rule that the Court should not strike down an act of

---

**34.** 384 U.S. 436, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**35.** *New York v. Quarles,* 467 U.S. 649, 654, 104 S.Ct. 2626, 2630, 81 L.Ed.2d 550 (1984) (quoting *Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182 (1974)) (alterations in original).

**36.** *See Miranda,* 384 U.S. at 467, 86 S.Ct. at 1624.

**37.** 414 U.S. 70, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973).

**38.** *Id.* at 77–78, 94 S.Ct. at 322 (emphasis added) (additional citations omitted); *see also Pillsbury Co. v. Conboy,* 459 U.S. 248, 262, 103 S.Ct. 608, 616, 74 L.Ed.2d 430 (1983) (holding that a court *cannot* compel self-incriminating testimony in the absence of a grant of immunity to the witness).

**39.** 142 U.S. 547, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892).

**40.** *See id.* at 585–86, 12 S.Ct. at 206.

Congress unless absolutely necessary,[41] it stands to reason that the Court would have both upheld the statute but declared that courts are required in future prosecutions to exclude the testimony itself as well as its fruits. Thus, the prohibition on forcing a witness to testify against his own penal interests is not a prudential, prophylactic rule imposed by the Supreme Court on lower federal courts. Rather, it is a requirement of the Constitution itself.

## C. *The* Murphy *Decision*

The Supreme Court's decision in *Murphy v. Waterfront Commission*[42] bolsters the conclusion that a fear of foreign prosecution justifies a witness's invocation of the privilege against self-incrimination. Indeed, it compels that conclusion. In this section, I begin by describing the facts and holding of *Murphy* and then analyze each part of the Court's opinion to demonstrate that every step in the Court's reasoning dictates this conclusion.

In *Murphy*, two witnesses asserted their Fifth Amendment right against self-incrimination at a hearing before the Waterfront Commission of New York Harbor and refused to testify despite a grant of immunity from prosecution under New York and New Jersey law because of fear of prosecution in federal court. They were cited for contempt and New Jersey's highest court affirmed the citation. The Supreme Court reversed, holding "the constitutional rule to be that a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him."[43] The Court further held, however, "that in order to implement this constitutional rule and accommo-

date the interests of the State and Federal Governments in investigating and prosecuting crime, the Federal Government must be prohibited from making any such use of compelled testimony and its fruits."[44] This rule removed the witnesses' fear of federal prosecution on the basis of compelled testimony and, thus, allowed the state to compel testimony under a grant of state immunity.

The Supreme Court decided *Murphy* on the same day it decided that the Fifth Amendment right against self-incrimination is applicable to the states through the Due Process Clause of the Fourteenth Amendment.[45] Thus, in *Murphy*, both the compelling jurisdiction—the state—and the potentially using jurisdiction—the federal government—were subject to the Fifth Amendment. The majority's claim, however, that *Murphy*'s application of the Self-Incrimination Clause to both the compelling sovereign and the using sovereign "was inextricably tied to a simultaneous decision applying the Self–Incrimination Clause to both jurisdictions"[46] and is applicable only in that context ignores the language and reasoning of *Murphy*.

The Court in *Murphy* presented its analysis in three parts, all of which address the issue before us today. First, the *Murphy* Court admonished that whether the privilege against self-incrimination applies in a given situation "must depend, of course, on whether such an application of the privilege promotes or defeats its policies and purposes."[47] It then explained the policies and purposes of the privilege and concluded that

> [m]ost, if not all, of these policies and purposes are defeated when a witness can be whipsawed into incriminating himself under both state and federal law.... This has become especially true in our age of

---

**41.** *See, e.g., Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 128, 3 L.Ed. 162 (1810) (Marshall, C.J.) (holding that legislative enactments should not be pronounced unconstitutional unless "[t]he opposition between the constitution and the law [is] such that the judge feels a clear and strong conviction of their incompatibility with each other").

**42.** 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

**43.** *Id.* at 79, 84 S.Ct. at 1609.

**44.** *Id.*

**45.** *See Malloy v. Hogan,* 378 U.S. 1, 6, 84 S.Ct. 1489, 1492, 12 L.Ed.2d 653 (1964).

**46.** Majority op. at 1432 (emphasis removed).

**47.** *Murphy,* 378 U.S. at 54, 84 S.Ct. at 1596.

cooperative federalism, where Federal and State Governments are waging a united front against many types of criminal activity.[48]

The rule adopted by the majority in this case clearly defeats at least some of the policies and purposes of the privilege—namely those implementing the rights-based rationale of

**48.** *Id.* at 55–56, 84 S.Ct. at 1597 (internal quotation marks omitted) (citation omitted).

**49.** *See supra* Part I.A, at [4–8].

**50.** *Moses v. Allard,* 779 F.Supp. 857, 875 (E.D.Mich.1991).

**51.** *See Balsys,* 119 F.3d at 130–31, (noting that "[i]nternational collaboration in criminal prosecutions has intensified admirably in recent years" and that "what might be called 'cooperative internationalism' has now begun to parallel the 'cooperative federalism' described in *Murphy*").

This case, though ostensibly concerned with no more than the application of United States immigration law, provides a good illustration for the potential extent of international cooperation in criminal matters as well as the potential use (or, perhaps more appropriately, misuse) of the contempt power of a United States court in the service of a foreign sovereign's prosecution. The United States and Lithuania have entered into an agreement which provides that the two governments

agree to cooperate in prosecution of persons who are alleged to have committed war crimes, . . . agree to provide mutual legal assistance concerning the prosecution of persons suspected of having committed war crimes, . . . will assist each other in the location of witnesses believed to possess relevant information about criminal actions . . . during World War II, and agree to intermediate and endeavor to make these witnesses available for the purpose of giving testimony in accordance with the laws of the Republic of Lithuania to authorized representatives of the United States Department of Justice.

Memorandum of Understanding Between the United States Department of Justice and the Office of the Procurator General of the Republic of Lithuania Concerning Cooperation in the Pursuit of War Criminals, Aug. 3, 1992, U.S.-Lithuania [hereinafter "Memorandum of Understanding"], ¶¶ 1–2. According to this document, a United States citizen suspected by Lithuania to have been a war criminal could be required by "authorized representatives" of the Justice Department to answer questions posed by Lithuanian authorities. Under the rule adopted by the majority today, the suspect cannot invoke his right against self-incrimination and the Justice Department could enlist the contempt power of a United States court to force the suspect to testify.

the privilege—as I have already shown.[49] As one district court noted, "this 'whipsaw' effect does not end at our borders but is equally relevant when the prosecuting body is a foreign nation instead of a state."[50] This is especially true in this era of increasing international cooperation in criminal investigations and prosecutions.[51]

Also, under the majority's rule, Lithuania could then seek the suspect's extradition *on the basis of testimony compelled by the United States government.* Thus, with the cooperation of the United States government, a foreign sovereign could use the contempt power of a court in this country to compel the suspect to incriminate himself. While bringing Nazi war criminals to justice is unquestionably a laudable goal of great legal and moral importance, we cannot allow the importance of the goal to blind us to the demands of the Constitution. Under our Constitution, even suspected Nazi war criminals are innocent until proven guilty and, at least within our territory, are endowed with the same constitutional rights accorded other persons.

Moreover, even if I were to agree that the only policy of the privilege is to preserve the integrity of our criminal justice system by constraining overzealous prosecution, I would hold that the privilege applies to a proceeding that is but a step in a cooperative effort between our government and that of a foreign country to prosecute a crime. *See Balsys,* 119 F.3d at 135. When our government seeks to deport a person to a country on the very basis that he is suspected of having committed a crime in that country, and for the avowed purpose of bringing that person to justice, our government is as prone to the corrupting influence of overzealous prosecution as it would have been if the alleged crime was a domestic one. Indeed, the behavior of prosecutors from the OSI, the very agency seeking to compel Gecas' testimony here, in the case of John Demjanjuk provides a vivid example of such corrupting influence. Demjanjuk, a Ukrainian immigrant, was denaturalized in 1981 and later extradited to Israel on the basis that he had misrepresented his whereabouts and activities during the war on his applications for entry into and naturalization within the United States. Specifically, the court had found that Demjanjuk was "Ivan the Terrible," a sadistic prison guard who committed countless atrocities at the Treblinka concentration camp in Poland. *See Demjanjuk v. Petrovsky,* 10 F.3d 338, 339–40 (6th Cir.1993). He was convicted of this charge in Israel and sentenced to death. After seven years in an Israeli jail, the Supreme Court of Israel overturned his conviction on the basis of new evidence that became available after the breakup of the Soviet Union which showed that Demjanjuk was not Ivan the Terrible. *Id.* at 342. After Demjanjuk's return to the United States, it became apparent that the OSI had been in posses-

Second, the Court reviewed in *Murphy* early English and American law cases which involved invocation of the privilege against self-incrimination for fear of prosecution in a foreign jurisdiction. The Court's review of early American case law focused on Chief Justice Marshall's opinion in *United States v. Saline Bank.*[52] In that case, the defendants invoked their privilege against self-incrimination and refused to comply with the federal government's request to discover certain evidence. Significantly, the evidence sought by the government exposed the defendants to criminal prosecution in Virginia state court only, to which the Fifth Amendment clearly did not apply at that time. Chief Justice Marshall's opinion for a unanimous Court reads as follows:

This is a bill in equity for a discovery and relief. The defendants set up a plea in bar, alleging that the discovery would subject them to penalties under the statute of Virginia.

The Court below decided in favour of the validity of the plea, and dismissed the bill.

It is apparent that in every step of the suit, the facts required to be discovered in support of this suit would expose the parties to danger. *The rule clearly is, that a party is not bound to make any discovery which would expose him to penalties,* and this case falls within it.

The decree of the Court below is therefore affirmed.[53]

The *Murphy* Court observed that *Saline Bank* "squarely holds that the privilege against self-incrimination protects a witness in a federal court from being compelled to give testimony which could be used against him in a state court," even though the same privilege clearly did not apply to the states at that time.[54]

Notably, the Court had recognized the import of *Saline Bank* in a previous decision.

sion of information tending to exculpate Demjanjuk, and that the OSI failed to disclose that information, during the denaturalization and extradition proceedings. Indeed, the Sixth Circuit reopened the case in which it had denied habeas relief to Demjanjuk and vacated that decision "on the ground that the judgments were wrongly procured as a result of prosecutorial misconduct that constituted fraud on the court." *Id.* at 356. The Sixth Circuit noted that "the attitude of the government trial attorneys ... 'at times bordered on gamesmanship,' " *id.* at 341 (quoting the Special Master report). The court further rejected the OSI's argument that its attorneys operated in good faith, stating that the court "do[es] not believe [the attorneys'] personal conviction that they had the right man provided an excuse for recklessly disregarding their obligation to provide [exculpatory] information," *id.* at 350, and generally chastised the OSI for "[t]he 'win at any cost' attitude displayed by" its attorneys, *id.* at 355. Significantly, the Sixth Circuit considered the issue of whether the *Brady* rule, requiring disclosure of exculpatory information by the prosecution, *see Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), applies in the denaturalization and extradition proceedings—all technically civil proceedings—against Demjanjuk. The court concluded that *Brady* should apply in such proceedings where the government seeks to denaturalize or extradite on the basis of alleged criminal activity. *Id.* at 353. If the purpose of the Fifth Amendment, like that of the *Brady* rule, is to protect the integrity of the

judicial system by restraining overzealous prosecution, then the Fifth Amendment must also apply in such proceedings.

In the instant case, the United States has entered into an agreement with Lithuania to *affirmatively assist it in obtaining information* regarding suspected Nazi collaborators and to *aid it in* prosecuting these people. Memorandum of Understanding, *supra.* The district court has characterized the deportation proceeding against Gecas as a *de facto* extradition. This deportation proceeding against Gecas is part and parcel of an effort to prosecute Gecas for alleged participation in war crimes. Hence, the United States government essentially is both the compelling and the using sovereign. *Cf. Balsys,* 119 F.3d at 131 ("In the presence of ... facts [very similar to ours], it would be odd indeed to suggest that the United States government does not care about foreign prosecutions and hence that allowing witnesses to invoke the privilege does not discourage governmental overreaching."); *id.* at 143 (Meskill, J, concurring in the result) ("[I]n this case the government's main interest in enforcing its organic laws is in facilitating a foreign prosecution."). While I recognize that Gecas may be deported to and prosecuted by other countries on the basis of evidence gathered elsewhere, his right to remain silent should be upheld.

**52.** 26 U.S. (1 Pet.) 100, 7 L.Ed. 69 (1828).

**53.** *Id.* at 104 (emphasis added).

**54.** *Murphy,* 378 U.S. at 60, 84 S.Ct. at 1599.

In *Ballmann v. Fagin,*[55] the defendant had been held in contempt for refusing to answer certain questions before a federal grand jury on the ground that his answer might incriminate him under the laws of the state in which the grand jury was sitting.[56] In an opinion by Justice Holmes, the Court reversed the contempt citation, and held that "[a]ccording to *United States v. Saline Bank,* [the defendant] was exonerated from disclosures which would have exposed him to the penalties of the state law."[57] Significantly, *Ballmann* too was decided at a time when the Fifth Amendment had not yet been declared applicable to the states through the Fourteenth

Amendment. Thus, it is abundantly clear that the *Murphy* Court's holding was not inextricably tied to the simultaneous *Malloy* decision applying the privilege to state courts. The Court said as much when it stated: "In light of the history, policies and purposes of the privilege against self-incrimination, we now accept as correct the construction given the privilege by ... Chief Justice Marshall and Justice Holmes."[58]

Equally instructive is the *Murphy* Court's review of early English case law involving invocation of the privilege against self-incrimination for fear of prosecution in a foreign jurisdiction.[59] The *Murphy* Court

---

**55.** 200 U.S. 186, 200 U.S. 186, 26 S.Ct. 212, 50 L.Ed. 433 (1906).

**56.** *Id.* at 195, 26 S.Ct. at 213.

**57.** *Id.* (citation omitted). Although the majority undertakes to reinterpret the English cases relied upon by the *Murphy* Court and in essence argues that *Murphy* misinterpreted that case law, the majority does not mention the fact that *Murphy* also relied on *Saline Bank* and *Ballmann.* The majority does mention *Saline Bank* once, stating:

> courts can prevent the infliction of criminal penalties based on compelled, testimonial self-incrimination by refusing to force witnesses to testify against their own penal interest. *See, e.g., Saline Bank.* This prophylactic rule prevents the infliction of criminal penalties on the basis of self-incrimination by keeping the testimony hidden from the opposing party.

Majority op. at 1429–30 (citation and footnote omitted). To the extent that the majority seeks to limit *Saline Bank* to a permissive rule, allowing— but not necessarily requiring—district courts to "refus[e]" to compel self-incriminating testimony, such a limited interpretation of *Saline Bank* is inconsistent with the language used by Chief Justice Marshall, as well as the Court's subsequent interpretation of that case in both *Murphy* and *Ballmann.* More recent decisions have also confirmed that *Saline Bank* stands for a broader proposition than that advanced by the majority in this case. *See, e.g., Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973) (citing *Saline Bank* as further support for the proposition that "[t]he object of the Amendment was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime.") (internal quotation marks omitted).

**58.** *Murphy,* 378 U.S. at 77, 84 S.Ct. at 1608–09.

**59.** The majority summarily dismisses vast portions of the *Murphy* opinion, in which the Court discussed *and adopted* the English case law applying the privilege across jurisdictions, as dicta.

*See* Majority op. at 1433–34. The majority's position is ironic, in light of the majority's heavy reliance on dicta from another Supreme Court case as the very linchpin of its argument that the Self–Incrimination Clause does not apply to a domestic compelling jurisdiction if the potentially using jurisdiction is not also subject to the Clause. The linchpin of the majority's argument is that the prohibition on compulsion is merely prophylactic because "a violation of the Self–Incrimination Clause ... occurs only at *a witness's own criminal trial.*" Majority op. at 1428. For this proposition, the majority cites *United States v. Verdugo–Urquidez,* 494 U.S. 259, 264, 110 S.Ct. 1056, 1060, 108 L.Ed.2d 222 (1990). *Verdugo–Urquidez,* however, is a case about the Fourth Amendment. The entire discussion of the Fifth amendment in that case consists of the following three introductory sentences:

> Before analyzing the scope of the Fourth Amendment, we think it significant to note that it operates in a different manner than the Fifth Amendment, *which is not at issue in this case.* The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants. *See* [*Malloy,* 378 U.S. 1, 84 S.Ct. 1489]. Although conduct by law enforcement officials prior to trial may ultimately impair that right, a constitutional violation occurs only at trial. [*Kastigar,* 406 U.S. at 453, 92 S.Ct. at 1661].

*Id.* (emphasis added). Thus, the *Verdugo–Urquidez* Court's discussion of the Fifth Amendment is not only dicta, but also merely passing dicta that provides no useful analysis whatsoever.

Moreover, neither *Malloy* nor *Kastigar* support the extremely broad propositions for which they are cited. *Malloy* did not limit the application of the privilege to criminal defendants. Rather, it held that "[t]he Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a *person* to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty ... for such silence." *Malloy,* 378 U.S. at 8, 84

looked at four English cases. The first two cases date from before the framing of the Constitution and hold that fear of prosecution in another jurisdiction justified the invocation of the privilege in an English court. In *East India Co. v. Campbell*,[60] the defendant refused to reveal evidence which would have exposed him to prosecution in the courts of India.[61] The Court of the Exchequer upheld the privilege.[62] The following year, the court applied the same rule in *Brownsword v. Edwards*.[63] In that case, the defendant refused to reveal to the court whether she was lawfully married to a certain individual because doing so would have opened her to prosecution by the ecclesiastical courts.[64] The majority discounts the importance of *Brownsword* and *Campbell* on the basis that the two cases involved jurisdictions " 'operating within the same legislative sovereignty' " as the English courts.[65]

A review of the English court opinions, however, strongly suggests that these courts viewed the ecclesiastical courts and the courts of India as distinct and independent entities.[66] More importantly, what is of importance here is how the *Murphy* Court viewed and interpreted these cases. The *Murphy* Court viewed the two early English cases as standing for the proposition that a fear of foreign prosecution justifies the invocation of the privilege in a domestic court. First, the Court began its review of Chief Justice Marshall's decision in *Saline Bank* by stating that "[i]t was against this background of English case law that this Court in 1828 decided" *Saline Bank*.[67] Thus, it is clear that the *Murphy* Court viewed *Brownsword* and *Campbell* as support for *Saline Bank*, which squarely held that fear of prosecution by a sovereign not subject to the Fifth Amendment nonetheless justifies invocation of the privilege in a court of the United States.[68]

S.Ct. at 1493–94 (emphasis added). Decades before, the Supreme Court had made it quite clear that the privilege is *not* limited to criminal defendants, though it is limited to criminal matters:

> It is impossible that the meaning of the constitutional provision can only be that a person shall not be compelled to be a witness against himself in a criminal prosecution against himself. It would doubtless cover such cases; but it is not limited to them. The object was to insure that a person should not be compelled, *when acting as a witness in any investigation,* to give testimony which might tend to show that he himself had committed a crime. The privilege is limited to criminal matters, but it is as broad as the mischief against which it seeks to guard.

*Counselman,* 142 U.S. at 562, 12 S.Ct. at 198 (emphasis added). Similarly, the language and reasoning of *Kastigar* do not support the broad proposition that the right against self-incrimination can only be claimed at a witness's own criminal trial, as I have already discussed. *See supra* Part I.B, at [8–14].

Once again, I acknowledge that both the majority and this opinion rely, to some extent, on dicta to support our respective positions. Surely, "[d]icta can sometimes be useful when it contains a persuasive analysis." *McNely v. Ocala Star–Banner Corp.,* 99 F.3d 1068, 1077 (11th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1819, 137 L.Ed.2d 1028 (1997). I respectfully submit that the dicta about the Fifth Amendment in three introductory sentences of the *Verdugo–Urquidez* opinion contains no analysis whatsoever, much less a persuasive analysis. By contrast, the *Murphy* decision is about the Self–Incrimination Clause. The *Murphy* Court's discussion of

English case law on the application of the privilege against self-incrimination when the danger of incrimination is under a foreign jurisdiction's law is persuasive because it contains a thorough analysis of this case law as well as an explicit adoption of the rule it represents as the proper construction of the Self–Incrimination Clause. *See Murphy,* 378 U.S. at 77, 84 S.Ct. at 1608–09 ("In light of the history, policies and purposes of the privilege against self-incrimination, we now accept as correct the construction given the privilege by the English courts and by Chief Justice Marshall and Justice Holmes.").

**60.** 27 Eng. Rep. 1010 (Ex. 1749).

**61.** *See Murphy,* 378 U.S. at 58, 84 S.Ct. at 1598.

**62.** *Id.*

**63.** 28 Eng. Rep. 157 (Ex. 1750).

**64.** *See Murphy,* 378 U.S. at 58–59, 84 S.Ct. at 1598–99.

**65.** Majority op. at 1433 (quoting *Murphy,* 378 U.S. at 82 n. 1, 84 S.Ct. at 1619 n. 1 (Harlan, J., concurring in the judgment)).

**66.** *See Moses v. Allard,* 779 F.Supp. 857, 876 (E.D.Mich.1991).

**67.** *Murphy,* 378 U.S. at 59, 84 S.Ct. at 1599.

**68.** *See id.* at 60, 84 S.Ct. at 1599. It is worth noting that the *Murphy* Court did not do so inadvertently or without fully understanding the alleged difference between the English cases and

Second, the *Murphy* Court's interpretation of the early English cases becomes even clearer when the Court reviewed a later case, *United States v. McRae*,[69] and concluded that it represented the English rule.

In *McRae*, the United States government sued in an English court for an accounting of monies allegedly received by the defendant as an agent to the confederate states during the American civil war. The defendant refused to answer on the basis that his answers might subject him to criminal penalties in the United States. On the authority of *King of the Two Sicilies v. Willcox*,[70] the United States argued that McRae could not claim the privilege since there was no risk of incrimination under English laws. In *Willcox*, the Chancery Court had compelled a defendant to testify even though he claimed that his answers might incriminate him under the laws of Sicily.[71] However, as the *Murphy* Court noted, and as the *McRae* court later explained, the Chancery Court had compelled the defendant's testimony in *Willcox* on two grounds: "(1) 'The impossibility of knowing, as matter of law, to what cases the objection, when resting on the danger of incurring penal consequences in a foreign country, may extend . . .'; and (2) the fact that 'in such a case, in order to make the disclosure dangerous to the party who objects, it is essential that he should first quit the protection of our laws, and willfully go within the jurisdiction of the laws he has violated.' "[72] The *McRae* court thus rejected the plaintiff's construction of *Willcox* and held that the defendant

could invoke the privilege in an English court, although the only penalties he feared were in another, foreign jurisdiction.[73]

The majority's attempt to distinguish *McRae* on the basis "of the obvious factual distinctions between *McRae* and the present case" is, at best, unconvincing. To reject the plaintiff's interpretation of *Willcox*, the *McRae* court did not rely on the fact that the plaintiff in that case was the United States, the very sovereign under which laws the defendant might be subject to criminal penalties. As the *Murphy* Court noted, "the Court of Chancery held [in *McRae* ] that where there is a real danger of prosecution in a foreign country, the case could not be distinguished 'in principle from one where a witness is protected from answering any question which has a tendency to expose him to forfeiture for a breach of *our own municipal law.*' "[74] Moreover, what is relevant for our purpose is what the *Murphy* Court understood *McRae* to stand for. The Court in *Murphy* contrasted *McRae* with *Willcox* and declared that *McRae*, "not [*Willcox* ], represents the settled 'English rule' regarding self-incrimination under *foreign* law."[75] The Court's decision in *Murphy* is quite clear: "In light of the history, policies and purposes of the privilege against self-incrimination, we now accept as correct the construction given the privilege by the English courts and by Chief Justice Marshall [in *Saline Bank* ] and Justice Holmes [in *Ballmann* ]."[76] It is in no way confined to the limited view of *McRae* that the majority suggests.[77]

the circumstances in *Saline Bank*. As the majority's quote shows, Justice Harlan identified this difference to the Court in his concurrence, but the Court clearly rejected it.

69. 3 L.R.-Ch. 79 (Ch.App.1867).

70. 61 Eng. Rep. 116 (Ch. 1851).

71. *See Murphy*, 378 U.S. at 60, 84 S.Ct. at 1599.

72. *Murphy*, 378 U.S. at 60–61, 84 S.Ct. at 1599–1600 (quoting *Willcox*, 61 Eng. Rep. at 128) (omission in original); *See also id.* at 62, 84 S.Ct. at 1600 (noting that *McRae* limited *Willcox* to its facts, where " '[The defendants there] did not furnish the least information what the foreign law was upon the subject' [and] 'it was doubtful whether the Defendants would ever be within the reach of a prosecution' " in Sicily) (quoting *McRae*, 3 L.R.-Ch. at 84–87).

73. *Murphy*, 378 U.S. at 63, 84 S.Ct. at 1601.

74. *Id.* at 67, 84 S.Ct. at 1603 (quoting *McRae*, 3 L.R.-Ch. at 87) (emphasis added).

75. *Id.* at 63, 84 S.Ct. at 1601 (emphasis added).

76. *Id.* at 77, 84 S.Ct. at 1608–09.

77. For the same reason, it is of no relevance that Parliament later overruled *McRae* by statute in 1968. *See* Majority op. at 1433. First, the Court in *Murphy* adopted the reasoning and result of *McRae* as evincing *the* correct interpretation of the privilege against self-incrimination as embodied in the Fifth Amendment. *See Murphy*, 378 U.S. at 77, 84 S.Ct. at 1608–09. Because we look for guidance to *our* Supreme Court's interpretation of pertinent decisional law, not that of

In part III of the *Murphy* opinion, the Court considered then-recent Supreme Court cases involving situations where a defendant in one domestic court had invoked the privilege against self-incrimination for fear of prosecution in another, domestic jurisdiction. The Court overruled in *Murphy* three cases which had held that the privilege can be invoked only where the danger is of a prosecution in the courts of the compelling sovereign.[78] The Court's treatment of these cases is highly instructive. Of the three cases, two involved testimony compelled in state court which was not, at the time, subject to the Fifth Amendment. *Feldman* involved the use by federal authorities of testimony compelled by a state under a grant of state immunity. The Court, relying on case law developed in the context of the Fourth Amendment, had held in *Feldman* that, since it was not illegal for a state to compel the testimony, the federal government was not precluded from using the compelled testimony in a federal prosecution.[79] The Court explained in *Murphy* that the legal foundation of *Feldman* was no longer valid because of the subsequent application of the Fourth Amendment to the states.[80] *Knapp* involved a situation where a defendant in state court refused to testify, despite a grant of state immunity, because of a fear of federal prosecution. The Court had held in *Knapp* that the Fifth Amendment did not apply to the states and, thus, there was no violation of the federal Constitution.[81] The Court explained in *Murphy* that the foundation of *Knapp* also was no longer valid in view of the Court's determination in *Malloy* that the Fifth Amendment does apply to the States through the Due Process Clause of the Fourteenth Amendment.[82] In sum, the Court concluded that, although both *Feldman* and *Knapp* had been correctly decided in light of the state of the law at the time they were rendered, neither case constituted valid, binding precedent because the Court, in the interim, had overruled the reasoning underlying these decisions.

By contrast, the *Murphy* Court overruled *Murdock* because it was wrongly decided. *Murdock* involved a situation similar to the one presented in this case: the defendant invoked the privilege against self-incrimination in federal court for fear of prosecution in the courts of another sovereign not bound by the Self–Incrimination Clause; in *Murdock*, however, that other sovereign was a domestic state.[83] Significantly, the Court in *Murphy* did *not* simply argue that *Murdock* was no

---

the British Parliament, the majority's declaration that it "decline[s] to rely on a foreign case that has been overruled," Majority op. at 1433, is perplexing. Gecas does not ask the court to rely on *McRae*. He argues, as I do, that it is *Murphy*'s understanding of *McRae* that should be followed. Second, Parliament's overruling of *McRae* provides us with insight into governments' attitudes toward the right against self-incrimination in contrast to the historic role of our judiciary as the protector of individual rights in this country. The right against self-incrimination, like all rights accorded to the individual in the Constitution, imposes limits on the power of government and, consequently, burdens law enforcement activities to a certain extent. Naturally, government would rather limit the right to a minimum. *See, e.g., McCarthy v. Arndstein,* 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924) ("The government insists, broadly, that the constitutional privilege against self-incrimination does not apply in any civil proceeding."); *Counselman,* 142 U.S. at 562, 12 S.Ct. at 198 ("It is broadly contended on the part of the [government] that a witness is not entitled to plead the privilege of silence, except in a criminal case against himself...."). The difference between England and the United States, of course, is that Parliament can brush aside the *McRae* rule by

legislation, while here our judiciary stands—or at least should stand—in Congress's way, for the privilege, "which in England was a mere rule of evidence, became clothed in this country with the impregnability of a constitutional enactment." *Brown v. Walker,* 161 U.S. 591, 597, 16 S.Ct. 644, 647, 40 L.Ed. 819 (1896).

78. *See Murphy,* 378 U.S. at 70–78, 84 S.Ct. at 1605–08 (overruling *United States v. Murdock,* 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210 (1931), *Feldman v. United States,* 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408 (1944), and *Knapp v. Schweitzer,* 357 U.S. 371, 78 S.Ct. 1302, 2 L.Ed.2d 1393 (1958)).

79. *Murphy,* 378 U.S. at 73–74, 84 S.Ct. at 1606–07 (describing *Feldman* ).

80. *Id.* at 74, 84 S.Ct. at 1607.

81. *Id.* at 76–77, 84 S.Ct. at 1608 (describing *Knapp* ).

82. *Id.*

83. *Id.* at 70, 84 S.Ct. at 1605 (describing *Murdock* )

longer good law because the *Malloy* decision changed the premise of that opinion. Rather, the *Murphy* Court analyzed the reasoning of *Murdock*, including its erroneous reliance on *Willcox* as "the English rule," [84] and concluded that "neither the reasoning nor the authority relied on by the Court in [*Murdock*] supports its conclusion that the Fifth Amendment permits the Federal Government to compel answers to questions which might incriminate under state law," even though the state was not subject to the Self-Incrimination Clause at that time.[85]

In short, I recognize that *Murphy* arose in a context distinguishable from this case and, thus, technically, did not decide the issue before us. I am convinced, however, that only a strained reading of the Court's opinion and wholesale discounting of the reasoning embodied in it could lead one to reach the conclusion of the majority in this case.

### D. *Purposes of the Privilege: The Historic Perspective*

The majority embarks on a lengthy foray into history in order to refute Gecas's claim that the Self-Incrimination Clause is not only a limit on the criminal procedures of domestic governments, but also embodies a personal right that protects a person's privacy and dignity. The majority's effort is unconvincing because (1) it falls short of the ambitious proposition it seeks to advance and (2) it is contradicted by many Supreme Court discussions of this issue.

I do not dispute any of the historical facts reported by the majority. Nor do I dispute the conclusion from these facts that the privilege against self-incrimination arose in England and was later enshrined in the Constitution of several American states as well as that of the United States in large part as "a

protest against the inquisitorial and manifestly unjust methods of interrogating accused persons." [86] That the abuses of government in suppressing political and religious freedom through the use of inquisitional procedures, both in England and the colonies, were the catalysts for several of the rights protected by the Bill of Rights is axiomatic. But that does not mean that the *only* purpose of these rights, as embodied in the Bill of Rights, was to curb the power of the federal government in that regard. Indeed, if that were so, it would appear that the First Amendment alone would have done the job.[87] Similarly, the historical account of the majority does not support its sweeping conclusion that the Framers saw in the privilege only a limit on the federal government's criminal procedures and no individual liberty values. The two purposes simply are not contradictory; indeed, to a large extent, they are complementary. The first ten amendments to the Constitution are included in a Bill of *Rights*, which is *also* a bill of limitations on government power. In *Murphy*, the Supreme Court was faced with an argument similar to that of the majority as a justification for confining the application of the Self-Incrimination Clause to fear of incrimination under the laws of the compelling sovereign. The Court had this to say:

> It has been argued that permitting a witness in one jurisdiction within our federal structure to invoke the privilege on the ground that he fears prosecution in another jurisdiction:

> "is rational only if the policy of the privilege is assumed to be to excuse the witness from the unpleasantness, the indignity, the 'unnatural' conduct of denouncing himself. [But] the policy of the privilege is not this. The policy of the privilege is to regulate a

---

84. *Id.* at 72, 84 S.Ct. at 1606.

85. *Id.* at 73, 84 S.Ct. at 1606; *see also Balsys*, 119 F.3d at 127, (noting that, because *Murphy* held that *Murdock* was wrongly decided, the Fourth Circuit's reliance in *Araneta* on pre-*Murphy* decisions governing the invocation of the privilege in federal court for fear of state prosecution is misplaced).

86. *Brown v. Walker*, 161 U.S. 591, 596, 16 S.Ct. 644, 646, 40 L.Ed. 819 (1896).

87. *Cf.* Leonard W. Levy, *Origins of the Fifth Amendment* 380 (1968) [hereinafter, Levy, *Origins*] ("In 1707, at the [New York] trial of Francis Makemie, a Presbyterian minister charged with preaching without a license, the defendant voluntarily, indeed, eagerly, answered all questions, however technically incriminating. His successful defense was based on the rights of conscience as protected by the Act of Toleration.").

particular government-governed relation—first, to help prevent inhumane treatment of persons from whom information is desired and, second, to satisfy popular sentiment that, when powerful and impersonal government arrays its forces against solitary governed, it would be a violation of the individual's 'sovereignty' and less than fair for the government to be permitted to conscript the knowledge of the governed to its aid. Where the crime is a foreign crime, any motive to inflict brutality upon a person because of the incriminating nature of the disclosure—any 'conviction hunger' as such—is absent. And the sentiments relating to the rules of war between government and governed do not apply where the two are not at war"....

"Thus, reasoning from its rationales, the privilege should not apply no matter how incriminating is the disclosure under foreign law and no matter how probable is prosecution by the foreign sovereignty. This is so whether the relevant two sovereignties are different nations, different states, or different sovereignties (such as federal and state) with jurisdiction over the same geographical area." 8 Wigmore, Evidence (McNaughton rev., 1961), 345.

As noted in the text, however, *the privilege against self-incrimination represents many fundamental values and aspirations. It is "an expression of the moral striving of the community .... a reflection of our common conscience ...."* Malloy v. Hogan, 378 U.S. [at] 9[, n. 7], 84 S.Ct. [at] 1494, n. 7, quoting Griswold, The Fifth Amendment Today (1955), 73. That is why it is regarded as so fundamental a part of our constitutional fabric, despite the fact that "the law and the lawyers ... have never made up their minds just what it is supposed to do or just whom it is intended to protect." Kalven, Invoking the Fifth Amendment—Some Legal and Impractical Considerations, 9 Bull. Atomic Sci. 181, 182. *It will not do, therefore, to assign one isolated policy to the privilege, and then to argue that since "the" policy may not be furthered measurably by applying the privilege across state-federal lines, it follows that the privilege should not be so applied.*[88]

Moreover, the majority's account, though long, is not exhaustive. It de-emphasizes and virtually ignores aspects of the development of the right against self-incrimination that evince its natural law roots.[89] This view of the right was first articulated by John Lilburne, the person whose punishment in 1637 for refusing to take the inquisitional oath before the Star Chamber led to the abolition of that tribunal. After being subjected to severe corporal punishment for refusing to take the oath, John Lilburne addressed the crowds, explaining that the inquisitional oath was "an oath against the law of the land ... [and] absolutely against the law of God; for that law requires no man to accuse himself."[90] John Bradshaw, Lilburne's counsel in 1645 before the House of Commons on Lilburne's petition to declare his conviction by the Star Chamber illegal and award him reparations, argued that the inquisitional oath was contrary "to the laws of God, nature, and the kingdom, for any man to be his own accuser."[91] "The Levellers, led by Lilburne, ... claimed a right not to answer any questions concerning themselves, if life, liberty, or property might be jeopardized, regardless of the tribunal or government agency directing the examination, be it judicial, legislative, or executive."[92]

The common-law courts later emphasized the natural law roots of the right. "To furnish testimonial evidence against himself, with or without oath, was likened to drawing

---

88. *Murphy*, 378 U.S. at 56 n. 5, 84 S.Ct. at 1597 n. 5 (emphasis added).

89. *See, e.g.*, Kevin Urick, *The Right Against Compulsory Self-Incrimination in Early American Law*, 20 Colum. Hum. Rts. L.Rev. 107, 118 (1988) ("The court noted that the right against self-incrimination represented the law of God, the law of nature, and the law of the land as derived from the Magna Carta.") (citing *The At-*

*torney Gen. v. Mico*, 145 Eng. Rep. 419, 420 (1658)).

90. Levy, *Origins, supra* note 87, at 277.

91. *Id.* at 299.

92. *Id.* at 330–31.

one's blood, running oneself upon the pikes, or cutting one's throat with one's tongue." [93] Lord Chief Baron Geoffrey Gilbert, whose *Law of Evidence* was well-known in the American colonies, wrote that although a confession was the best proof of guilt, " 'this Confession must be voluntary and without Compulsion; for our Law in this differs from the Civil Law, that it will not force any Man to accuse himself; and in this we do certainly follow the Law of Nature, which commands every Man to encourage his own Preservation.' " [94] Thus, as the Supreme Court recognized:

> There can be no doubt that long prior to our independence the doctrine that one accused of crime could not be compelled to testify against himself had reached its full development in the common law, was there considered as resting on the law of nature, and was imbedded in that system as one of its great and distinguishing attributes.[95]

Consonant with this view, common-law courts even expanded the right beyond its initial concern for potential penal consequences to protect a witness from answering questions that might subject the witness to disgrace or infamy.[96] For example, Lord

Chief Justice George Treby declared, as early as 1696:

> "Men have been asked whether they have been convicted and pardoned for felony, or whether they have been whipped for petty larceny: but they have not been obliged to answer; for though their answer in the affirmative will not make them criminal, or subject them to a punishment, yet they are matters of infamy; and if it be an infamous thing, that is enough to preserve a man from being bound to answer. A pardoned man is not guilty, his crime is purged; but merely for the reproach of it, it shall not be put upon him to answer a question whereon he will be forced to forswear or disgrace himself.... The like have been observed in other cases of odious and infamous matters which were not crimes indictable." [97]

Such a broad understanding of the privilege highlights the fact that it came to focus as much on the dignity of the individual as it functioned as a limit on the power of government. That the right later contracted back to protecting the witness from answering questions that might expose him to penal consequences does not necessarily mean that individual dignity was no longer one of its underlying rationales.[98]

---

93. *Id.* at 330.

94. Urick, *supra* note 89, at 118 (quoting Geoffrey Gilbert, *The Law of Evidence* 99 (1979) (reprint of 1754 edition)) (emphasis removed); Levy, *Origins, supra* note 87, at 327. The self-preservation rationale for the natural law roots of the right against self-incrimination harkens back to ancient Talmudic law, which provided that " 'a man cannot represent himself guilty, or as a transgressor.' " *See Moses v. Allard*, 779 F.Supp. 857, 870 (E.D.Mich.1991) (quoting Levy, *Origins, supra* note 87, at 434). Indeed, some commentators and courts have suggested that the right against self-incrimination in modern Britain and the United States owes its roots to ancient Talmudic law. *See id.* (citing N. Lamm, *The Fifth Amendment and its Equivalent in Jewish Law*, 17 Decalogue 1, 12 (1967)); *see also Miranda v. Arizona*, 384 U.S. 436, 458 n. 27, 86 S.Ct. 1602, 1619 n. 27, 16 L.Ed.2d 694 (1966); *Garrity v. New Jersey*, 385 U.S. 493, 497 n. 5, 87 S.Ct. 616, 619 n. 5, 17 L.Ed.2d 562 (1967). Although Professor Levy found no evidence that the Talmudic references actually influenced the development of the modern right against self-incrimination, he noted that "[t]he Talmudic source of the right ... provided an ancient lineage and a high moral authority for" it. Levy, *Origins, supra* note 87, at 441.

95. *Bram v. United States*, 168 U.S. 532, 545, 18 S.Ct. 183, 187–88, 42 L.Ed. 568 (1897).

96. Levy, *Origins, supra* note 87, at 317–20.

97. Levy, *Origins, supra* note 87, at 318 (quoting Treby's statement in Peter Cook's trial, *State Trials*, XIII, 311 at 334–35 (K.B.1969)) (omission in original). *See also East India Co. v. Campbell*, 27 Eng. Rep. 1010, 1011 (Ex. 1749) (after ruling that fear of criminal prosecution in the courts of India justified invoking the privilege in an English court, the court continued: "But this objection goes farther; for if it only tended to render him infamous, he should not be obliged to answer") (citations omitted); Sir William Blackstone, *Commentaries on the Law of England* III, 364 (1765–69) (stating that "no man is to be examined to prove his own infamy") *quoted in* Levy, *Origins, supra* note 87, at 318.

98. The majority acknowledges in passing the natural law roots of the right against self-incrimination in addition to its function as a limitation on the power of centralized government. Majority op. at 1451. Yet, when the majority notes in the very next paragraph that "[b]y the mid-eighteenth century in England, common-law courts

It is undeniable that the early colonists in America, like their English ancestors, asserted the right against self-incrimination in response to the government's political repression. But the majority's conclusion from this fact that the colonists asserted the right exclusively as a limit on government's power and not additionally as an expression of individual dignity is not a necessary one. The majority ignores the practical reality that rights cannot be asserted in the abstract; people claim rights as against the government when they perceive that the government is abusing them. When the colonists claimed the right, moreover, they claimed it as part of *"English Liberty,"* [99] thus incorporating all that the right signified to their English ancestors into their own conceptions of the right. The right

> grew so in popularity that in 1735 Benjamin Franklin, hearing that a church wanted to examine the sermons of an unorthodox minister could declare: "It was contrary to the common Rights of Mankind, no Man being obliged to furnish Matter of Accusation against himself." In 1754, a witness parried a Massachusetts legislative investigation into

seditious libel by quoting the well-known Latin maxim [*nemo tenetur seipsum accusare*], which he freely translated as "A Right of Silence as the Privilege of every Englishman." In 1770 the attorney general of Pennsylvania ruled that an admiralty court could not oblige people to answer interrogatories "which may have a tendency to criminate them, or subject themselves to a penalty, it being contrary to any principle of Reason and the Laws of England." [100]

As Professor Levy notes: "When a right becomes so profoundly accepted that it has been hallowed by its association with Magna Carta and has been ranked as one of the common rights of man deriving from the law of nature, it receives genuflection and praise, not critical analysis." [101] Thus, it is not surprising that the colonists or, for that matter, the Framers did not leave behind theoretical explanations and rationales for the right against self-incrimination. But history's silence on whether the policies underlying the right were to limit government's power, secure individual dignity, or both cannot be taken as absolute proof that the Framers did not seek to advance all these policies.[102]

---

> could hold that '[i]t is clearly settled now, that no person is obliged to make a discovery, which will subject him to a disability,'" *id.* at 1451 (quoting *Harrison v. Southcote*, 1 Atk. 530, 533 (1751)), it merely concludes: "This 'clearly settled' principle was a rule of evidence limiting the government's power to establish inquisitional tribunals," *id.* The majority does not explain, however, why this "clearly settled" principle, so expansively embraced by the court, does not also evince a respect for the individual dignity of the person.

**99.** Levy, *Origins, supra* note 87, at 386 (quoting John Lovell).

**100.** Leonard W. Levy, *Original Intent and the Framers' Constitution* 265–66 (1988) [hereinafter Levy, *Original Intent*].

**101.** *Id.* at 266.

**102.** Indeed, the Supreme Court has already rebuffed attempts to so limit the scope of the right against self-incrimination. *See Murphy*, 378 U.S. at 56 n. 5, 84 S.Ct. at 1597 n. 5. The majority's reliance on history's silence is not unlike that of the governments's attempt in *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), *overruled in part on other grounds*, *California v. Acevedo*, 500 U.S. 565, 111 S.Ct.

1982, 114 L.Ed.2d 619 (1991), to limit the scope of the Fourth Amendment Warrant Clause to the specific historical circumstances that gave rise to it. In that case, the government argued that the Framers did not intend the Warrant Clause to prohibit warrantless searches outside the home because that Clause "was adopted primarily, if not exclusively, in response to unjustified intrusions into private homes on the authority of general warrants," and, moreover, there was no historical evidence whatsoever that the Framers "intended to disturb the established practice of permitting warrantless searches outside the home." *Chadwick*, 433 U.S. at 6–7, 97 S.Ct. at 2481. The Supreme Court answered:

> Although the searches and seizures which deeply concerned the colonists, and which were foremost in the minds of the Framers, were those involving invasions of the home, it would be a mistake to conclude, as the Government contends, that the Warrant Clause was therefore intended to guard only against intrusions into the home....
>
> ... [I]f there is little evidence that the Framers intended the Warrant Clause to operate outside the home, there is no evidence at all that they intended to exclude from protection of the Clause all searches occurring outside the home. The absence of a contemporary outcry against warrantless searches in public places

The process of constitutionalizing the right against self-incrimination started with the inclusion of a version of that right in the Virginia Declaration of Rights.[103] The right appeared, however, within section eight, which exclusively dealt with the procedural rights of an accused at his own criminal trial.[104] Virginia's formulation of the right was later widely copied by constitution drafters in other states.[105] Nonetheless, the majority's conclusion from this fact that these states therefore viewed the right as a privilege available only to the criminal defendant is erroneous. As Professor Levy demonstrates, extending the right to the criminal defendant at a time when that defendant was not even allowed, in Virginia as well as other states, to testify at his own trial would have been an utterly superfluous action. As a matter of practice, a much broader and more meaningful right was recognized in Virginia around 1776, protecting witnesses from being compelled to testify against their legal interests in judicial proceedings as well as before non-judicial tribunals, and even "shield[ing] witnesses against mere exposure to public obloquy."[106] In fact, state courts never interpreted clauses similar to Virginia's to apply only to criminal defendants. For example, although Pennsylvania had enacted a self-incrimination clause similar to Virginia's, seemingly only protecting the accused at his own trial, the state supreme court interpreted that provision as expressing the broader

historic maxim that no person is bound to accuse himself. The court held:

> It has been objected that the questions propounded to the electors contravene an established principle of law. The maxim is, "Nemo tenetur seipsum accusare (sen prodere)." It is founded on the best policy, and runs through out our whole system of jurisprudence. It is the uniform practice of courts of justice as to witnesses and jurors. It is considered *cruel and unjust* to propose questions which may tend to criminate the party.... The words "accusare" and "prodere" are general terms, and their sense is not confined to cases where the answers to the questions proposed would induce to the punishment of the party. If they would involve him in shame or reproach, he is under no obligation to answer them.[107]

Although the self-infamy rule eventually fell into disuse, the right against self-incrimination in the states simply never contracted to a literal application of section eight of the Virginia Declaration of Rights or other state constitutional provisions modeled after it.

More importantly, the right against self-incrimination was not included in the United States Constitution as one of the cluster of procedural rights afforded criminal defendants. While other such procedural rights derived from section eight of the Virginia Declaration were included in the Sixth Amendment, the right against self-incrimina-

---

was because, aside from searches incident to arrest, such warrantless searches were not a large issue in colonial America. Thus, silence in the historical record tells us little about the Framers' attitude toward application of the Warrant Clause to [such] search[es]. What we do know is that the Framers were men who focused on the wrongs of that day but who intended the Fourth Amendment to safeguard fundamental values which would far outlast the specific abuses which gave it birth.

*Id.* at 8–9, 97 S.Ct. at 2482 (footnote omitted). This last observation is as true for the Self–Incrimination Clause as it is for the Warrant Clause.

**103.** Constitution of Virginia, Bill of Rights (1776), *reprinted in Sources of Our Liberties* 311–12 (Richard L. Perry & John C. Cooper eds., rev. ed.1978).

**104.** Section eight of the Virginia Declaration of Rights provided:

That in all capital or criminal prosecutions a man hath a right to demand the cause and nature of his accusation, to be confronted with the accusers and witnesses, to call for evidence in his favor, and to a speedy trial by an impartial jury of twelve men of his vicinage, without whose unanimous consent he cannot be found guilty; nor can he be compelled to give evidence against himself; that no man be deprived of his liberty, except by the law of the land or the judgment of his peers.

**105.** Levy, *Original Intent, supra* note 100, at 250–51.

**106.** *Id.* at 249.

**107.** *Respublica v. Gibbs*, 3 Yeats 429, 437 (Pa. 1802), *quoted in* Levy, *Original Intent, supra* note 100, at 256–57 (emphasis added).

tion was included separately in the Fifth Amendment. James Madison's initial draft of what eventually became the Bill of Rights in fact included a Self–Incrimination Clause that was as broad as the common-law right ever was: "No person ... shall be compelled to be a witness against himself."[108] Such a broad formulation of the rights clearly aims to preserve individual dignity and privacy, as well as limit the power of government from establishing inquisitional tribunals. The only commentary about the Clause in the first Congress was by a New York Federalist, John Laurence, who stated that it was "a general declaration in some degree contrary to laws passed," and proposed an amendment to "confine[ it] to criminal cases."[109] The amendment was adopted unanimously, without debate.[110] The majority concludes from these scant facts that the Framers therefore "intended [no more than] to protect the integrity of the common-law criminal trial against the adoption of inquisitional tactics by the federal government."[111] Another, equally plausible conclusion is that the Framers merely sought to confine the right not to be compelled to be a witness against oneself to its core purpose of not being compelled to incriminate oneself; that is, the Framers sought to limit the invocation of the right to instances where the potential consequences are criminal, not civil.[112] The brief "legislative history" of the Self–Incrimination Clause tells us virtually nothing about its underlying rationale. "By 1776 the principle of the

*nemo tenetur* maxim was simply taken for granted and so deeply accepted that its constitutional expression had the mechanical quality of a ritualistic gesture in favor of a self-evident truth needing no explanation."[113] The majority cannot read in the absence of an explanation a rejection of the individual dignity rationale for that maxim.

> The fundamental value that the privilege reflects is intangible, it is true; but so is liberty, and so is man's immortal soul. A man may be punished, even put to death, by the state; but ... he should not be made to prostrate himself before its majesty. *Mea culpa* belongs to a man and his God. It is a plea that cannot be exacted from free men by human authority. To require it is to insist that the state is the superior of the individuals who compose it, instead of their instrument.[114]

Notwithstanding the majority's historical analysis, the Supreme Court has long recognized the rights-based rationale of the Self–Incrimination Clause. For example, in *Malloy,* the Supreme Court explained: " 'the freedom from unconscionable invasions of privacy [guaranteed by the Fourth Amendment] and the freedom from convictions based upon coerced confessions [guaranteed by the Fifth Amendment] enjoy an "intimate relation" in their perpetuation of *"principles of humanity and civil liberty* [secured] ... only after years of struggle." ' "[115] The

---

**108.** *Sources of Our Liberties, supra* note 103, at 422.

**109.** Levy, *Origins, supra* note 87, at 424.

**110.** *Id.* at 424–25.

**111.** Majority op. at 1456–57.

**112.** Professor Levy suggests that Lawrence used "laws passed" to refer to certain provisions of the Judiciary Act of 1789, which empowered federal courts to compel the production of books or papers that might subject parties to civil liability and that, therefore, the Framers were concerned with "retain[ing] the customary equity rule that compelled evidence of *civil* liability." Levy, *Origins, supra* note 87, at 425–26 (emphasis added).

**113.** Levy, *Origins, supra* note 87, at 430.

**114.** Fortas, *supra* note 4, at 99–100.

**115.** *Malloy v. Hogan,* 378 U.S. 1, 9, 84 S.Ct. 1489, 1494, 12 L.Ed.2d 653 (1964)(quoting *Mapp v. Ohio,* 367 U.S. 643, 656, 81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081 (1961) (quoting *Bram v. United States,* 168 U.S. 532, 543–44, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897))) (emphasis added) (last alteration and omission in original).

The "intimate relation" between the Fourth Amendment's Search and Seizure Clause and the Fifth Amendment's Self–Incrimination Clause was first recognized by the Supreme Court in *Boyd v. United States,* 116 U.S. 616, 633, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886). This view goes back further, however, to *Entick v. Carrington,* 19 How. St. Tr. 1029, 95 Eng. Rep. 807 (K.B.1765), a decision by Lord Camden that predates independence and which "is considered [both in the colonies and the mother country] as one of the landmarks of English liberty." *Boyd,* 116 U.S. at 626, 6 S.Ct. at 530. *Entick* involved the search of plaintiff's house and the seizing of incriminating papers on the authority of a general war-

Court, thus, "repudiated the *Twining* concept of the privilege as a mere rule of evidence 'best defended not as an unchangeable principle of universal justice, but as a law proved by experience to be expedient.' " [116] In *Murphy*, the Court stated that the right against self-incrimination reflects, among other policies, "our respect for the inviolability of the human personality and of the right of each individual 'to a private enclave where he may lead a private life.' " [117] It then held that the privilege must be applied across state-federal lines *because*, otherwise, its policies would be defeated.[118] Relying on *Murphy*'s enumeration of the policies underlying the privilege against self-incrimination, the Court in *Kastigar* acknowledged that "[t]he privilege reflects a complex of our fundamental values and aspirations, and marks an important advance in the development of our liberty." [119] As recently as 1990, the Court reaffirmed that "[a]t its core, the privilege reflects our fierce 'unwillingness to subject those suspected of crime to the cruel trilem-

ma of self-accusation, perjury or contempt.' " [120]

In short, the majority's attempt to ascribe a singular policy to the Self–Incrimination Clause, and then to argue that the Clause does not apply in this case because such application does not advance *the* policy, must be rejected, as the Court admonished.[121] The majority's appeal to the historic circumstances surrounding the development of the right against self-incrimination is unpersuasive and contradicted by the Supreme Court's own discussions of this issue.

### E. *Practical Considerations*

Although the majority does not base its decision on the alleged negative repercussions to domestic law enforcement of a rule applying the right against self-incrimination to a witness who fears foreign prosecution, it contends that these repercussions would be substantial. Two sister circuits have found

---

rant. The plaintiff sued the king's agents for trespass, and he won. *Id.* In holding the general warrant search illegal, Lord Camden said: "It is very certain that the law obligeth no man to accuse himself, because the necessary means of compelling self-accusation, falling upon the innocent as well as the guilty, would be both *cruel and unjust;* and it would seem that search for evidence is disallowed upon the same principle." *Entick*, 19 How. St. Tr. at 1073, *quoted in Boyd*, 116 U.S. at 629, 6 S.Ct. at 532 (emphasis added). The Supreme Court explained:

It is not the breaking of his doors, ... that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property.... Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony, or of his private papers to be used as evidence to convict him of crime, or to forfeit his goods, is within the condemnation of that judgment.

*Boyd*, 116 U.S. at 630, 6 S.Ct. at 532.

What is most remarkable about Lord Camden's decision, for the purpose of this case, is that it highlights once more that the right against self-incrimination was embedded so strongly in the law by 1765 that Lord Camden sought to invalidate a general warrant search on the basis that it is but a form of compelling self-incriminating evidence. Moreover, the intimate relationship between these two provisions of the Bill of Rights harmonizes with the idea that the Self–Incrimination Clause, like the Fourth Amendment, has individual privacy as one of its core concerns.

**116.** *Malloy*, 378 U.S. at 9, 84 S.Ct. at 1494 (quoting and overruling *Twining v. New Jersey*, 211 U.S. 78, 113, 29 S.Ct. 14, 25, 53 L.Ed. 97 (1908)).

**117.** *Murphy*, 378 U.S. at 55, 84 S.Ct. at 1597 (quoting *United States v. Grunewald*, 233 F.2d 556, 581–82 (2nd Cir.1956) (Frank, J., dissenting), *rev'd*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957)). *See also United States v. Nobles*, 422 U.S. 225, 233, 95 S.Ct. 2160, 2167, 45 L.Ed.2d 141 (1975) ("The Fifth Amendment privilege against compulsory self-incrimination ... protects 'a private inner sanctum of individual feeling and thought and proscribes state intrusion to extract self-condemnation.' ") (quoting *Couch v. United States*, 409 U.S. 322, 327, 93 S.Ct. 611, 615, 34 L.Ed.2d 548 (1973)).

**118.** *Id.; see Kastigar v. United States*, 406 U.S. 441, 456, 92 S.Ct. 1653, 1663, 32 L.Ed.2d 212 (1972) (noting that the holding of *Murphy* was based on "an examination of the policies and purposes of the privilege").

**119.** *Kastigar*, 406 U.S. at 444, 92 S.Ct. at 1656 (citation omitted).

**120.** *Pennsylvania v. Muniz*, 496 U.S. 582, 596, 110 S.Ct. 2638, 2647, 110 L.Ed.2d 528 (1990) (quoting *Doe v. United States*, 487 U.S. 201, 212, 108 S.Ct. 2341, 2348, 101 L.Ed.2d 184 (1988)) (internal quotation marks omitted).

**121.** *See Murphy*, 378 U.S. at 56 n. 5, 84 S.Ct. at 1597 n. 5.

these repercussions to be potentially so substantial that they grounded their denial of the right to a witness who fears foreign prosecution largely on these alleged repercussions.[122] The majority formulates the following hypothetical:

> Assume, for example, that the sale and distribution of cocaine is illegal in the nation of Ames. A citizen of Ames visits the United States on a temporary visa. She is arrested in Miami International Airport after police find five kilograms of cocaine in her luggage. The prosecution offers her immunity [from domestic prosecution] in exchange for testimony about three leaders of a drug ring operating in Southern Florida.[123]

The suspect in that hypothetical could still refuse to testify because of her fear of prosecution in Ames, thus frustrating the efforts of domestic law enforcement, according to the majority. The majority is wise not to have relied on this rationale for denying Gecas the right against self-incrimination. For, as one thoughtful district court judge has said:

> While this Court appreciates the potential burdens that expansion of the privilege might place on law enforcement officials, it cannot abrogate a right solely on this ground. In fact, the Bill of Rights as a whole stands for the proposition that the rights of the individual must, in constitutionally defined circumstances, be preeminent, even when those rights may entail hardship to law enforcement personnel.[124]

Moreover, the majority's assessment is correct, but only to a point. A fear of foreign prosecution is substantial enough to justify invocation of the right against self-incrimination only if there is a reasonable possibility that the suspect will be apprehended by the foreign government in question. This could happen in one of two ways: either the suspect voluntarily travels to Ames; or the government delivers her to Ames authorities, through deportation or extradition.[125]

---

**122.** *See United States v. (Under Seal)*, 794 F.2d 920, 926 (4th Cir.) [hereinafter *Araneta*], cert. denied sub nom. *Araneta v. United States*, 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986); *In re Parker*, 411 F.2d 1067, 1070 (10th Cir.1969) [hereinafter *Parker*], vacated as moot sub nom. *Parker v. United States*, 397 U.S. 96, 90 S.Ct. 819, 25 L.Ed.2d 81 (1970).

The Tenth Circuit in *Parker* posited what one commentator charitably described as a "bizarre and isolated hypothetical." *See* Moshe M. Surenik, Note, *Testimony Incriminating Under the Laws of a Foreign Country—Is There a Right to Remain Silent?*, 11 N.Y.U. J. Int'l L. & Pol. 359, 370 (1978). According to the *Parker* court,

> [t]he ideology of some nations considers failure itself to be a crime and could provide punishment for the failure, apprehension, or admission of a traitorous saboteur acting for such a nation within the United States. In such a case the words "privilege against self-incrimination," engraved in our history and law as they are, may turn sour when triggered by the law of a foreign nation.

*Parker*, 411 F.2d at 1070 (footnote omitted). In addition to the fact that requiring the witness to demonstrate a real and substantial fear of foreign prosecution eliminates the apprehension that a person could manufacture a potential for foreign prosecution or raise this specter solely to frustrate domestic law enforcement, the situation described by the *Parker* court could never arise because the witness in that case would not be subject to extradition to the foreign country in question; that is, the witness could not prove a real and substantial fear of foreign prosecution. This is so because of the "double criminality"

principle embodied in extradition treaties to which the United States is a party, according to which extraditable offenses are either specifically listed in the treaty or, if unlisted, must satisfy the requirement that the alleged offense is considered to be a crime in both the requesting and the requested state. *See generally* M. Cherif Bassiouni, *International Extradition: United States Law and Practice* 388–93 (3d ed.1996); *see also Balsys*, 119 F.3d 122, 135, (2nd Cir.1997).

**123.** Majority op. at 1434.

**124.** *Moses v. Allard*, 779 F.Supp. 857, 882 (E.D.Mich.1991). Another district judge, Jon O. Newman—now Chief Judge of the Second Circuit—said:

> Of course, a constitutional privilege does not disappear, nor even lose its normal vitality, simply because its use may hinder law enforcement activities. That is a consequence of nearly all the protections of the Bill of Rights, and a consequence that was originally and ever since deemed justified by the need to protect individual rights

*In re Cardassi*, 351 F.Supp. 1080, 1086 (D.Conn. 1972).

**125.** *See* Scott Bovino, Comment, *A Systematic Approach to Privilege Against Self–Incrimination Claims When Foreign Prosecution Is Feared*, 60 U. Chi. L.Rev. 903, 912 (1993). Bovino also posits that a foreign government could gain custody of a witness by kidnaping. *Id.* The possibility of a foreign government kidnaping a person

Any restriction on the suspect's ability to travel resulting from being compelled to testify is not the type of consequence from which the privilege shields a witness.[126] Therefore, the only legitimate fear that the suspect would have in the majority's hypothetical stems from the *government's* actions of deporting or extraditing her to Ames. These are actions that are completely within the control of the government. Therefore, the government has the ability to render insubstantial the suspect's fear of foreign prosecution by agreeing not to deport or extradite her.[127] This is, perhaps, a high price to pay in exchange for the suspect's testimony. But that is the disability that the Constitution imposes on our government.[128] In other words, the Self–Incrimi-

from the United States, however, is too remote to be seriously considered.

**126.** *See In re Sealed Case,* 825 F.2d 494, 497 (D.C.Cir.1987) (The privilege "does not protect against dangers voluntarily assumed."); *Moses,* 779 F.Supp. at 867–68 (discussing Supreme Court decisions regarding the "right to travel" and concluding that a burden on such right does not justify invocation of the privilege); *cf. Ullmann v. United States,* 350 U.S. 422, 430, 76 S.Ct. 497, 502, 100 L.Ed. 511 (1956) (stating that the privilege does not shield a witness from "disabilities . . . such as loss of job, expulsion from labor unions, . . . passport eligibility, and general public opprobrium").

**127.** The government apparently has done so in the past. In the course of its investigation of Gecas, the OSI sought the testimony of Antanas Ragauskas, a former Lithuanian national who immigrated to the United States in 1961, under an administrative subpoena. Ragauskas invoked his right against self-incrimination, and the OSI sought to compel his testimony by offering him immunity from prosecution under the Immigration Act on the basis of that testimony. *See United States v. Ragauskas,* 1995 WL 86640, No. 94 C 2325, (N.D.Ill. Feb. 27, 1995). The court initially enforced the OSI's subpoena. *Id.* The OSI withdrew the offer before Ragauskas' deposition, however, and the court upheld Ragauskas' right to refuse to answer any questions thereafter on the basis of his reasonable fear of prosecution in Lithuania. *Id.* at *2, *6.

Some have argued that, under current law, it is not clear that a prosecutor has the authority to grant immunity from extradition. *See, e.g.,* Comment, *Criminal Law—Self–Incrimination—The Fifth Amendment Protects a Witness Who Refuses to Testify for Fear of Self–Incrimination Under the Laws of a Foreign Jurisdiction.* In re Cardassi, *351 F.Supp. 1080 (D.Conn.1972),* 5 Rut–Cam. L.J. 146, 161 (1973); *but see Geisser v. United States,* 513 F.2d 862, 869 n. 11 (5th Cir.1975)(suggesting that, if extradition would violate a person's constitutional rights, the power of the government to extradite "may well be circumscribed by *Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), holding individual constitutional rights superior to the Government's treaty obligations"). The Secretary of State, however, has the discretion to refuse to extradite a person, even if that person is accused of an extraditable offense. *See, e.g.,* Bassiouni, *supra* note 122, at 576 & n. 250 (3d ed.1996) (reporting instances where the Secretary of State exercised such discretion). It follows that the government as a whole, through cooperation of the State and Justice departments, could overcome the suspect's fear of being extradited on the basis of her compelled testimony by simply promising not to extradite her. In any case, Congress has the authority to enact a law giving the executive the ability to grant formal immunity from extradition and directing the courts not to certify extraditability on that basis. *See generally Balsys,* 119 F.3d at 138 (noting that "Congress may change the law of the land by statute, even when doing so is inconsistent with a treaty previously in existence") (citing *Clark v. Allen,* 331 U.S. 503, 508–09, 67 S.Ct. 1431, 1434–35, 91 L.Ed. 1633 (1947) and other authority). Because Congress has such authority, the majority's suggestion that upholding the privilege in this case would somehow compromise our own national sovereignty is erroneous. *See id.* at 139 n. 16. Responding to the majority's footnote 15, I would observe that their predicate assumption ("In most cases, these individuals cannot be deported without their testimony;")—for which no authority is offered—is specious. In the well-documented case of John Demjanjuk (*see* note 51), he was deported without the use of any of his testimony. Moreover, the government in the investigation of Gecas that gives rise to this case offered immunity to Antanas Ragauskas to testify against Gecas, as noted above. The government has the ability and resources to develop evidence quite apart from requiring the target of an investigation to testify against himself.

**128.** The majority suggests, with apparent alarm, that upholding the privilege in this case would result in a situation where "[f]ugitives who flee to the United States would become entitled to a procedural right they lack in their own countries." Majority op. at 1435. This is true, without a doubt, whether Gecas' right is upheld or not. Indeed, "[f]ugitives who flee to the United States" are entitled to due process of law, *see Shaughnessy v. United States,* 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953) (noting that "aliens who have once passed through our gates, even illegally," are entitled to due process of law), as well as the equal protection of the laws, even if such rights are nonexistent in their own countries. This is our nation's greatest attribute, not its failing.

nation Clause in the majority's hypothetical does not paralyze domestic law enforcement; it imposes costs on it, just as it does in every instance the government is willing to grant immunity to a witness.[129]

Moreover, while the facts of the majority's hypothetical may lead some to balk at its possible result, namely that a foreign drug dealer on a temporary visa could frustrate domestic law enforcement efforts, other hypotheticals might present much more sympathetic witnesses. For example, instead of a drug dealer on a temporary visa, we can imagine a young American tourist recently returned from Ames and wrongly accused by its authorities of having connections with one of its drug cartels. To the disappointment of the Miami Airport police, no drugs are discovered in the young citizen's luggage. Nonetheless, convinced that the "intelligence" they received was correct, American authorities insist on questioning the suspect under oath. Immunity from domestic prosecution is hardly of any value to a suspect who risks extradition to Ames and conviction there on the basis of his answers.[130]

It cannot be gainsaid that the majority's decision in this case opens the door for the use of our courts to compel the testimony of a United States citizen in the service of a foreign sovereign's prosecution. Even if there were also a valid domestic law enforcement purpose for this testimony,[131] it is hard to believe that the Constitution allows such a result. As Judge Rosen remarked upon the historical context for the adoption of the Bill of Rights:

> This new nation had just fought a war to be free from domination of the American people by a foreign sovereign. It is difficult to credit that, given this context, the founders of this new government would have countenanced the compulsion of an American's testimony so that it could be turned over to an English king's prosecutor for prosecution of that American in

**129.** I hasten to add that the consequences of the majority's rule in this case with respect to domestic law enforcement are not much better than those identified in the hypothetical. If it is apparent to the suspect that the United States government intends to use her cooperation to apprehend the local drug leaders, and then ship her back to Ames to be prosecuted on the basis of that same testimony, the suspect simply has no incentive to cooperate. Moreover, depending on the prison conditions in Ames, the suspect might well prefer to end up in a local jail on a charge of contempt, rather than go back to Ames. See *Balsys*, 119 F.3d at 142, (Block, J., with whom Calabresi, J., joins, concurring) ("It simply cannot pragmatically be assumed that when faced with the 'cruel trilemma of self-accusation, perjury or contempt,' the choice would invariably be self-accusation. Balsys, for example, would obviously choose domestic contempt over foreign execution...."). Finally, considering that the suspect was apprehended in the Miami Airport in possession of a large quantity of cocaine, she is subject to significant criminal penalties in this country. Her cooperation is more likely to come as a result of a plea agreement rather than under an immunity statute.

**130.** [I]f an accused person be asked to explain his apparent connection with a crime under investigation, the ease with which the questions put to him may assume an inquisitorial character, the temptation to press the witness unduly, to browbeat him if he be timid or reluctant, to push him into a corner, and to entrap him into fatal contradictions,

*Brown v. Walker*, 161 U.S. 591, 596–97, 16 S.Ct. 644, 646–47, 40 L.Ed. 819 (1896), are some of the reasons that have led to the constitutionalization of the privilege against self-incrimination in the United States.

**131.** If the majority's decision were to become the law of the land, nothing stands in the way of a treaty, for example, which would require the United States government to compel an American citizen's answers to questions put to him by foreign prosecutors in the course of an extradition proceeding. And this without the assertion of any domestic law enforcement whatsoever, but in the interest of increased cooperation among the nations in fighting crime. A compelling hypothetical can be formulated here too: An American tourist recently returned from Singapore is accused by Singaporian authorities of having vandalized several cars by spraying graffiti on them, a serious offense in Singapore. The Singaporian government cannot prove his whereabouts during the time of the alleged offense, but has recently signed a new extradition treaty with the United States, which provides for increased cooperation between the two countries in criminal investigations. Under this treaty, the Singaporian government may submit interrogatories to the United States Justice Department, which has the authority to subpoena the suspect and require him to answer the interrogatories. According to the rule adopted by the majority today, nothing precludes the government from demanding answers, however incriminating, and enlisting the contempt power of a federal court to compel them.

England. This is particularly clear to this Court when one considers that, if the prosecution were by an American prosecutor, the testimony certainly could not have been compelled. One can hardly believe that our Founders would have formulated a fundamental right which could be exercised on American soil under the American Constitution and which could not be abridged by an American government but which could be abridged for the benefit of a foreign government or monarch.[132]

Indeed, the concept that an American citizen's Fifth Amendment right depends upon whether he is to be subjected to domestic prosecution, with its manifold due process safeguards, or delivered into the hands of a foreign regime, whose judicial processes *may or may not* comport with the American paradigm of human rights, is repugnant to our nation's historical protection of individual liberties.

## II. WAIVER

The government contends, alternatively, that Gecas waived his Fifth Amendment right with respect to the questions relevant to any statements he made in his visa application, thirty-five years ago. The government relies on *Rogers v. United States*, in which the Supreme Court held that "where criminating facts have been voluntarily revealed, the privilege cannot be invoked to avoid disclosure of the details."[133] As we have previously held, however, this rule "is generally only applicable when the 'disclosure of the details' is being sought in the same proceeding where the initial 'criminating facts have been voluntarily revealed.' "[134] Therefore, the government's waiver argument is tenable only if the visa acquisition process is part of his deportation proceeding. Other than the government's and a district court's utterly conclusory statements,[135] there is no support for such a proposition.[136] In *Fortin*, we adopted the following rule:

> [t]he privilege [against self-incrimination] attaches to the witness in each particular case in which he may be called on to testify, and whether or not he may claim it is to be determined without reference to what he said when testifying as a witness on some other trial, or *on a former trial of the same case*, and without reference to his declarations at some other time or place.[137]

If a witness does not waive his privilege in a former trial in the same case, then he surely does not waive it either by completing a visa application thirty-five years before the institution of a deportation proceeding.[138] Similarly, a person who completes a visa application does not waive his privilege as to the information contained therein in a deportation proceeding any more than a government contractor waives his privilege as to the information contained in his bid to the government by submitting such a bid, or an involuntary bankrupt waives his privilege in the bankruptcy proceeding by filing a schedule of

**132.** *Moses*, 779 F.Supp. at 874 n. 24.

**133.** 340 U.S. 367, 373, 71 S.Ct. 438, 442, 95 L.Ed. 344 (1951).

**134.** *United States v. Fortin*, 685 F.2d 1297, 1298 (11th Cir.1982).

**135.** *See United States v. Balsys*, 918 F.Supp. 588, 600 (E.D.N.Y.1996), *rev'd*, 119 F.3d 122 (2nd Cir.1997).

**136.** What is a "proceeding" anyway? The government suggests that Gecas' visa application and entry into the United States, his obtaining a "green card" (i.e., becoming a permanent resident), and the current deportation action are part of the same "immigration proceeding." It seems much more logical to conclude that Gecas has, thus far, been involved in three separate proceedings pertaining to his immigration to and status in the United States. First, a visa proceeding, as a result of which he entered the United States; second, a "green card" proceeding, as a result of which he became a permanent resident; and third, currently, a deportation proceeding, as a result of which he could be deported if he is found to have misrepresented material facts in either previous proceedings.

**137.** *Fortin*, 685 F.2d at 1298–99 (quoting *In re Neff*, 206 F.2d 149, 152 (3d Cir.1953)) (alterations in original) (emphasis added).

**138.** The passage of time, in and of itself, is significant because "there have been substantial intervening changes in immigration law, in immigration procedures, and in the criminal law of Lithuania, Israel, and the United States." *Balsys*, 119 F.3d at 140, *see also Poretto v. United States*, 196 F.2d 392, 394 (5th Cir.1952) (noting that the passage of time is relevant to the issue of waiver of Fifth Amendment right).

assets with the court.[139] The government's waiver argument is meritless. Gecas did not waive his constitutional right against self-incrimination by completing a visa application.[140]

## III. CONCLUSION

The facts in this case are as ironic as the legal principle examined is fundamental. Government prosecutors seek potentially incriminating evidence from a thirty-year resident alien who is suspected of war crimes perpetrated by the Nazi regime during World War II. The atrocities to which they would link him epitomize the depths to which humankind can descend and exemplify an absolute denial of human dignity. Yet, if the lessons from that tragic episode in history are to teach us anything it must be that the sanctity of the individual citizen must be cherished and protected relative to the power of his government—even the majority in a democratic society.

In the span of human history, the era of Nazi Germany is certainly little more than yesterday. Many of our fathers and grandfathers fought and died to liberate those who survived the holocaust. However, even the participants in that conflict were at a loss to understand how a modern, civilized nation—one that had given the world great composers, artists, musicians, craftsmen, philosophers and theologians—could so totally reject the concept of human dignity. Unless we are blind and deaf to the legacy of the holocaust, we must understand that the Fifth Amendment's prohibition against the government's intrusion into the inner sanctum of the individual citizen is no mere "prophylactic rule" as suggested by the majority. Rather, it is a right that acknowledges and ordains the sanctity of the individual, insures his dignity and reaffirms the American concept of a government of laws, where the government is subservient to the governed. It is indeed a tragic day when a court of this nation—traditionally the bulwark of individual liberties—abandons two centuries of Constitutional tradition and relegates one of our fundamental rights of citizenship to the stature of a "prophylactic rule." Therefore, I must respectfully dissent.

CARNES, Circuit Judge, dissenting:

I dissent from the Court's holding for essentially those reasons Judge Birch has ably and thoroughly explained in his opinion. Although I agree with most of what is said in that opinion, I write separately for two reasons.

The first is to point out that the Department of Justice has admitted in another court that this case is less about efforts to determine whether Gecas should be deported than it is about efforts to assist foreign countries in prosecuting him. After the panel decision was issued in this case, the United States Attorney's Office for Arizona filed a brief in the Ninth Circuit on behalf of the United States as appellee in a case in which

---

139. *See, e.g., Arndstein v. McCarthy,* 254 U.S. 71, 72, 41 S.Ct. 26, 26, 65 L.Ed. 138 (1920).

140. I also note that Gecas did not have any Fifth Amendment rights before he entered the United States. *See Shaughnessy v. United States,* 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953). Thus, as the Second Circuit observed in a similar case, "It is problematic, to say the least, to suggest that [Gecas] could have implicitly waived constitutional rights that he did not yet possess." *See Balsys,* 119 F.3d at 140.

In our order granting rehearing en banc in this case, we asked the parties to address also the following question: "Whether an alien who putatively acquired his resident status by misrepresenting a material fact should be permitted to invoke the Fifth Amendment privilege against self-incrimination." Other than managing to restate its waiver and fear of domestic prosecution arguments in a different form, the government appears to answer this question in the affirmative in its brief. *See* Brief of Appellee at 37–38 (citing *Leng May Ma v. Barber,* 357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1958) (noting that rights and privileges have been extended to aliens "who are within the United States after an entry irrespective of its legality"); *Jean v. Nelson,* 727 F.2d 957, 967–68 (11th Cir. 1984) (en banc) (same), *aff'd on other grounds,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985)). Clearly Gecas is a "person" within the meaning of the Fifth Amendment, whether he misrepresented facts on his visa application or not. Moreover, considering that the purpose of this deportation proceeding is to deport Gecas *if* he gained entry to the United States by misrepresenting material facts on his visa application, the argument that he cannot assert his constitutional right because he allegedly misrepresented such facts must fail because of its hopeless circularity.

the appellant had been held in civil contempt for failing to answer questions before a grand jury. The appellant had refused to answer those questions based upon his asserted fear of foreign prosecution. Seeking to distinguish the present case from that one, the United States' brief explained to the Ninth Circuit:

> The Department of Justice sought Gecas' compelled testimony about his association with Nazi forces during World War II to assist Israel and Lithuania who likely would prosecute him under applicable war crimes statutes. The Justice Department was actively assisting those foreign counties' criminal investigation by sharing with them information and evidence. The treaty with Lithuania specifically mandated that the United States provide sworn testimony, such as that given by Gecas, to Lithuania. The United States in *Gecas* was clearly the alter ego of Israel and Lithuania.

After quoting from the *Gecas* panel opinion to support that characterization of this case, the United States' brief went on to argue that the case was wrongly decided, anyway.*

I think that the United States' brief in the Arizona case accurately described this case to the Ninth Circuit. The Department of Justice is "actively assisting" foreign countries in their criminal investigations of Gecas in order to further his prosecution in those countries. The protection afforded by the Fifth Amendment's Self–Incrimination Clause is sufficient to prevent the United States government from doing indirectly, while acting as the "alter ego" of foreign prosecutors, what it could not do directly.

The second reason I write separately is to suggest with appropriate deference that this issue, brightly illuminated as it is by the facts of this case, is one that the Supreme Court might wish to review and decide. The issue has percolated enough to cause a circuit split, and has produced in this Court two fine opinions exhaustively exploring every conceivable argument on each side. The closeness of the question is evidenced by this Court's six-to-five division. Finally, the issue is one of fundamental importance, and it is also of growing quantitive importance in view of the increasingly international nature of crime and of law enforcement cooperation.

---

* The reason I do not cite the case name and number of the brief being quoted is that the briefs in that Ninth Circuit case are under seal. Nonetheless, the case is cited by name and number in Gecas' reply brief, which quotes from the relevant part of the United States' brief. I have obtained a copy of the United States' brief from the Ninth Circuit and verified the quotation.

At oral argument in this case, the attorney representing the Department of Justice was questioned about the statements concerning this case contained in the brief filed in the Ninth Circuit. He attempted to explain those statements as merely an Assistant United States Attorney's characterization of the panel opinion in this case. However, he also admitted that the Assistant United States Attorney who authored the Ninth Circuit brief did so after consulting with attorneys in the Department of Justice, including the Office of Special Investigations, about the *Gecas* case.